State Board of Assessors v. Central R. R. Co.

STATE BOARD OF ASSESSORS ET AL., PLAINTIFFS IN ERROR,
v. CENTRAL RAILROAD COMPANY OF NEW JERSEY ET
AL., DEFENDANTS IN ERROR.

1. The act "for the taxation of railroad and canal property," approved
April 10th, 1884, is not in contravention of the provision of the con-
stitution that property shall be assessed for taxes under general laws,
and by uniform rules, according to its true value.

2. The constitutional provision does not take away from the legislature
the power of selecting the subjects of taxation; but it requires that all
the members of the class selected shall be included in the taxing law,
and that the rule applied thereto shall be uniform as to the whole of
the class, and that the assessment shall be made at the true value of
the property constituting the class; and if those requirements are
answered by the law, it is not in conflict with the constitutional pro-
vision.

3. The constitutionality of a law which taxes a class of property sepa-
rately is to be determined in the same way in which it would be deter-
mined if the property taxed were the only property taxed in the state.

4. The doctrine laid down in *Van Riper* v. *Parsons*, 11 *Vroom* 123, that a
law framed in general terms, restricted to no locality, and operating
equally upon all of a group of objects, which, having regard to the
purposes of legislation, are distinguished by characteristics sufficiently
marked and important to make them a class by themselves, is not a
special or local law, but a general law, approved.

5. Railroad and canal property has such characteristics, and therefore
may be made the subject of separate legislation for the purpose of taxa-
tion.

6. Being peculiar property, the method of valuing it must be peculiar.
The machinery provided for the purpose by the act—a state board of
assessors—is appropriate and such as is necessary.

7. All taxes, whether levied for state, county or municipal purposes, are
state taxes; they can be imposed by no other authority than that of
the state, and the state appropriates the proceeds to whatever purposes
it sees fit.

8. If the legislative provision for taxation be not unconstitutional, the
apportionment of the proceeds of the taxation cannot make it so.

9. Under the act above mentioned, the taxes imposed are one tax, and the
fact that under the act railroad and canal property pays less than its
share of municipal or county tax as compared with other property, is
no objection to the law.

10. The act is not in contravention of the fourteenth amendment to the
federal constitution.

11. Corporate franchises are property, and are taxable as such.

State Board of Assessors v. Central R. R. Co.

On *certiorari* to the Supreme Court. For opinion of the Supreme Court, see *ante p.* 1.

For the plaintiffs in error, *Barker Gummere.*

The act of April 10th, 1884, alters the provisions of the charters of those of the defendants in error which contain special provisions respecting taxation, and also section 19 of the general railroad law (*Rev., p.* 931,) which is the special charter provision respecting the taxation of the other defendants in error in *certiorari,* in the following particulars:

I. It imposes a tax for state purposes upon the true value of all the property of each of the defendants in error (including the franchise,) which is used for railroad purposes, (*Pamph. L.* 1884, *p.* 143, § 3,) whilst the charters and section 19 of the general railroad law impose a tax upon the cost of the railroad, equipments and appendages only, and not upon the true value thereof; and the same charters and section impose no tax on the franchise.

The act of 1884 makes no change in the rate of taxation imposed upon the defendants in error, the tax prescribed being at the rate of one-half per centum upon the assessed valuation of the property, (*Pamph. L.* 1884, *p.* 147, § 12,) whilst the tax prescribed by the charters and section 19 of the general railroad law, is at the rate of one-half per centum upon the cost of the respective railroads, equipments and appendages.

The only change, therefore, in the tax for state purposes, wrought by the act of 1884, is that this tax, in obedience to article IV., § 7, ¶ 12, of the state constitution, is levied upon all the property of the defendants in error, instead of upon a part of that property, and upon the true value of that property instead of upon its cost.

II. The other alteration is that the act of 1884 imposes a local tax in each taxing district upon the true value of a specified part of the property of the defendants in error, situate therein, to wit, the real estate described in subdivision 2 of section 3 of said act, at the same rate as fixed and assessed for county and municipal purposes upon other property in such

taxing district, (*Pamph. L.* 1884, *p.* 147, § 12); but there is a limitation upon this local taxation of the property of the defendants in error, to wit: however much the rate of local taxation upon the property of others in a taxing district may exceed the rate of one per cent., the property of the defendants in error cannot be assessed at a higher rate than one per cent.

The act of 1884, therefore, repeals the provisoes in the several charters of the defendants in error who have special charters, which provisoes exempt them from any other tax than that of one-half per cent. upon the cost of their roads, &c., and imposes an additional tax for local purposes upon part of their property, at the local rate of taxation, but in no case at a higher rate than one per centum.

### ARGUMENT.

It will be well, in entering upon the discussion of the validity of the act of 1884, and of these assessments, to refer to some axioms respecting the taxing power and its exercise, and the relative functions of the legislative and judicial departments in relation thereto.

### *The Taxing Power is Inherent in the State.*

*a.* The taxing power is inherent, and an essential ingredient of sovereignty; and it is co-extensive with the sovereignty. *Transportation Co.* v. *Wheeling,* 99 *U. S.* 281; *Parham* v. *Decatur,* 9 *Ga.* 352; *Cooley on Const. Lim.* (2d ed.) 479.

*b.* It therefore exists independently of the constitution, and is not derived from it.    *Railroad Co.* v. *Peniston,* 18 *Wall.* 5; *People* v. *Coleman,* 4 *Cal.* 46.

*c.* It is a postulate of a state constitution, which distinguishes it from the federal, that all the power of the people is delegated by it, except such parts as are specifically reserved. *Kirby* v. *Shaw,* 19 *Penna. St.* 260; *Wisconsin R. R. Co.* v. *Taylor Co.,* 52 *Wis.* 86.

### *Taxing Power Exclusively Legislative.*

*a.* The legislature makes, the judiciary construes, the execu-

tive executes the laws, and neither can exercise any of the powers belonging to either of the others. *Wayman* v. *Southard*, 10 *Wheat.* 46; *Sanborn* v. *Rice Co.*, 9 *Minn.* 273.

Therefore, courts cannot annul tax laws because they operate unjustly—if they could, they could defeat all taxation, for there never yet was a tax law that was not more or less unjust in its practical working. *Wisconsin R. R. Co.* v. *Taylor Co.*, 52 *Wis.* 57; *State* v. *Branin*, 3 *Zab.* 484, 494, 495; *State* v. *Newark*, 5 *Vroom* 237, 243.

Therefore, also, the extent and proportion to which the taxing power is carried belongs to the state only, and is beyond judicial examination. *State Tax on Railroads' Gross Receipts*, 15 *Wall.* 296. As are also the objects and property to be taxed. *St. Louis* v. *Ferry Co.*, 11 *Wall.* 429.

Therefore, also, the wisdom, or expediency, or reasonableness of a tax, or of its apportionment, are matters wholly of legislative discretion, and the remedy is to be sought from the legislative department, and not the judicial department. *Ex parte Spinney*, 10 *Nev.* 337; *Dubuque* v. *Chicago, &c., R. R. Co.*, 47 *Iowa* 201; *Coburn* v. *Richardson*, 16 *Mass.* 213; *People* v. *Brooklyn*, 4 *N. Y.* 419.

Nor can the motives of the legislature as to the selection of objects for taxation, or the determination of the rate, be inquired into for the purpose of voiding legislation, as proper motives are always conclusively presumed. *Ex parte McCardle*, 7 *Wall.* 514.

And therefore, also, the only security against unjust and excessive taxation, is in the relations and responsibility of the legislature to its constituents. *McCulloch* v. *Maryland*, 4 *Wheat.* 434; *Providence Bank* v. *Billings*, 4 *Pet.* 514.

*Judiciary Determines only the Constitutionality of Tax Laws.*

*a.* If there be any restrictions contained in the constitution of the state, limiting the taxing power, it is the function of the judiciary department to determine whether any particular tax law violates the provisions of the constitution. And this is the limit of the judicial function in respect to the exercise

of the taxing power. *Wright* v. *Southwestern R. Co.*, 64 *Ga.* 790; *Beals* v. *Amador Co.*, 35 *Cal.* 624; *Weismer* v. *Village*, 64 *N. Y.* 91; *Taylor* v. *Chandler*, 9 *Heisk.* 349.

*b.* And in all such cases the violation of the prohibition or restriction of the constitution must be clearly and unmistakably apparent; it must be palpable and plain. *Maltby* v. *Reading R. R. Co.*, 52 *Penna. St.* 145; *Felty* v. *Uhler*, 10 *Phila.* 513; *Livingston Co.* v. *Darlington*, 101 *U. S.* 407; *Bloomfield Co.* v. *Richardson*, 63 *Barb.* 437.

*c.* And the law in question must be violative of some specific clause or clauses of the constitution; the judiciary cannot declare a law void merely because in their opinion it is opposed to the spirit of the constitution. *Luehrman* v. *Taxing District*, 2 *Lea* 440; *People* v. *Fisher*, 24 *Wend.* 381; *Wynehamer* v. *People*, 13 *N. Y.* 378; *People* v. *Gallagher*, 4 *Mich.* 244.

The defendants in error, in these causes, insist that the act of 1884 is violative of that provision of the state constitution which requires that property shall be assessed for taxes under general laws and by uniform rules, according to its true value; and that it also violates section 1 of the fourteenth amendment to the constitution of the United States, by depriving them of their property without due process of law, and by denying them the equal protection of the law.

*Constitutionality of Act of* 1884, *under the State Constitution.*

If the contentions heretofore made in this brief are sound, there remains the inquiry whether the provisions of the act, or any of them, are violative of any specific requirement or restriction embodied in the state constitution.

*a.* The specific requirement of the state constitution is as follows: "Property shall be assessed for taxes under general laws and by uniform rules, according to its true value." *Rev., p.* 38; *Art. IV.,* § 7, *subd.* 12.

*b. Property Taxed by the Act.*

1. The property upon which taxes are assessed by the act

of 1884, (*Pamph. L.*, *p.* 142,) is the property of railroad and canal companies only ; and it may be contended by the defendants in error that universality is intended by subdivision 12, and that its object was to prohibit the legislature from either exempting any property from, or from selecting or classifying any class or classes of property as the objects of taxation.

If this had been the intent of the framers of this amendment of 1875, if they had intended to prohibit the exercise of the sovereign power of selection, it is submitted that such intent would have been specifically expressed, and that the word " all " would have been added at the beginning of the subdivision, so that it would read, " All property shall be assessed for taxes." The omission of the very word that would have expressed the intent to prohibit selection or classification, is decisive that no such prohibition was intended.

2. Contemporaneous construction, although not conclusive of the true construction of a statute, is a powerful argument in support of such construction ; and since the adoption of the constitutional amendment of 1875, it has been the uniform practice of the state to classify property for taxation in the same manner as before the adoption of the amendment.

The " act providing for state taxes on railroads," &c., approved April 13th, 1876, (*Rev.*, *p.* 1168,) and its uniform enforcement by the state officers and the court, without challenge of its constitutionality by the railroad corporations, are most significant ; the act of 1873, (*Rev.*, *p.* 1166,) which preceded the constitutional amendment of 1875, imposed an annual state tax of one-half per cent. upon the cost, equipment and appendages of all railroad companies ; the act of 1876, with the evident intent to conform to the provision of the amendment of 1875 that " property should be assessed  *   *   *  according to its true value," directed the annual state tax of one-half per cent. to be assessed, not upon the cost, but upon the true value of the road, equipment and appendages, and this change has been construed by all to conform the act of 1876 to the provisions of the amendment.

A comparison of the act of 1876 with the act of 1884,

demonstrates that they do not differ in principle, but in methods only; both select the same objects and impose the same rates for annual taxation.

3. But we are not left merely to the argument of contemporaneous construction.

The effect of the amendment of 1875 upon the power of the legislature to select or classify the objects of taxation, has been repeatedly considered by the Supreme Court of the state, and it has been expressly adjudged that the amendment in no wise limits the legislative power of selecting the class or classes of property which are to be taxed, but requires only that the class or classes so selected shall be assessed by general laws and uniform rules, according to its true value. *State* v. *Readington*, 7 *Vroom* 66, 70; *State* v. *Yard*, 13 *Vroom* 357, 364; *Stratton* v. *Collins*, 14 *Vroom* 562, 564, 565.

The adjudications of many other courts upon like constitutional provisions are in accord with those of the courts of this state. *Zimmerman* v. *Perkiomen Co.*, 81 *Penna.* 96; *Kitty Roup's Case*, 81 *Penna.* 216; *Wisconsin Central R. R.* v. *Taylor Co.*, 52 *Wis.* 37; *State* v. *Ogden*, 10 *La. Ann.* 402; *New Orleans* v. *Kaufman*, 29 *La. Ann.* 283; *New Orleans* v. *Davidson*, 29 *La. Ann.* 555; *State* v. *North R. R.*, 44 *Md.* 131; *Berney* v. *Tax Collector*, 2 *Bail.* 681.

But wholly irrespective of the general power to select these corporations as a distinct class, and their property as a distinct object of taxation, is the fact next presented.

*Annual Taxation is a Condition of the Corporate Existence of Railroad Corporations.*

1. In determining the constitutionality of the selection of the property of railroad corporations as an object of specific annual state taxation by the act of 1884, it must be borne in mind that they are created by the state, and that the state had the right and power to impose such conditions of existence upon its creatures as seemed wise to the legislature. At the moment of creating each railroad corporation, the payment of annual taxes at the legislative discretion was imposed by the

state as the condition of existence and continued life of a railroad corporation.

The charter of every railroad corporation which has been specially created by the legislature of New Jersey contains the condition that it shall pay an annual tax upon its property, wholly irrespective of the fact whether any other property was taxed or not taxed in any such year. In a very few charters the amount of such tax was fixed by contract, but in most cases the amount was merely nominated, but left to be altered by amendment, at the discretion of the legislature. And so, also, the same condition of payment of annual taxes, wholly irrespective of the assessment of other property, was imposed on every railroad corporation created under the general railroad act of April 2d, 1873. *Rev., p.* 931, § 107.

It can hardly be claimed that the power of the legislature to create corporations is limited by the constitution. The only provision upon that subject is a prescription of the machinery of creation, to wit, by general laws, and not by private, lo⌐·¹ or special laws. Nor can it be claimed that the constitut. limits the power of the legislature to impose annual payment₃ of money, or any other terms, upon corporations as a condition of their creation and existence. The only restraint upon the legislative power in this respect is the prohibition of the granting of exclusive franchises. *Art. IV.,* § 7, *subd.* 11; *Rev., p.* 38.

2. The fact then is that the acts of 1873, 1876 and 1884 are not acts imposing taxes upon railroad corporations or classifying their property for taxation, but are acts amending the charters of all pre-existing corporations, whether granted by special acts or by the general railroad law, and increasing the amount of tax already imposed on them by their respective charters and the general railroad law, as conditions of their corporate privileges and existence. The obligation of these corporations to pay an annual tax arises under the charters and the general railroad act, all of which were passed prior to the adoption of the constitutional amendments of 1875. The rate of such annual tax, to wit, one-half per centum per an-

num for state purposes, and one per cent. per annum for municipal purposes, was fixed by the amending tax act of 1873, which also defined the property subject to each rate of taxation, and this act also was passed prior to the adoption of the amendment of 1875, and the same annual state and local tax was explicitly continued by the amending tax act of 1876. *Rev.*, *p.* 1170, § 7. The act of 1884, which is a further amending act, does not alter either the rates or the objects fixed by the acts of 1873 and 1876, save that it repeals the exemption of terminal property from municipal taxation.

It is certain that the effect of the twelfth subdivision of section 7 of article IV. of the constitution would not be to repeal the whole charter of a railroad company, and it can hardly be contended that its effect would be to repeal the terms of the charter respecting taxation, which enure to the benefit of and which were of the essence of the consideration passing to the state, whilst preserving to the corporation its entire benefit.

3. And this contention becomes conclusive upon reading the schedule to the constitution, in connection with subdivision 12 of article VII.   *Art. X.*, *subd.* 1 ; *Rev.*, *p.* 44.

The actual connection would read as follows: "Property shall be assessed for taxes under general laws and by uniform rules, according to its true value, and all charters of incorporation shall continue as if no change had taken place."

Now, the opening clause of subdivision 1 of the schedule does clearly repeal all statutes repugnant to the constitution, and the able framers of it were well aware that charters of incorporation, being legislative acts, might be held to be within the general term "statutes," and to avoid all contention on this point, expressly declared that all charters of incorporation, however repugnant to the constitution, should continue as if no change had taken place.

It is submitted, therefore—

*a.* That the provisions of the charters of railroad corporations and of the general charter railroad act of 1873, imposing special annual taxes, and the provisions of the amending acts

State Board of Assessors v. Central R. R. Co.

of 1873, 1876 and 1884, are not repugnant to the twelfth subdivision of section 7 of Article IV.; and that the acts of 1873, 1876 and 1884 are valid amendments to the tax clauses of the charters; and—

*b.* That if repugnant they are saved by the provisions of subdivision 1 of Article X. of the schedule.

4. If the provisions of these charters imposing special taxes, are, in fact, saved and continued, it is obvious that the power to amend and alter them, reserved in each charter and in the corporation act of 1846, is also saved and continued; and that the rate of such taxation and the methods of valuation may be altered at the legislative will, provided the rules of such alteration be uniform and include all such corporations. *Iron City Bank* v. *Pittsburg*, 37 *Penna.* 340; *St. Joseph* v. *Hannibal R. R.*, 39 *Mo.* 476; *State* v. *Miller*, 2 *Vroom* 521; *Tomlinson* v. *Jessup*, 15 *Wall.* 454; *Wes. & Wis. R. R.* v. *Supervisors*, 93 *U. S.* 595.

It is submitted, therefore, that the act of 1884, in nowise conflicts with the state constitution.

5. The effect of the foregoing contention, if sound, is conclusive of the whole subject of the constitutionality of the act of 1884, and it is admitted to be so by the court below. The reasons for which that court rejects these contentions of the state, are: 1. That a term of a charter couched in the following words, " That it shall be the duty of the treasurer of said company * * * to pay a tax of one-half of one per centum upon the cost of said road; * * * provided, that no other tax or impost shall be levied or assessed upon the said company. This charter shall be subject to alteration, suspension and repeal, in the discretion of the legislature," is, in legal contemplation, a contract between the state and the corporations, and that such contract cannot be modified and a new term interpolated into it, by exercising the reserved power of alteration. 2. That the only power reserved to the legislature was the power to repeal the proviso (and thereby the alleged contract,) because it was a franchise of exemption, but that it cannot alter this franchise of exemption; although the court

admit that the power to repeal or alter is a power to take away, or modify such franchise. Let us consider these two reasons of the court below, in their order.

### 1. *Is the Term of the Charter above stated a Contract?*

I admit that if the charter provision in question be a strict, unalterable contract for the imposition of an annual state tax, it is invaded by the act of 1884, in this respect: the charter provisions limit the state tax to one-half per cent. upon the cost of the road in some cases, and the cost of the road, equipment, &c., in other cases; whilst the act of 1884 levies the same rate of tax, in obedience to the state constitution, (*art. IV.*, § 7, *subd.* 12,) upon the true value, instead of the cost of the road and equipment, (*Pamph. L.* 1884, § 3, *p.* 143,) and upon all property used for railroad purposes, instead of upon only the road, equipment, &c. *Pamph. L.* 1884, *p.* 142. The act of 1873, (*Rev., p.* 1166,) does not share with the acts of 1876 and 1884 in either of these invasions of the alleged charter contract; but the act of 1876 does share in the first invasion stated of these invasions, inasmuch as it makes the true value, and not the cost of the road, equipments, &c., the basis of the state taxation. *Rev., p.* 1168, § 1.

I admit, also, that the act of 1873, (*Rev., p.* 1166, § 1,) the act of 1876, (*Rev., p.* 1170, § 7,) and the act of 1884, (*Pamph. L., p.* 147, § 12,) do all invade the alleged charter contract, inasmuch as under each a local tax of one per cent. per annum is levied upon other and further property of railroad corporations, than the road and equipments used for railroad purposes.

The alleged contract is derived by the Supreme Court from what it adjudges to be the legal force of a provision in each charter substantially as follows: " The said corporation shall pay annually to the treasurer of this state a tax of one-half of one per centum on the cost of said road (or of said road and its equipment); provided, that no other tax or impost shall be assessed upon the said corporation; but this charter

shall be subject to alteration, suspension or repeal in the discretion of the legislature."

As each such provision concerned the exercise of the sovereign prerogatives of legislation and taxation, it was of the utmost importance that the constitutional construction of such provision should be settled by the courts, and that such construction should be firmly adhered to, forming, as it necessarily must, the only and the controlling guide to the legislative and executive departments in making provision for the state and municipal revenues. At the passage of the act of 1884 the judiciary had solemnly adjudged in the following cases, not only that these charter provisions, relating to taxation were not contracts, but, further, that by virtue of the power reserved by the legislature to alter, suspend, or repeal charters, they have the right to alter the mode and amount of the tax prescribed therein. *State, Jersey City and Bergen Railroad Co., pros.*, v. *Jersey City*, 2 *Vroom* 575 ; *Warren R. R. Co.* v. *Person*, 3 *Vroom* 566 ; *State* v. *Miller*, 1 *Vroom* 368 ; *Morris and Essex R. R. Co.* v. *Commissioner of Taxation*, 8 *Vroom* 236 ; *S. C.*, 9 *Vroom* 478 ; *Little* v. *Bowers*, 17 *Vroom* 300.

It seems to me that the decisions above quoted rule this case on this point.

The tax act of 1862, which was the ground of the litigation in the cases of *Jersey City and Bergen R. R. Co.*, 2 *Vroom ; Warren R. R. Co.* v. *Person*, 3 *Vroom ; State* v. *Miller*, (*Morris and Essex*,) 1 *Vroom*, altered not only the basis but the rate of taxation of railroad companies ; *i. e.*, it changed the basis from " cost " to " capital stock and accumulated surplus ; " and it changed the rate from one-half of one per cent. to the local rate in the various taxing districts.

The railroad tax act of 1873 changed the rate of tax which was provided for in the Morris and Essex charter. This act was the basis of the litigation in the Morris and Essex case, in 8th and 9th Vroom. Yet these various cases hold that these acts were amendments to the charters of these railroad

companies; or that they repealed the tax clause in such charters, and substituted another mode of taxation in lieu thereof.

It was in view of this unbroken line of decisions, some of them by those judges who adjudged this case in the court below, and extending through a period of twenty years, from 1864 to 1884, and as a consequence of this continuous instruction of the executive and legislative departments by the Supreme Court and Court of Errors of the state, as to their constitutional powers over the taxation of railroad companies having repealable charters, that the act of 1884 was passed.

That act retains the state tax of one-half per cent. imposed by the charter, repeals the proviso which gives the corporation immunity from any other tax, and imposes a local tax much less than the ordinary local tax imposed upon other taxpayers.    It is submitted that this act is a lawful exercise of the reserved power to alter or repeal the immunity from taxation originally granted to the defendants in error.

### Is the Act of 1884 a General Law in Contemplation of the Constitution ?

The court below admit fully that property may be classified for the purpose of taxing it, just as it could have been before the adoption of the amendments to the constitution. And that " a general law, as applied to the constitutional clause, is one that embraces the whole of a class, and not merely part of a class."    But the court devotes a large part of the opinion to the attempted demonstration that the property of railroads and canals is not a class of property, but has been arbitrarily selected for taxation by the acts of 1873, 1876 and 1884. That it is part of a homogeneous mass of property, identically conditioned with the mass ; that it is a part of a class, arbitrarily selected from property of the same nature and quality of property ; that it is property subtracted from the mass of property, and identical in its nature with such mass ; that the lands and tangible personalty of railroads and canals have no different characteristics of nature or quality from the lands and tangible personalty of other persons; that the franchise

of railroads and canals is similar to the franchise of all other corporations.

It is submitted that all that is required in classifying property for taxation is that the property separated shall be considerable, and naturally separable from the mass of other property. The universal nomenclature, by which we designate, both in conversation, legislation and judicial decision, as " railroad property"—that composite gathering of things which constitute " a railroad"—demonstrates that such property is a class of property well known and universally recognized, and not an arbitrary selection by a perverse and oppressive legislature.

The following cases amply sustain the act of 1884 as constitutionally classifying " railroad property " for the purpose of taxation :

In the case of *Georgia* v. *Atlantic and Gulf Railroad*, 3 *Woods* 541, Judge Bradley says : " A railroad is a public highway, and a highway of the most peculiar kind. It is not land nor like land, in the ordinary sense. For though, in form, the railroad company may own the fee or some other legal estate in the strip of land on which the road is constructed, yet the company owns it and holds it under a franchise for a particular purpose, namely, that of a roadway for the operation of a railroad under and by virtue of the franchises which have been conferred upon it, and for the purposes of travel and transportation thereon by the public. It is an artery of commerce."

Chief Justice Waite says, in the *Sinking Fund Cases*, 9 *Otto* 722, a little below the middle of the page : " Railroads are a peculiar species of property, and railroad corporations are in some respects peculiar corporations."

In the case of Louisville and Nashville R. R. *v.* Kentucky, decided in the Supreme Court of the United States at the October Term, 1885, Matthews, J., delivering the opinion of the court says, (*Pamphlet Opinion, p.* 8): " The right to classify railroad property as a separate class, for purposes of taxation, grows out of the inherent nature of the property."

In the case of *Board of Supervisors* v. *Burlington and Quincy R. R.*, 44 *Ill.* 237, Judge Breese says : " Their property [*i. e.*, railroad property,] is *sui generis.*"

In the case of *State Tax Cases*, 2 *Otto* 611, 612, Miller, J., holds that railroad property is a class · by itself for the purposes of taxation.

I also call attention, as bearing on this point, to the case of *Vail's Ex'rs* v. *Runyon*, 12 *Vroom* 98, and the case of *Central R. R. Co.* v. *Mutchler,.* 12 *Vroom* 97.

The Chief Justice bases his conclusion that the act of 1884 is not a general law on the line of cases beginning with Van Riper *v.* Parsons, involving the construction of the constitutional provision prohibiting the legislature from passing local or special laws regulating the internal affairs of towns or counties.

Do these cases bear out his conclusion ?

In *Van Riper* v. *Parsons*, 11 *Vroom* 8, the Chief Justice says : "A law settling the methods by which all railroads should become incorporated would be special in the sense that it would be confined in its operation to but a single kind of corporations.   *   *   *   But who, conversant with the usage of these terms, would venture the assertion that such a statute would not be a general law?   All legislation is based, of necessity, on a classification of its subjects, and when such classification is fairly made, and the legislation founded upon it is appropriate to such classification, such legislation is as legitimate now as it would have been prior to the recent amendments to the constitution.   My theory is that if a set of objects be fairly classified, a law embracing them will be a general one and in all respects unobjectionable."

In the same case, when it subsequently came before the Supreme Court, Judge Dixon, delivering the opinion, says (11 *Vroom* 123): "A law framed in general terms, restricted to no locality and operating equally upon all of a group of objects which, having regard to the purposes of the legislation, are distinguished by characteristics sufficiently marked

and important to make them a class by themselves, is not a special or local law, but a general law."

In the case of *Bingham* v. *Camden*, 11 *Vroom* 156, Justice Reed, delivering the opinion of the court, approves the Van Riper case.

In the case of *Pell* v. *Newark*, 11 *Vroom* 78, Justice Van Syckel, delivering the opinion of the court, affirms the decision in Van Riper v. Parsons.

In the case of *Rutgers* v. *New Brunswick*, 13 *Vroom* 51, Justice Depue, delivering the opinion of the court, re-affirms Van Riper v. Parsons. Justices Scudder and Knapp concurred in the opinion.

In the case of *Skinner* v. *Collector*, 13 *Vroom* 409, Justice Magie, delivering the opinion of the court, declares that Van Riper v. Parsons has settled the construction to be given to the terms "special laws" and "general laws."

In the case of *Zeigler* v. *Gaddis*, 15 *Vroom* 365, Justice Scudder, delivering the opinion of the court, cites Van Riper v. Parsons, Pell v. Newark, Rutgers v. New Brunswick, as settling the construction to be given to the terms "general" and "special laws."

In the case of *Woodruff* v. *Freeholders of Passaic*, 13 *Vroom* 535, Justice Parker, delivering the opinion of the court, affirms the distinction between a special and a general law laid down in Van Riper v. Parsons.

It is submitted that after thus schooling the state, its officers and legislature in the constitutionality of legislating in regard to railroads as a lawful class, it is not permissible to reverse these decisions and throw into chaotic confusion the finances of the state and of nearly all its municipalities.

If anything more needs to be added on this point, I call attention to the fact that art. IV., § 7, subd. 11, clauses 8 and 11 of the constitution evidently separate "railroads" into a separate "class" as subjects of legislation.

*Constitutionality of the Act of 1884, under the Federal Constitution.*

1. But it is contended by the prosecutors that whatever may be the determination of the court as to the violation of the state constitution by this enactment of 1884, yet that the act of 1884 does clearly violate the fourteenth amendment to the federal constitution, which is in the words following :

"Sec. 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States ; nor shall any state deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." *Rev., p.* 11.

It is said that corporations are persons within the purview of this amendment, and that therefore their property cannot be taken " without due process of law," and that they are entitled to " the equal protection of the laws ; " and that the act of 1884 violates both of these provisions of the amendment, inasmuch as it imposes a purely arbitrary tax upon the property of railroad and canal corporations, and does not impose the same tax upon the property of other persons ; and that it discriminates, by imposing taxes upon the property of railroad and canal corporations purely by reason of its ownership.

There is certainly nothing in the context of the fourteenth amendment to justify the contention that artificial persons were intended to be brought within its scope. Section 1 announces, in its opening lines, as the subjects of its legislation, " born and naturalized persons," who are declared to be " citizens" of the United States and of the state wherein they reside." Can it be pretended that " corporations " are here intended as " born " by the creative act of incorporation ? Again, the next clause prohibits each state from abridging the " privileges or immunities of citizens of the United States."

Any citizen may at pleasure change his residence from one state to any other state. Can it be pretended that it was intended that any corporation of Pennsylvania may move its residence into this state, and exercise here, as of right, all the privileges granted to it by the State of Pennsylvania, without any power in this state to abridge such exercise? And if Pennsylvania has granted it entire immunity from taxation, did this amendment intend to prohibit this state from abridging such immunity?

The inherent constitution of a corporation vests it with special privileges superior to the inherent rights of a natural person. Corporate existence is superior to natural existence, for it is perpetual, and its tenure of property is eternal; its property is not compulsorily distributable at the close of each generation, whilst the statutes of distribution and against perpetuities compel the distribution of the property of natural persons. Again, the property of natural persons is liable without limit for the payment of their debts, but the property of the persons composing a corporation is not liable for corporate debts. Again, a natural person may engage in any lawful business or hold any quantity of land, whilst a corporation can do neither. In short, the laws of the states as they now stand, have vested corporations with life, and have generally reserved the power to the legislatures to terminate that life at the legislative pleasure, and without due process of law, but the lives of natural persons cannot be terminated save by due process of law. There is, then, an inherent difference in the quality of the two classes of persons; each has rights and property that the other can neither acquire nor hold, and each labors under disabilities from which the other is freed. In a word, the existing laws under which natural and artificial persons and their respective properties are governed, are highly discriminating—they do not and cannot enjoy the equal protection of the laws, unless existing discriminating laws are repealed, and each class of persons is vested with the same rights and subjected to the same disabilities with the other class.

It is submitted, therefore, that neither congress nor the states intended to include " artificial persons" within the purview of the fourteenth amendment to the federal constitution.

*b.* If it were admitted that the railroad and canal corporations of New Jersey are within the designation of the subjects of this amendment (which is not admitted,) yet it cannot successfully be contended that the framers of it, or the states which adopted it, intended either to prohibit the states from classifying property for taxation, either to repeal any provisions for special taxation imposed fundamentally in a charter as a condition of the grant of corporate franchises; or to repeal the power of amending or altering such condition of special taxation when such power was reserved in the charter. The making of any grant by any grantor, and the prescribing the conditions thereof, must necessarily lie solely within the will of the grantor; or if a charter be considered to be a contract, it is equally true that the making of such contract and the settling of the conditions thereof, must lie wholly within the will of the contracting parties.

All of these charters, whether they be grants or contracts, were made or agreed upon, and the conditions of special taxation and the right to amend the same also accepted or agreed upon by the respective parties; and if anything is clear, it is that the act of 1884 does not deprive the railroad or canal corporations of any legal rights which they possessed; for the act does no more than enforce conditions and obligations which those corporations had freely accepted. The whole tenor of the amendment shows that it contemplates only acts *in invitum*, operating upon vested rights, and that it intends only to prevent the deprivation of such rights, and does not intend to release the conditions upon which such rights are held.

It is submitted, therefore, that the act of 1884 neither " abridges the privileges or immunities" of the prosecutors, nor " deprives them of property without due process of law," nor " denies to them the equal protection of the laws."

*c.* But it is said further that even if the state has power to require payment from the prosecutors of special annual taxes

of such rate as the legislature may fix, yet that the act of 1884 discriminates in the valuation of the property of railroad and canal corporations, and permits the valuation of their property at higher rates than the property of others, not because of its use, but because of its ownership; especially that it permits the land of such corporations to be valued higher than like lands of other owners.

It is important, in view of this contention, to inspect the act of 1884, and it will be clearly seen, upon such inspection, that the whole scope and express provisions of the act contemplate the assessment of property thereunder in respect to its use only, to wit:

I. The first section of the act (*Pamph. L.* 1884, *p.* 142,) directs that all property of railroad and canal corporations, not used for railroad or canal purposes, shall be assessed by the same assessor, in the same manner, and at the same rate as the taxable property of other owners.

No such property is assessed by the state board, and therefore there can be no discrimination as to this kind of property. In this respect the act of 1884 differs wholly from the legislation of the State of California, which was pronounced to be violative of the fourteenth amendment to the federal constitution, in *San Mateo* v. *Southern Pacific R. R. Co.*, 8 *Sawy.* 238 ; *Santa Clara* v. *Southern Pacific R. R. Co.*, 9 *Sawy.* 165. The constitution of California prescribes that all the property of railroad corporations should be assessed by a state board, as well that not used as that used for railroad purposes ; it also prescribed that in the assessment and valuation of the property of railroad corporations there should be no deduction of mortgage debts, but that in the valuation of the property of all others mortgage debts should be deducted. No provision was made in the constitution for notice to or hearing of the railroad corporations by the state board, and it seems from the case that there was in fact no such notice or hearing. The Southern Pacific Railroad Company owned many millions of acres of land which were not used for railroad purposes; but were in all respects just such lands as those of the other land-

owners of the state, and these lands were subject to the large general mortgages made by the railroad company. It seems, also, that in California many natural persons own and operate railroads and rolling stock, and that mortgage debts were deducted in the valuation of their railroad property, but were not deductible from like property of the railroad corporations. 9 *Sawy.* 200, 201. Hence it was held by the court that the constitution of California was violative of the fourteenth federal amendment, because—

*a.* It prescribed a mode and rate of assessment of lands, railroad-beds, rails and rolling stock, &c., owned by railroad corporations, different from the mode and rate of assessment prescribed as to like lands, railroad-beds, rails, rolling stock, &c., owned by natural persons, and that such provision was not a classification of property for the purpose of taxation, but a mere unequal valuation of like properties because of corporate ownership.

*b.* It allowed deductions for mortgaged debts in the valuation of lands, railroads, rolling stock, &c., owned by natural persons, and prohibited such deductions in the valuation of like lands, railroads, &c., when owned by corporations.

*c.* And the court also held that as the California constitution provided for neither notice to nor hearing of the railroad corporations, in the making of the assessments, it violated that clause of the fourteenth amendment which prohibits the depriving of any person of property " without due process of law."

I have already shown that as to lands not used for railroad purposes the act of 1884 prescribes the same mode of assessment of lands owned by railroad corporations as is prescribed for all other like lands owned by natural persons.

2. As to lands used for railroad purposes, road-beds, rails, rolling stock, &c., the *status* in New Jersey is entirely different from that declared by this case to exist in California.

*a.* The plain meaning of section 3 of the act of 1884 is that the lands, road-beds, rails, rolling stock, &c., used for "railroad purposes"—*i. e.,* used in and essential to the exercise of

the franchise, among others, of taking tolls for the general transportation of freight and passengers, shall be assessed—it is in respect to this use that this property is selected and classified as an object of taxation, and not on account of its ownership.

*b.* Whatever may be the case in California, in New Jersey natural persons are prohibited from holding or using lands, road-beds, rails, rolling stock, &c., and franchises for railroad purposes. So that railroads and their appurtenances can only be held, owned, possessed and operated in New Jersey by a corporation until by a general law natural persons shall be authorized to a like use thereof. Therefore, there cannot be in New Jersey an unequal valuation of property used for railroad purposes on account of its ownership by corporations and as between corporations and natural persons; and in this respect the act of 1884 is not obnoxious to the criticisms in the case in 9th Sawyer.

3. As to the criticism in 9th Sawyer upon the prohibition to deduct mortgage debts in the valuation of the property of railroad corporations, whilst allowing such deductions in the valuation of the property of natural persons, the act of 1884 is not open to such criticism, for section 10 of the act expressly directs the allowance thereof in any case in which such deduction could be claimed by natural persons under the existing law.

4. And as to the criticism in 9th Sawyer upon the non-provision for notice to and hearing of railroad corporations in respect to the valuation of their property, the act of 1884 is not open to that criticism, for section 12 provides for notice of the valuation, and sections 7 and 15 provide for hearing of the corporations in respect thereto.

It is submitted, therefore, that in these respects the act of 1884 does not violate the fourteenth amendment to the federal constitution.

For the Philadelphia and Reading Railroad Co., defendants in error, *B. Williamson.*

Equality of burden is of the essence of lawful taxation.

Unequal taxation, to the extent of such inequality, is confiscation, not taxation.

This fundamental principle of justice, older than our laws and constitution, has never been more forcibly stated than by a judge of this court before the constitution of 1875 made it part of the written as well as the unwritten law of the state. Says Mr. Justice Depue:

" It is of the very essence of taxation that it should be equal and uniform, and that where the burden is common there should be common contribution to discharge it. * * * The tax must be apportioned among those who are to bear the burden, upon the rule of uniformity. *   *   * A tax upon the persons or property of A, B, C, individually, whether designated by name or in any other way, which is in excess of an equal apportionment among the persons or property of the class of persons or kind of property subject to the taxation, is, to the extent of such excess, the taking of private properties for a public use without compensation. The process is one of confiscation, and not of taxation." *State* v. *Readington*, 7 *Vroom* 69, 70.

The first of Adam Smith's four maxims or principles of taxation, which, as stated by Mill, " having been generally concurred in by subsequent writers, may be said to have become classical," is as follows :

" The subjects of every state ought to contribute to the support of the government, as nearly as possible, in proportion to their respective abilities ; that is, in proportion to the revenues they enjoy under the protection of the state. In the observation or neglect of this maxim consists what is called the equality or inequality of taxation." *Wealth of Nations, book 5, ch. 2 ; Mill's Political Economy, book 5, ch. 2.*

It is to this fundamental principle of law that the Chief Justice alludes in his opinion in this case as " the great principle of justice that a common burden of taxation shall be

placed on all the same kinds of property under similar conditions, no matter by whom such property may be used or owned."

" It is not in the power of the legislature, under the guise of taxation, to give the property of A to B, or to impose the whole burden of a tax for the state upon one person or upon one community. Such absolute, arbitrary powers have no place in a government regulated by law." *Burroughs on Taxation*, p. 22; *Gordon* v. *Cornes*, 42 *N. Y.* 612; *Railroad* v. *State*, 60 *N. H.* 94; *Santa Clara R. R. Tax Case*, 9 *Sawy.* 189.

This fundamental principle of equal distribution of the burden of taxation was first incorporated into the written law of New Jersey in 1875, by the amendment to the constitution which provides that " property shall be assessed for taxes under general laws and by uniform rules, according to its true value."

As is stated by the Chief Justice in his opinion below: "Although, as a matter of theoretical statement, it was sometimes said that the legislative power to tax was unlimited, nevertheless when it exhibited itself in any of the tyrannous forms to which it inevitably tended, it was refused recognition and enforcement by the judicial power. But if its existence was thus left in doubt, no thoughtful person failed to perceive that it was a prerogative liable to great abuse and a standing menace to the security of private property. Hence the restriction put upon such prerogative by so many of the states, and hence the amendment in this particular to our own constitution in the year 1875."

The constitutions of other states, notably those of more recent enactment, recognize the same fundamental rule of taxation in terms all the more forcible as to their intent, because expressed in different language. *Arkansas Constitution of 1836, tit. "Revenue," art. VII., § 2; California Constitution of 1849, art. XI., § 13; Florida Constitution of 1838, art. VIII., § 1; Georgia Constitution of 1865, art. I., § 27 ; Kansas Constitution of 1858, art. XI., § 2 ; Louisiana Constitution of 1879,*

*tit. " Revenue and Taxation," art. CCII.*; *Maine Constitution of 1820, art. IX., § 8, amended 1876*; *Minnesota Constitution of 1859, art. IX., § 3*; *Nevada Constitution of 1864, art. X., § 1*; *Oregon Constitution of 1857, art. IX., § 1*; *South Carolina Constitution of 1868, art. IX., § 1*; *Tennessee Constitution of 1834, art. II., § 28*; *Texas Constitution of 1876, art. VIII., § 1*; *West Virginia Constitution of 1861–1863, art. VIII., § 1*; *Wisconsin Constitution of 1848, art. VIII., § 1.*

Such constitutional safeguards, designed to protect private property from tyrannical abuse of power, sprung from the same soil which centuries ago produced the Magna Charta and the bill of rights. Then the danger lay in the prerogative of the king, now it lies in the failure to observe constitutional limitations. Confiscation by taxation is only the modern form of what was once confiscation by attainder.

What are the essential elements of the "general laws," "uniform rules" and "true value" according to which, under the constitution, property must be taxed?

## I. Essential Elements of General Laws.

The essential elements of general laws have never been more succinctly stated than in the opinion of the Chief Justice in this case. His language is as follows:

"The requirement that taxes upon property must be imposed under a general law was intended to deprive, and does deprive, the law-making department of every pretence of the right to arbitrarily select property for such purpose. Its office is to prohibit arbitrary selection as contradistinguished from classification. This is the result of the mandate that the taxing act, with respect to property, must be performed by means of a general law—for a general law is one that is founded on a class. To take part of a homogeneous mass of property, the whole being identically conditioned, and to tax such part exclusively, would be an act of selection at will, and not a classification; and the law authorizing it would be a special and not a general law. In our estimation, a general law, as applied to this constitutional clause, is one that embraces the

whole of a class, and not merely part of a class. Property may now, as formerly, be classed, in view of taxing it, as a separate thing, but a class cannot be created at the will of the legislature, but must arise out of the nature of the thing classed. Nor can the lawmaker, by the exercise of his volition, convert a fragment of a class into a class."

## II. *The Essential Elements of Uniform Rules.*

Uniform rules are such as secure equality in the burden of taxation. Equality of burden necessarily involves: first, valuation by a uniform standard of value; second, assessment at a uniform rate; third, application of this valuation by uniform standard and assessment at uniform rate to all taxable property in the territory to which the tax applies. If a state tax, it must extend to all taxable property in the state. If a county tax, to all taxable property in the county. If a municipal tax, to all taxable property in the municipality. These essential elements of uniform rules are illustrated by many decisions, among which are the following:

Says Mr. Justice Depue of this constitutional provision: "Its object was to secure to the people of the state the equalization of taxation, so far as was practicable, by requiring the imposition of taxes on property by general laws, on the principle of uniformity in the subjects of taxation and in valuations." *Trustees* v. *City of Trenton,* 3 *Stew. Eq.* 667, 677.

Says the same judge in another case: "The object of this constitutional provision was the equalization of taxation in its relation to the several parts of the state, and the prevention of unjust discrimination in the apportionment of the public burdens among its citizens liable to taxation. *State, ex rel. Vanatta,* v. *Runyon,* 12 *Vroom* 98, 105.

In Ohio, where the constitution requires "taxing by a uniform rule," Mr. Chief Justice Bartley, speaking for the Supreme Court of that state, said:

"'Taxing' is required to be 'by a uniform rule,' that is, by one and the same unvarying standard. Taxing by a uniform rule requires uniformity, not only in the rate of taxation, but

also uniformity in the mode of the assessment upon the taxable valuation. Uniformity in taxing implies equality in the burden of taxation, and this equality of burden cannot exist without uniformity in the mode of the assessment as well as the rate of taxation. But this is not all. The uniformity must be co-extensive with the territory to which it applies. If a state tax, it must be uniform over all the state; if a county, town or city tax, it must be uniform throughout the extent of territory to which it is applicable. But the uniformity in the rule required by the constitution does not stop here. · It must be extended to all property subject to taxation, so that all property may be taxed alike equally—which is taxing by a uniform rule." *Exchange Bank* v. *Hines*, 3 *Ohio St.*, 1, 15.

Says Mr. Justice Dixon, speaking of this constitutional provision : " The direction requires and is fulfilled by such regulations as should impose the same percentage of its actual value upon all the taxable property in the township for township purposes, in the county for county purposes, and in the state for state purposes." *Stratton* v. *Collins*, 14 *Vroom* 565 ; *Worth* v. *Wilmington and Weldon R. R.*, 113 *Am. & Eng. R. R. Cas.* 586 ; *Knowlton* v. *Supervisors of Rock County*, 9 *Wis.* 411 ; *Railroad* v. *State*, 60 *N. H.* 94, 95 ; *State of Arkansas* v. *County Court of Crittenden County*, 19 *Ark.* 368, 370.

## 1. *The Valuation Must be by a Uniform Standard ·of Value.*

Mr. Justice Reed, speaking for the Supreme Court of New Jersey, says : " The uniform rules of the constitution mean rules which fix a common standard for the assessment of taxes for the state and all its political subdivisions." *Mayor, &c.,* v. *Vreeland*, 14 *Vroom* 638.

The constitution of Michigan, which provides that " the legislature shall provide a uniform rule of taxation except on property paying special taxes, requires assessment by a uniform standard of value." *Woodbridge* v. *City of Detroit,* 8 *Mich.* 276.

" The basis of all *ad valorem* taxation is necessarily the as-

sessment of the property; that is, the estimate of its value.
Whatever affects the value necessarily increases or diminishes
tax proportionately.    If, therefore, any element which is
taken into consideration in the valuation of the property of
one party be omitted in the valuation of the property of
another, a discrimination is made against the one and in favor
of the other, which destroys the uniformity so essential to all
just and equal taxation." *Santa Clara Tax Case,* 9 *Sawy.*
180.    See, also, *Marsh* v. *Supervisors of Clark County,* 42
*Wis.* 502.

### 2. *The Assessment Must be at a Uniform Rate.*

*Knowlton* v. *Supervisors of Rock County,* 9 *Wis.* 411; *State
of Arkansas* v. *County Court of Crittenden County,* 19 *Ark.*
370.    See, also, *Norris* v. *Waco,* 57 *Tex.* 641.

### 3. *The Tax Must be Laid Upon all Taxable Property in the Territory to Which it Applies.*

*Exchange Bank* v. *Hines,* 3 *Ohio St.* 115; *Railroad* v.
*State,* 60 *N. H.* 94, 95.

In declaring unconstitutional a provision permitting a city
council to select within city limits any area upon which
taxes for special purposes may be levied, Mr. Justice Van
Syckel says: "It violates both the spirit and letter of the
constitution and selects persons and objects upon which the
public burdens are laid by special rules applicable to one
locality, and not by general laws uniform in their operation."
*Morgan* v. *Elizabeth,* 15 *Vroom* 574.

### III. *Essential Elements of "True Value."*

Value is a word of many meanings, and since minds can-
not meet until language is defined, it is important to fix the
precise meaning of this term "true value," as used in the
constitution and the law.    Water has value, because it is use-
ful; but under ordinary circumstances water has no price and
is free to all.    Value, therefore, in the sense of utility, is not
taxable value or the "true value" of the constitution and the

law.   The "true value" of the constitution, as is stated by the Chief Justice in his opinion in this case, is "exchangeable or cash value," or, as it has been elsewhere defined, "ratio of exchange" or "purchasing power;" that is, the average relation between the property in question and the desires or necessities of the community which is indicated by the price which under ordinary circumstances and conditions can be realized for it.   "Value must mean the worth of the property as compared with the money of the country, the standard by which all values are regulated."   *Chenango* v. *R. R. Co.*, 7 *Tenn.* 569.

The same conception of value is embodied in that provision of the general tax law which requires each assessor to value all property liable to taxation "at such price as in his judgment said property would sell for at a fair and *bona fide* sale at private contract on the day prescribed by law for the commencement of the assessment."   *Rev., p.* 1155, § 71.

It is, however, not every sale of a single farm or lot, or a single block of stock, which indicates what "all the said property would sell for at a fair and *bona fide* sale by private contract."   The considerations of many sales grow out of the special desires or necessities of the buyer or purchaser.

Again, it is all important that taxable value should be constant, and should not vary with the lesser changes of price which experience teaches us to expect between different seasons and years.   It can only remain constant by being kept below the range of probable fluctuations in price, and this consideration may easily and properly have led, in some degree, to the "universal custom" of local assessors to value at a percentage of market value.

It is unnecessary, for any purpose of this argument, to discuss what percentage of the market value of pieces of property sold singly is the taxable or "true value" of all property. It is only necessary to state a conclusion as to which there can be no difference of opinion among reasoning men, that there is a fixed and determined ratio between market value and taxable or "true value," a conclusion which necessarily follows

from the fact that taxable or "true value" is an "exchange value." If market value rises, taxable or true value must rise; if market value falls, taxable or true value must fall. Whatever the relation between market value and taxable value, and however far below the market value of single pieces of property is the market value of all property sold in "one continuous sale," the ratio between these two is constant, and taxable or "true value" can never exceed market value.

WHY THE RAILROAD TAX LAW OF 1884 IS ILLEGAL AND UNCONSTITUTIONAL.

### I. It is a Special and Not a General Law.

It discriminates among the several corporations of the state, and places the exclusive burden of the tax imposed upon the real and personal property and franchises of railroad and canal companies, and exempts the real and personal property of all other corporations and persons from a like tax; consequently, the act assesses property for taxation, not by a general law, but by a special act applicable only to the property of two kinds of corporations, and not applicable to like property of other corporations or persons. See the opinion of the Chief Justice in this case, and the cases therein cited. *Parsons* v. *Van Riper*, 11 *Vroom* 1; *Pell* v. *Newark*, 10 *Vroom* 18; *Rutgers* v. *New Brunswick*, 13 *Vroom* 53; *Anderson* v. *City of Trenton*, 13 *Vroom* 458; *State* v. *Hammer*, 13 *Vroom* 435; *S. C. on appeal*, 15 *Vroom* 367.

### II. It Does Not Tax By Uniform Rule.

It imposes the burden of an exclusive state tax upon the real and personal property of railroad and canal companies, which is not imposed on the real and personal property of any other persons or corporations, thereby making the burden of taxation unequal.

Property of railroad corporations must be subject to the same burden, and no other, as like property of individuals; and if a rule is prescribed for rate of tax, or for ascertaining the true value of property, the rule must be uniform, not only

in its application under one general law, but under all general laws which subject like property to the same burden.

Can this discrimination be made by adopting the method of multiplying the general laws?

The real estate of this company cannot be taxed for state purposes at other valuation or rates than the real estate of other corporations, or than the real estate of individuals, and you cannot evade this conclusion by embracing such property in a so-called general law—general only so far as it includes the real estate of all railroad and canal companies. Nor can its real estate be assessed for local purposes, except by the same rules and at the same rate as other real estate in the same taxing district for or in which the tax is imposed.

The answer is that these considerations do make it impossible to confiscate the property of these corporations, and very difficult to impose upon them taxes inconsistent with the protection which the constitutional provision intended should be extended to all property alike.

In the charter of the Central Railroad Company is a contract providing for the taxation of its property. It is one-half of one per cent. on the cost of the road, increasing in amount every year as the cost of the road increases.

It ought to be very difficult for the state, at its pleasure, to change this contract, and to impose upon the company any heavier taxation than is required by its charter. Even if this contract may be disregarded, there is no alternative but to either tax it under the contract or to tax it by uniform rule with other property in the state.

*III. It Imposes Different Rates of Tax on Parts of the Real Estate of Railroad Companies which are Essentially Similar, Thereby Violating the Principle of Equality of Burden by an Inequality of Rate.*

The act designates an arbitrary part of the real estate as "main stem," which it defines as "the road-bed not exceeding one hundred feet in width, with its rails and sleepers, depot buildings used for passengers, connected therewith,"

and imposes on this arbitrary part a tax of one-half of one per cent. It designates another arbitrary part as "other real estate used for railroad or canal purposes in each taxing district in this state, including the road-bed (other than main stem), water-ways, reservoirs, tracks, buildings, water-tanks, water-works, riparian rights, docks, wharves and piers, and all other real estate, except lands not used for railroad or canal purposes. Section 3, II. It imposes on this second arbitrary part a tax of one-half of one per cent., and an additional rate not to exceed one per cent., or three times as much. Both parts thus differently taxed are identically conditioned. What inherent difference is there between land or rails or sleepers, within or without an arbitrary limit of one hundred feet, or between "depots used for passengers" and depots used for freight, that can justify taxation of the latter at three times the rate of the former?

In the case of highway bridges and culverts, those portions within the one hundred foot limit must be valued as "main stem" and taxed at the lesser rate, while those portions outside this limit must be classed as "real estate other than main stem," and taxed at the higher rate.

It need not be denied for the purposes of this argument that the legislature may not, for the sake of convenience, classify railroad real estate, but it is too clear for debate that they cannot subdivide real estate for the purpose of subjecting it to different rates of tax assessment.

This is just what is done by this act. A part of the real estate constituting the so-called "road-bed" is arbitrarily carved out of the rest and denominated "main stem," and an arbitrary tax is put upon it of one-half of one per cent.

The remaining portion of the real estate is subjected to that arbitrary tax and to a tax of one per cent. more.

The board did what the "act" directed them to do. In assessing the property they applied the rule prescribed by the "act." They had no authority to assess it in any other way, or by any other rule. The defect is inherent in the "act" which thereby violates the uniform rule of the constitution.

*IV. It Imposes Different Rates of Tax on the Road-bed of Different Railroads Identically Conditioned, and Even Leaves the Designation of which Railroad is to be Taxed at the Higher and which at the Lower Rate Entirely to the Arbitrary Will of the Assessors.*

Section 6 of the act provides, " That whenever in any taxing district there shall be several branch lines of railroad belonging to or controlled by one company, or operated under one management, the assessors shall designate one of said lines as the main stem, and the value of the others shall be included in the separate valuation provided for in the second subdivision of section 3 of the bill."

To analyze the section and abbreviate it: wherever in any one taxing district there are several lines of railroad, either owned or controlled by the same management, one shall be designated as main stem and taxed at one-half of one per cent., and the other or others shall be designated as property used for railroad purposes other than main stem, and taxed at three times that rate.

The practical operation of this section is illustrated by the following facts, which appear on the record :

The Central Railroad of New Jersey operates four different lines of railroad in the taxing district of the city of Elizabeth.

*First.* That over which the main travel of the road between New York and Philadelphia now passes, which happens to have been designated by the board as " main stem."

*Second.* The so-called Elizabeth Loop Line, now used mainly for coal traffic, over which the main travel of the road passed when it connected with New York by ferry from Elizabethport.

*Third.* The so-called Elizabeth and Newark Branch, running from Elizabethport to New York.

*Fourth.* The former Elizabethport and Perth Amboy Railroad, now known as the Elizabethport and Perth Amboy Branch, from Elizabethport to Perth Amboy.

All these lines of railroad are identically conditioned. All consist of "road-bed," with its "rails and sleepers," and "depot buildings, used for passengers, connected therewith."

The board have arbitrarily designated the first of these lines as main stem, and taxed it at one-half of one per cent. They have arbitrarily designated all the other three as " real estate used for railroad purposes other than main stem," and have taxed them at one and one-half per cent.

Can it be possible that a law which confers upon the assessor the right to arbitrarily select property for the purpose of taxation, is constitutional?

When this " act" confers upon the assessors the right to select one of four railroads in a taxing district and arbitrarily call one hundred feet of it the " main stem," and as such assess it at one-half of one per cent., and to assess the other three railroads at one and one-half per cent. " as real estate used for railroad purposes," is it not conferring upon the assessors a power truly despotic?

It is a violent construction of the constitution which would authorize the legislature to make such an arbitrary classification and selection of property for taxation ; but for the legislature to confer such a power upon assessors is a total disregard of the language and spirit of the constitution.

What law could be a more direct violation of the constitutional rule of equality of burden than one which imposes unequal taxes, not only at the will of the legislature, who stand as the representatives of the people, but at the absolute fiat of an appointed board.

*V. It Values the Real and Personal Property of Railroads by a Standard of Value Different from and Greater than that by which Like Property of Individuals and Other Corporations is Valued, Thereby Violating the Principle of Equality by Inequality of Valuation.*

All the railroad property included in three of the four arbitrary divisions of section 3, viz. : first, " main stem ;" third, " tangible personal property ;" fourth, " franchise," is to be

valued according to the standard of value adopted by the
state board; while all the property included in the second,
viz. : "the real estate used for railroad purposes other than.
main stem," is to be valued according to the standard of
value adopted by local assessors for the different taxing dis-
tricts in which it is situated.

The report of the state board of assessors shows that their
standard of value is much higher than that of other assessing
officers.

The law therefore prescribes valuation by a higher standard
as to three so-called divisions of railroad property, and only
provides for value at a standard uniform with that applied to
other property in the case of one of these divisions.   The in-
jury is therefore certain, but the remedy is inadequate because
it provides for its redress only in the case of one out of four
so-called divisions of property.   A law which provides, first,.
for the perpetration of an iniquity, and, secondly, for its in-
adequate redress, cannot be sustained as conforming to the
constitutional rule of equality of burden.

*VI. The Provision of the Law Which Prescribes Separate
Valuations of the Four Arbitrary Divisions of Railroad
Property Makes it Impossible, Under the Law, to Make a
Valuation " According to True Value." The True Value
of a Railroad Depends Upon its Utility, and can Only
be Ascertained by Valuing it as a Unit.*

The scheme of separate valuation is an essential part of the
law.   The law so prescribes.

The state board must ascertain " separately : "

1. The " value of the main stem."

2. The " value of the other real estate used for railroad:
purposes."

3. The " value of the tangible personal property."

4. The " value of the franchise."

The property was so assessed.

See valuation and assessment of state board, as set forth in
the return to the writ, and their return made to the comp-

troller.  They further made a separate valuation of every item of property other than main stem in each taxing district, assessed separately every excess in width, every siding, every pier, every building, &c.

Counsel for the state so declares.

"This plan of separate valuations lies at the very foundation of the law," he says, in his brief below.  "It is clear that the whole scheme of valuation intended by the legislature was that the original unit 'railroad' should be valued separately in the four great component parts stated in subdivisions 1, 2, 3 and 4; and seems equally clear that it intended that the great complex part of main stem, composed of land, of right of way, bridges, culverts, embankments, viaducts, tunnels, cuttings, fillings, bed, sleepers or ties, rails, spikes, switches, depots, &c., should be valued by ascertaining the existing value of each part; and the fact that in connection with the directions for separate valuation of the great parts, the legislature separately points out some of the component parts of one of such great parts as objects of valuation, indicates the intent to carry out, as thoroughly as possible, the system of separate valuation."

The consideration of the proposition that this scheme of separate valuations necessarily leads to a value which is not constitutional "true value," involves a statement of some of the elementary principles of value.

As has already been demonstrated, the taxable, or "true value," of property bears a constant ratio or relation to its market value, and cannot exceed it.  The taxable or true value of railroad property is greater or less, according as its market value is greater or less.

It is self-evident that the market value of a railroad property must be equal to the market value of the securities which represent it, and it should be stated, once for all, that the market value of securities, as that term is used in this brief, is not the varying or speculative price which they may have in the stock market from day to day, inasmuch as this variation of price is often determined by the special desires or necessities of buyer or seller, as when a contest at a coming election gives

enhanced value to stock transferred before the closing of the books, or when a financial panic forces some unfortunate holders to sell for what they can get, no matter how little, but that market value which is determined by the inherent conditions of the property itself, and which should accord with the average price realized for securities during a period of time.

It is also self-evident that the market value of the securities of a railroad, as above defined, depends upon the earning capacity of the railroad. If that earning capacity be increased, the market value of the securities is increased. If that earning capacity be diminished, their market value is diminished.

Inasmuch as the taxable or true value of the railroad depends upon the market value of its property, and the market value of its property depends upon the market value of its securities, and the market value of its securities depends upon its earning capacity, and bears a constant relation to it, therefore taxable or true value depends on earning capacity. The greater the earning capacity, the greater the taxable or true value. The less the earning capacity, the less the taxable or true value. The true value of the constitution depends upon and varies with earning capacity.

This is no abstract theory; it is *res judicata* in our courts.

"Assessors, in fixing the value of a railroad, must be very largely controlled by its ability to earn money, and the productiveness of its use for the purposes of a railroad. As an original question it would seem to be reasonably clear that the value of railroad property must almost entirely depend upon its capacity to earn money for its owners." *Wallkill R. R. Co.* v. *Keator*, 67 *How. Pr.* 278; *People, ex rel. Albany and Greenbush Bridge Co.*, v. *Weaver*, 67 *How. Pr.* 479, 480; *S. C.*, 34 *Hun* 323; *State of Illinois* v. *Illinois Central R. R. Co.*, 27 *Ill.* 64–70.

"A railroad, with its necessary fixtures and appliances, is real estate, and taxable as such, and must be taxed upon its value as a railroad, and that value must be ascertained by the actual and not its speculative profits, or its mere capacity for productiveness, as it must be taxed at its value when assessed,

and not what might be its value if under better management."
*Louisville and Nashville R. R. Co.* v. *State of Tennessee*, 8
*Tenn.* 797.

"The consideration of profits should have a large, if not
controlling influence upon the value of almost everything, ex-
cept when considerations of taste or pleasure or comfort are
involved. A thing, to be worth its cost, must be able to pay
out of the profits from its use and enjoyment an income bear-
ing some relation to the interest due from an investment or
loan of a sum of money equal to such cost, and over and
above the loss by wear or waste. * * * The value of the
property is to be measured and determined by the amount of
debt against a solvent debtor that the property is the equiva-
lent of, or, in shorter phrase, the amount of money the prop-
erty would sell for at a free and well-advertised sale. The
price it would bring would largely depend upon the use to
which it could be applied, and the profits of such use."
*People, ex rel. Ogdensburg, &c., Co.*, v. *Pond*, 13 *Abb. N. Cas.* 7.
See, also, *State of Nevada* v. *Central Pacific R. R. Co.*, 10
*Nev.* 65–68.

Having reached the conclusion that the "true value" of the
constitution depends upon and varies with earning capacity, it
only remains to demonstrate that the earning capacity of a
railroad depends upon the complete union of all its parts, in
order to prove that the true value of the whole cannot be as-
certained by a separate valuation of these parts.

Its franchise may be useful, and therefore valuable, if there
are any persons who wish to build a railroad under it, and if
there is no general law by which they could obtain a similar
franchise without expense; but these values of the separate
parts, even when added together, have no relation to the value
of the whole.

Like any other property, a railroad must be valued in ref-
erence to the use for which it is intended, and not in reference
to any other use, and the use to which it is intended requires
that it exist as an integral whole, and not in separate parts.

The proposition that a railroad must be valued as a unit, a

single money-making machine, is no more theory than the proposition that the value of this machine depends upon its earning capacity. Some of the decisions on this point are as follows:

"A railroad is an entire thing not legally subject to coercive severance or dissolution." *Elizabethtown and Paducah R. R. Co.* v. *Trustees of Elizabethtown*, 12 *Bush* 238; *Louisville, &c., R. R. Co.* v. *Bate*, 12 *Lea* 573, 581; *Gulf R. R. Co.* v. *Morris*, 7 *Kan.* 222; *Porter* v. *R., R. I. & St. L. R. R. Co.*, 76 *Ill.* 584; *City of Dubuque* v. *C., D. & M. R. Co.*, 47 *Iowa* 202.

A railroad and its equipment must be regarded for most if not all purposes as a unit or as constituting a "single entire property." *Stein* v. *Mayor, &c., of Mobile*, 17 *Ala.* (*N. S.*) 240; *People, ex rel. Ogdensburg, &c., R. R. Co.*, v. *Pond*, 13 *Abb. N. Cas.* 1, 6; *People, ex rel. Buffalo, &c., R. R. Co.*, v. *Barker*, 48 *N. Y.* 70, 77; *People, ex rel. Albany, &c., Bridge Co.*, v. *Weaver*, 67 *How. Pr.* 477; *People* v. *Keator*, 67 *How. Pr.* 277; *People, ex rel. Buffalo, &c., R. R. Co.*, v. *Fredericks*, 48 *Barb.* 173; *State* v. *Southwestern R. R.*, 70 *Ga.* 33; *Virginia and Tennessee R. R. Co.* v. *Washington Co.*, 30 *Gratt.* 480; *Georgia* v. *Atlantic and Gulf R. R. Co.*, 3 *Woods* 438; *Law* v. *People*, 87 *Ill.* 412.

*VII. The Separate Valuation of Franchise Prescribed by the Law Necessarily Leads to Taxation of Railroad Property in Excess of its True Value, and Therefore Violates the Constitutional Rule of Uniformity and Equality of Burden.*

In considering the question of the constitutionality of the law, we should keep steadily in mind the inherent attributes of "franchise."

Franchise (as of a railroad) has sometimes been designated as property, as possessing value, as capable of condemnation and appropriation under the exercise of the power of eminent domain; but, when spoken of as property, or as possessing value, or as subject to transmission by sale or under the exercise of the powers of eminent domain, it is always so used in

connection and association with the property in and through which the franchise operates.

A franchise (as of a railroad) is no more than the privilege of conducting a business and owning the property and equipment necessary for the conduct of such business. A franchise in itself is not a thing that can be seen or measured, or weighed. It is purely and altogether intangible, and except in association with property, possesses no value that is capable of ascertainment by any rule that has ever been applied by any court or legislature. For example, under the general railroad law, upon the payment of a few dollars to the state, any association of citizens may obtain the right to parallel an existing road, and the franchise of the present railroads and of the parallel roads thus incorporated would be exactly alike. They would both possess exactly the same privileges, the same rights, run through the same territory, and be authorized to conduct the same business; yet the one being associated with a created business and a constructed road, and the ownership of property, may possess a value in such association which the other company, with equal charter privileges, separated from, and without such business, road and property, does not possess.

In estimating the value of the franchise of a railroad company in association with its property, two methods of appraisement seem to be possible, and only two have ever heretofore been attempted. One, by assuming that the franchise, in association with the property, should form the basis for the ascertainment of the aggregate value of the combined franchise and property; the other, that under the appraisement of the property, the value of the franchise, as associated therewith, should be ascertained. Thus, in Pennsylvania corporations are taxed upon their gross earnings, which is assumed to represent the relative value of railroad franchises and property towards one another. In Illinois the franchise is taxed, but with the capital stock, and not as distinct from the property of the railroad company. In New Jersey an attempt is made, for the first time, to separate the inseparable elements

of the franchise from the property, and make each the subject of a separate and independent valuation for the purpose of taxation. This, it is submitted, cannot be done and preserve uniformity in the valuation of railroad property, nor does it result in the valuation of such property at its true value.

All the values which inhere in the tangible property, real and personal, of the corporation, in so far as they derive any value from their use as railroad property, in the conduct of the business, are necessarily included in estimating or valuing each element of the company's property which goes to make up the whole property. The value arising out of the franchise is inevitably taken into consideration, so that the separate valuation of each of the items of property being added together, you have an aggregate which fully equals the value of the property separately considered, as well as the value which inheres in the use of the property, and consequently there remains nothing to be taxed or assessed to the franchise separately beyond the nominal sum for which equal franchise rights might be acquired. The law which compels a separate value to be put on franchise, in addition to the value of all elements of tangible property, therefore necessarily leads to a valuation far in excess of the "true value," which is the limit of the constitution.

*VIII. It Imposes Valuations by Methods and Tribunals Different from those by which all Other Property is Valued for Taxation, which Necessarily Results in Taxing Railroad Property by a Standard of Value Higher than that Applied to Other Property. Such Inequality Violates the Fundamental Principle of Equality of Burden, and Whenever it has Occurred, the Courts have Prohibited the Collection of the Tax, even when the Error was not in the Value of Railroad Property, but in the Value of Other Property.*

The constitution of Ohio declares that "laws shall be passed taxing, by a uniform rule, all moneys, credits, investments in bonds, stocks, joint-stock companies or otherwise; and also all the real and personal property, according to its

true value in money." *Cummings* v. *National Bank*, 11 *Otto* 153.

Throughout a large part of Ohio, including Lucas county, in which A, a national bank, is located—perhaps all over the state—the officers charged with the valuation of property for purposes of taxation adopted a settled rule or system, by which real estate was estimated at one-third of its true value, ordinary personal property about the same, and moneyed capital at three-fifths of its true value. The national bank shares were valued at their full, true value.

Although, for purposes of taxation, the statutes of a state provide for the valuation of all moneyed capital, including shares of national banks, at its true cash value, the systematic and intentional valuation of all other moneyed capital by the taxing officers far below its true value, while those shares are assessed at their full value, is a violation of the act of congress which prescribes the rule by which they shall be taxed by state authority.

In such case, on the payment or the tender of the sum which such shares ought to pay under the rule established by that act, a court of equity will enjoin the state authorities from collecting the remainder. *Pelton* v. *National Bank*, 11 *Otto* 143.

In a case which arose in the State of Illinois, the valuation of the property of individuals in Bureau county ranged from one-fifth to one-third of its cash value. The valuation returned by the railroad company ranged from one-third to one-half of its actual value. The assessors valued the property of the railroad at its actual value. The court below reduced the valuation of the railroad so as to bear the same proportion to actual value as the property of individuals. *Bureau Co.* v. *C., B. & Q. R. R. Co.*, 44 *Ill.* 229; *People, ex rel. Wallkill Valley R. R. Co.*, v. *Keator*, 67 *How. Pr.* 280.

*IX. It Imposes an Arbitrary Tax Without Regard to the Purpose for which it is to be Used, or the Amount Required.*

Property is to be assessed "for taxes." It can be assessed

for no other purposes.    This involves an ascertainment of the taxes before the assessment can be made.    The assessment is a condition precedent to the collection of the taxes.    But it is equally necessary that the sum to be levied and the purposes for which it is to be levied should first be ascertained by the law-making power.

The tax of one-half of one per cent. on all the property of the company is an arbitrary sum or rate fixed by the legislature to be raised out of the property without any regard to the wants of the state, or to the purposes for which the money is to be raised.

The amount to be produced by levying the tax is not ascertained.    It is not for any particular purpose or appropriation. It is an arbitrary rate without any regard to the amount the rate will produce.

It is a fundamental principle, without any need of constitutional provision to protect it, that the legislature cannot raise money by taxation without specifying the amount to be raised or the purposes of the taxation.

Otherwise, the taxpayer has no protection.

If the legislature can arbitrarily levy a tax of one-half of one per cent., they can levy a tax of two or of five per cent. If this can be done lawfully, the legislature may classify property, and then, under the guise of taxation, confiscate it.

There is a general rule under which property has always been subject to taxation in New Jersey ; that rule is to ascertain the purpose of the tax to be raised, and its amount. This rule is applicable to the imposition of any and every tax.    No one can calculate so as to approximate to the amount which the tax of one-half of one per cent. levied under the "act" would produce, and no one can tell for what purpose it is wanted or will be appropriated.

It may be said that the school tax is not assessed by the rule suggested.

Is this so ?    The purpose is designated and the money appropriated.    The materials were within reach and on the records

of the state, and by easy deduction the amount to be produced could be ascertained with reasonable certainty.

X. " *The Fourteenth Amendment of the Constitution of the United States, in Declaring that no State shall Deny to Any Person Within its Jurisdiction the ' Equal Protection of the Laws,' Imposes a Limitation Upon the Exercise of All the Powers of the State which can Touch the Individual or His Property, Including Among Them that of Unequal Taxation.*"

The " equal protection of the laws " to any one implies not only that he has a right to resort, on the same terms with others, to the courts of the country for the security of his person and property, the prevention and redress of wrongs, and the enforcement of contracts, but also that he is exempt from any greater burdens or charges than such as are equally imposed upon all others under like circumstances. This equal protection forbids unequal exactions of any kind, and among them that of unequal taxation.

Private corporations are persons within the meaning of the first section of the fourteenth amendment, and are entitled, so far as their property is concerned, to the equal protection of the laws.

" Unequal exactions in every form, or under any pretence, are absolutely forbidden ; and of course unequal taxation, for it is in that form that oppressive burdens are usually laid. It is not possible to conceive of equal protection under any system of laws where arbitrary and unequal taxation is permissible ; where different persons may be taxed on their property of the same kind, similarly situated, at different rates ; where, for instance, one may be taxed at one per cent. of the value of his property, another at two or 'five per cent., or where one may be thus taxed according to his color, because he is white, or black, or brown, or yellow, or according to any other rule than that of a fixed rate proportionate to the value of his property." *Santa Clara Tax Case,* 9 *Sawy.* 189 ; *Railroad Tax Case,* 8 *Sawy.* 238.

For the Lehigh Valley Railroad Co. and others, defendants in error, *Thomas N. McCarter*.

*I. The Act of the Legislature Under which these Taxes are Imposed is in Conflict with the Twelfth Paragraph of Section 7 of the Constitution of New Jersey, as Amended, which Declares that " Property Shall be Assessed for Taxes Under General Laws and by Uniform Rules, according to its True Value."*

A brief reference to the more prominent provisions of the law in question will make manifest the soundness of the above position.

It selects the property of a certain class of artificial persons, viz., railroad and canal companies, and natural persons using railroad and canal property, and imposes a special tax of the half of one per cent. on the whole of such property, when no similar tax is imposed on the property of any other persons in the state, either artificial or natural.

It is difficult to add anything to the force of the argument by which this discrimination is shown, in the opinion of the Supreme Court, to violate the constitutional requirement of general laws. I will not attempt the task.

Such discrimination also fails to comply with the requirement that taxation of property shall be by uniform rules. The legal meaning of the expression " uniform rule," as applied to taxation, has been settled, so that no doubt can remain as to its true scope and meaning. *Exchange Bank of Columbus* v. *Hines*, 3 *Ohio St.* 15.

In *Stratton* v. *Collins*, 14 *Vroom* 565, Mr. Justice Dixon says: " The property to be taxed being thus indicated, the direction that it be assessed by uniform rules, according to its true value, becomes then applicable. This direction requires and is fulfilled by such regulations as should impose the same percentage of its actual value upon all the taxable property in the township for township purposes, in the county for county purposes, and in the state for state purposes." And he cited

in support of that position the Ohio case cited above; also, *State, Vail's Ex'rs, pros.*, v. *Runyon*, 12 *Vroom* 98.

In the latter case Justice Depue said, in speaking of the constitutional requirement of uniformity in taxation: "The object of this constitutional provision was the equalization of taxation in relation to the several parts of the state, and the prevention of unjust discriminations in the apportionment of the public burdens among its citizens liable to taxation." See, also, *State* v. *Newark*, 10 *Vroom* 392; *Pine Grove* v. *Walcott*, 19 *Wall*. 675; *Gilman* v. *Sheboygan*, 2 *Black* 514; *Knowlton* v. *Supervisors of Rock County*, 9 *Wis.* 410; *Weeks* v. *Milwaukee*, 10 *Wis.* 242; *Sanderson* v. *Cross*, 10 *Wis.* 282; *Attorney-General* v. *Winnebago, &c., R. R. Co.*, 11 *Wis.* 62; *City of Zanesville* v. *Richards*, 5 *Ohio St.* 589; *Burroughs on Taxation* 62.

With such a standard of uniformity as is above established, it requires no argument to show that a law which enables and requires the whole ordinary revenue of the state to be collected by taxation out of the property of one class of artificial persons, and permits like property of all other persons, either natural or artificial, to escape state taxation, fails to comply with the constitutional requirement of uniformity.

Again. This law fails to comply with the requirement of "general laws and uniform rules" in that it deprives these corporations of the benefit of the limitation of the rate of taxation allowed to all other persons and property in our general act concerning taxes, in section 2 of the supplement of 1866. *Rev.*, *p.* 1150, § 61.

By the law now being considered, the property of railroad and canal corporations is taken out of the operation of the above-recited section and subjected to an arbitrary rate, without limitation as to the amount required to be raised, and entirely without regard to the sum which the operation of the act will produce.

The case of *State, North Ward National Bank, pros.*, v. *Newark*, 10 *Vroom*, is instructive on this point. In that case a general law existed for the taxation of the stock of national

banks, while the tax then in question was imposed under a special law relating to the city of Newark, which was in force when the amendment of the constitution was adopted. The Supreme Court held that the special law was an instance of the violation of uniformity of rule in the assessment of property for taxation, and of inequality in taxation under special and local laws, and that the adoption of the constitutional amendment operated *proprio vigore* to repeal the special provision, which was inconsistent with the general law and with the amended constitution.

This decision has been acquiesced in, and its doctrines cannot successfully be impeached. It received the sanction of this court, on writ of error, in 11 *Vroom* 358, in which case this court went beyond the Supreme Court in enforcing the rule of uniformity required by the constitution.

A similar application of the rule of uniformity has been made by our Supreme Court in the case of *Rankin* v. *Love*, 17 *Vroom* 132. See, also, *Murphy* v. *Trenton*, 18 *Vroom* 79.

If, then, these amendments operated of themselves to repeal and abrogate existing legislation of a special character and inconsistent with the general law in force, *a fortiori* must they be held to interdict subsequent legislation of the same character.

Again. This law fails to conform to the rules of generality and uniformity required by the constitution, in other respects.

It discriminates between the lands of the corporations for railroad or canal purposes and their lands not used for such purposes; it imposes one-half of one per cent. on such lands in addition to the local rate, while lands not so used are not subject to the half per cent. tax. It limits the rate to one per cent. for local purposes on such lands, while other lands not used for railroad purposes and the lands of others are taxed to the full local rate without the one per cent. limitation. On the main stem it imposes only the half of one per cent., and that part of the property of these corporations escapes local taxation entirely. As to the main stem, it requires the assessors to value it at the full value, to be ascertained by them;

as to lands outside the main stem, they are, by the fourth section of the act, required to be reduced to the valuation put upon the lands by the local assessors, if it is less than the value found by the state assessors.

Again. It appears by the summary annexed to the report of the state board for 1884 that the total valuations of property taxed under the law is $190,437,933.96.

This vast amount of property is withdrawn from local taxation, and forms no part of the fund on which the local rate is computed. It therefore makes the local percentage so much greater in every taxing district, and thereby subjects the remaining property in the taxing districts not taxable under this law to a higher rate than it would bear if this valuation were computed in the several taxing districts in which the railroad property is located.

It, in the third section, directs a subdivision of the real property into main stem and land outside of main stem, in such manner that it is incapable of being valued by the rule which applies to the assessment of all other property.

By section 12 of the general tax law of 1866, (*Rev.*, *p.* 1155, § 71,) it is enacted that the assessor shall annex to his tax return an oath that he has valued all the property liable to taxation in his township, at its full and fair value, at such price as in his judgment such property would sell for at a fair and *bona fide* sale by private contract, on the day prescribed by law for commencing the assessment.

It is manifest that such rule of valuation is not capable of being applied to the real estate to be taxed under this act, subdivided, as it is required to be, into main stem and lands outside of main stem, and especially so as the assessors have in practice executed this law by making an additional and separate valuation of all erections and structures within the one hundred feet of main stem, and not enumerated within its definition; that is, they limit the valuation of main stem to road-bed, rails, sleepers and depot buildings used for passengers.

All other structures, such as turn-tables, freight-houses,

engine-houses, water-tanks, although within the one hundred feet of main stem and affixed to the realty, have been separately valued as real estate other than main stem.

Property, thus subdivided and distributed into its component parts, is incapable of being valued as all other property is supposed to be valued, viz., by a price for which it would sell at a fair and *bona fide* sale by private contract, or of being valued at its true value as required by our constitution.

Again. This act, by its twenty-first section, requires every person or company running, operating or constructing every railroad or canal in this state to make sworn returns to the board of the property of said railroad or canal, the particulars of which returns are so numerous and searching that a compliance with the requirement necessarily imposes vast labor and expense in the preparation, and the twenty-fourth section imposes a possible penalty of $10,000 on any person or corporation failing to comply with such requirement, although it may turn out that the property of such person or corporation may be, by contract with the state or otherwise, wholly exempt from taxation.

What person using or operating any other kind of property is subjected to such an onerous and oppressive requirement?

Certainly the above will suffice to establish the position contended for, that the Supreme Court committed no error in declaring this law unconstitutional.

*II. This Act is in Conflict with the Provision of the Fourteenth Article of the Amendments to the Constitution of the United States, which Requires that no State shall " Deny to any Person Within its Jurisdiction the Equal Protection of the Laws."*

It is not my purpose to elaborate this point to any extent. Much of the foregoing argument on the first point is also applicable to this.

I rely, in support of this position, mainly on the decisions which have been had under the amendment in the federal

courts. *Railroad Tax Cases*, 13 *Fed. Rep.* 722; *Santa Clara County* v. *Southern Pacific R. R. Co.*, 18 *Id.* 385.

These cases afford so full a discussion of the question now being considered, by that distinguished jurist, Justice Field, of the Supreme Court, that they exhaust the subject.

. He holds that what is called for under a constitutional provision requiring equality and uniformity in the taxation of property, must be equally called for by the fourteenth amendment. 13 *Fed. Rep.* 734.

*III. Independently of Constitutional Restrictions, it has Always been held to be a Fundamental Condition of Legal Taxation that there shall be Equality and Uniformity in the Distribution of Public Burdens.*

In *Burroughs on Taxation, ch.* 3, § 76, *p.* 22, under the head of "Equality in the burden of taxation," it is said: "The first of the maxims of Adam Smith on the subject of taxation is that the subjects of every state ought to contribute to the support of the government, as nearly as possible, in proportion to their respective abilities—that is, in proportion to the revenues they enjoy under the protection of the state. In the observation or neglect of this maxim consists what is called the equality or the unequality of taxation. Absolute equality is not contemplated by these writers; it is to be 'as near as possible;' and the courts, while they have regarded any attempt to practice absolute equality as utopian, have, at the same time, recognized the principles stated by these writers, and have endeavored to enforce a practical equality. It is not in the power of the legislature, under the guise of taxation, to give the property of A to B, or to impose the whole burden of a tax for the state upon one person or upon one community. Such absolute, arbitrary powers have no place in a government regulated by law."

So, in the last edition of *Cooley on Taxation, p.* 2, the author says: "Taxes differ from the forced contributions, loans and benevolences of arbitrary and tyrannical periods, in that they are levied by authority of law, and by some rule of

proportion which is intended to insure uniformity of contribution and a just apportionment of the burdens of government. In an exercise of the power to tax, the purpose always is that a common burden shall be sustained by common contributions, regulated by some fixed general rule, and apportioned by the law according to some uniform ratio of equality. The power is not therefore arbitrary, but rests upon fixed principles of justice, which have for their object the protection of the tax-payer against exceptional and invidious exactions, and it is to have effect through established rules operating impartially." The same rule is laid down in *State* v. *Readington*, 7 *Vroom* 66.

Justice Depue's opinion is quoted with approbation in the opinion of Justice Field in the case above cited from 13 *Fed. Rep.* *Gordon* v. *Corning*, 47 *N. Y.* 611; *Lexington* v. *McQuillan's Heirs*, 9 *Dana* 513.

The foregoing is no new doctrine in this court. It was announced more than twelve years ago with great force by Chief Justice Beasley, in rendering the judgment of this court in the well-known case of *State, Agens, pros.*, v. *Newark*, 8 *Vroom* 421.

Citations of this kind might be multiplied to any extent, but the above will suffice to show the rule of uniformity required, not only by the federal and state constitutions, but by the fundamental rules of taxation as well.

The attempt to sustain this method of taxation, by referring to those cases in which it has been held that the requirement of general laws is not violated by grouping into classes certain subjects, and legislating in regard to such subjects as a class, cannot succeed. The argument of Chief Justice in the opinion of the Supreme Court, furnishes a complete answer to such a claim, and a few illustrations of the results of an attempt to classify property for purposes of taxation, not by anything in the character or quality of the property itself, but by the use to which it is subjected, will show the absurdity of such a classification.

It is respectfully submitted that such discrimination as that

cannot be justified or sustained by invoking the claim of the legislative right to classify property for purposes of taxation.

*IV. The Assessments now being Considered are Illegal and Unconstitutional, so far as they Include the So-called Value of the Franchises of these Various Corporations, and Impose the Tax Upon that Valuation.*

In considering this question it must be borne in mind that the tax imposed by these assessors upon the value of the franchise of these various corporations, is a property tax as distinguished from a license or excise tax.

In the briefs of the counsel for the state used in the argument in the Supreme Court, it was frankly admitted that this tax of the franchise was a tax on property. And a reference to the third section of the act in question shows that the assessors are required to ascertain the true value of all property used for railroad or canal purposes, including its franchises, and by the fourth subdivision they are to determine separately the value of the franchise, and by the subsequent sections of the act it is provided that the value thus ascertained for the franchise shall be computed with and treated as forming a part of the value of the real estate of the companies. Such being the case, I respectfully contend that the franchise by itself is not taxable as property, because it is incapable of valuation for purposes of taxation by any standard by which the other property of the state is to be valued for such purposes.

When our constitutional amendments were adopted there was in force a general law providing for the taxation of all real and personal property. *Pamph. L.* 1866 ; *Rev., p.* 1150, *pl.* 2.

It will be observed that a franchise is not included in the definition of either real or personal estate in the general law. And it is also clear that by itself it is incapable of being valued by the rule which the local assessor is obliged to apply to the valuation of the real and personal property by him assessed. A franchise cannot be sold at private contract. It

is not a thing that can be sold separate from the property in connection with which it is used. It is incapable of valuation by the local assessor's rule of valuing property for taxation, which was in use when this constitution was adopted, and in reference to which we may assume the constitutional provision was made. When, therefore, the constitution provides that the property shall be taxed by uniform rules and at its true value, and when at the same time there was in force a general law, applicable to all real and personal estates, which fixed a rule of valuation, incapable of being applied to a franchise, the inference is irresistible that a franchise, as property, was not intended to be within the constitutional meaning of the word "property." But, whether that be so or not, it is very clear that unless the thing called a franchise is capable of being valued by a general law relating to other kinds of property, or unless the legislature, in the law by which its taxation is attempted, prescribes some general rule by which all franchises may be valued for purposes of taxation, they cannot be taxed at all.

The legislature prescribed no rule in this act of 1884 for the valuation of a franchise; it directed the assessors to ascertain its value without giving them any direction as to the standard by which its value was to be determined. So that if it is to be treated as property, and property capable of taxation, until the legislature has prescribed some rule for its valuation, it must be taxed by the general law, which provides for the value of all other kinds of property, or else it cannot be taxed at all.

The decisions of this state, heretofore quoted, showing that when there is a general law, any special regulation differing from the general law must, under our present constitution, fall, must also hold that if franchises are to be valued for the purposes of taxation they also must be valued by some general law—some rule uniform with that regulating the value of other property, or not at all; and that the ascertainment of their value must not be left to the caprice or fanciful speculations of a board of railroad assessors.

But I go further and contend that a franchise is not property in the sense in which that word is used in our constitution, when dealing with the subject of taxation.

It is true that the Supreme Court, in the opinion delivered in these cases on the question as to whether corporate franchises are taxable, say they think it must receive an affirmative answer; and the judges expressed their opinion " that the subject is not debatable at the present day, because the doctrine has become already accredited by so many decisions, as well of federal as of the state courts." It is submitted that such announcement evades the force of objection now being considered. It is not claimed, on behalf of the defendants in error, that the legislature may not tax franchises; the claim is that they cannot, under any system of law now in force in this state, be valued separately as property and taxed as such on such valuation.

The cases commonly referred to in support of the position that a franchise tax may be sustained are *Society for Saving* v. *Coite,* 6 *Wall.* 594, and *Provident Institution* v. *Massachusetts,* *Id.,* 611.

In the *State Railroad Tax Case,* 92 *U. S.* 675, Judge Miller says that the Supreme Court had, in the two cases last cited, sanctioned a tax on the franchise, but the citation was unfortunate, because an examination of those cases will show that the taxation there attacked was sustained only on the ground that it was a tax on the franchise as a license or excise tax, and not a tax on the property.

It cannot be denied that the possession of corporate franchises confers an additional value upon the property of the corporation in connection with which the franchise is to be exercised.

It has been argued that it was held by this court, in the case of *Black* v. *Delaware and Raritan Canal Co.,* 9 *C. E. Green* 697, that franchises are property. It is respectfully submitted that there is nothing in the Black case last cited which bears upon the question now under discussion. The question in that case was, not whether franchises were prop-

erty, but whether the stock of a corporation could be con-
demned and taken for public use when its owner refused to
consent to the leasing of the railroad property represented by
the stock.  The court, in support of its decision that prop-
erty of that character was subject to be taken for public use
upon making compensation, referred to several cases which
held that the franchises of a corporation, although they had
once been granted by the legislature, were subject to the right
of eminent domain, and all that was decided in that case touch-
ing the points in question was that it was lawful and compe-
tent for the legislature to provide for the condemnation of the
stock of a dissenting stockholder.  The question as to whether
franchises were property was not involved directly in the
case, and as to whether they were property of a kind to be
subjected to taxation under a general law of the state, pre-
scribing a rule for taxing real and personal property, was not
considered or discussed in the case at all.  The same remark
may be made of the cases before cited from 92 *U. S.*, called
the *Railroad Tax Cases*, which decision of the Supreme Court
is often quoted as supporting not only the right to tax a fran-
chise, but the principle on which the value of the franchise
of the railroad corporation is fixed by the board of assessors
in the case now under review was arrived at.

So the establishment of the doctrine that a franchise may be
taken by condemnation establishes nothing towards the deci-
sion of the question now being discussed.

It may well be questioned whether our recent constitutional
amendments have not abolished franchises in the sense in
which they have heretofore been considered as property.
What was a franchise, in the sense in which the term was
originally used ?  In American law it is a particular privi-
lege conferred by grant from the government and vested in
individuals.  3 *Kent Com.* 458.  In English law it is defined
to be a royal privilege or branch of the prerogative subsisting
in the hands of a subject, and arising either from royal grant
or prescription which presupposes a grant.  In *Winfield's
Adjudged Words, p.* 273, will be found a series of definitions

of the word "franchise," and the distinctive feature of each is that it must be a special privilege not enjoyed by citizens in common, and depending for its existence and enjoyment on a distinct legislative grant. Our constitutional amendments have abolished all such special grants and privileges. The legislature can no longer grant them specially, but they are bound to provide them freely for the public without grant. If they exist at all, their character as special privileges has been abolished, and while their enjoyment may confer a value on property, just as the right to travel on a highway may confer a value on the team or carriage which the traveler uses, the right to do one is as free and independent of special legislative grant as the other. This view is well illustrated by the case of *Pennsylvania R. R. Co.* v. *National R. R. Co.*, 8 *Stew. Eq.* 441, in which it was held that the franchise of the Camden and Amboy Railroad Company was exclusive as to all except the state and those upon whom the state has conferred it. It was also held in that case as follows: " When the franchise to operate a public highway for tolls is conferred by the state, it is so far a delegation of power conferred to it in trust by the people.  *   *   *   The attempt to exercise them by individuals or companies, until so conferred, can be nothing but an unwarrantable exercise of power."

Our new constitution has done away with all this. What before was a special privilege or a part of the legislative prerogative is now a matter of common right, and its distinguishing characteristic as a franchise has been abolished. The people have abdicated their governmental right over this subject as a prerogative, and have conferred it freely on all who choose to exercise it.

But if I should be wrong in this contention, and the court should hold that a franchise was property, and as such capable of valuation for the purposes of taxation, it still is subject to the constitutional requirements that if taxed as property it shall be by a uniform rule. Now, the meaning of the word "rule" is not in doubt; it is a law laid down by the superior and which the inferior is bound to obey, and it must

be permanent, uniform and universal.    As before shown, the
legislature has prescribed no rule for a valuation of this kind
of property, and as it confessedly cannot be valued by the gen-
eral rule, it is left entirely to the assessors to make a rule.
They have made two rules for the valuation of franchises ; one
in relation to one class of corporations and another in relation
to another class.    In regard to one class, to determine the
value of the franchise they first ascertain and add together the
amount and value of a capital stock of the corporation and
the amount and value of its funded and other debts ; from
this aggregate amount they deduct the valuation of the visible
and tangible property, and they fix the value of the franchise
at sixty per cent. of the difference.    In the other class, when
the value of the visible and tangible property exceeds the value
of the capital stock and funded debt, the gross earnings of such
corporation are ascertained, and twenty per cent. of such gross
earnings, (being an amount which would make the tax upon
the franchise of such corporation a sum equal to one-tenth of
one per centum upon such gross earnings,) is taken to be the
value of the franchise.

It has been repeatedly held by the Supreme Court of the
United States, in many familiar cases, that the assessing and
levying of taxes is a legislative and not a judicial act; the
legislature cannot confer upon the Supreme Court the power
to do such an act.    It was held by the Supreme Court of this
state, in the case of *Rahway* v. *Mundy,* 14 *Vroom* 338, that a
law which required the Supreme Court to determine what rate
of taxation could be imposed on a municipal corporation,
without injury to the interest of its creditors, was unconstitu-
tional, upon the ground that the power of taxation is legisla-
tive, and that the levying of taxes is not a judicial act, but
one which belongs to the legislative department exclusively,
to be performed upon considerations of policy, necessity and
public welfare, and for these reasons that court declared that
an act then being considered was unconstitutional; and in the
opinion of Justice Dixon the following extract from *Cooley
on Taxation* was approvingly quoted : " It is as incompetent

for the legislature to confer the power to tax upon the judiciary as upon the executive."

The decision of the Supreme Court in that case was affirmed in this court, (15 *Vroom* 395,) in which the opinion was delivered by the Chief Justice, substantially affirming the view expressed in the Supreme Court.

It is difficult to understand how, under the operation of these decisions, the legislature could confer upon the Supreme Court the right, or impose upon it the duty of determining a proper mode of valuing this franchise in the absence of any legal standard created by the legislature. But I make this digression in the hope that if the court shall reach a discussion of this question of the valuation of franchises, it will also lay down the law for the Supreme Court as to the power of the legislature under our constitution to make a taxing board of the Supreme Court. The question is not exactly pertinent to the present argument, and is only introduced here for the purpose of showing the court that this difficulty has not been overlooked by the counsel for the defendants in error.

I think it abundantly appears from what has been said that so far as the valuation of the franchises of these corporations enters into the value of its property, by the methods adopted by this board of assessors, it is illegal and unconstitutional, and this court should so declare, even if it should hold that the law was not, in its main idea and principle, in violation of the constitution. It would seem to be wise policy in the court, in cases of this kind, to settle and dispose of every question fairly presented to it by the record, and concerning which its judgment and opinion would serve as a guide to the legislature and the courts in their subsequent dealings with the questions arising under this law.

It must be manifest that the adoption of the system of taxation set on foot by this law establishes both for state and local purposes, a system and method of taxation entirely at variance with any which has heretofore been adopted and with the fundamental rules of taxation as established in this country and England. The twelfth section of this act pro-

vides that as to property outside of the main stem, and used for railroad purposes, the board of assessors shall assess this property and collect the taxes upon it, and remit the money to the township or municipal division in which the property is situated, to be used for public purposes. The invariable rule has hitherto been that in levying assessments in cities or other municipal divisions, the representatives of the people shall determine how much they will raise and the purposes for which it shall be spent, and in harmony with that system our general law imposes a taxation sufficient to raise the amount thus pre-ascertained, and that establishes the local rate. This board of assessors adopts that local rate (where it does not exceed one per cent.,) and levies a tax, not exceeding one per cent., upon all the property of those companies outside of the main stem, collects that tax and sends it to the township or city in which the property is located. The act says it shall be used for public purposes, but to what public purposes can it be devoted when all the public needs have already been provided for in the aggregate of the sums which go to make up the local rate? It strikes at the very root of taxation in our state, which is that the people themselves shall determine in each municipality how much money shall be raised therein for taxing purposes, and for what purposes it shall be expended. It has been uniformly held that townships and other municipal authorities have no right or power to raise money for contingencies. They are required by the laws of their existence to determine how much money they shall raise, and appropriate the money for some of the particular purposes for which they are empowered to raise money. They have no power to raise money for contingencies. *State* v. *Sickels*, 4 *Zab.* 125 ; *State* v. *Saalman*, 8 *Vroom* 159. The importance of this protection to the tax-payer cannot be over-estimated. By the provisions of this law, after every public need which the charters or laws organizing these municipal bodies permit them to provide for has been satisfied by local taxation, this board of assessors collects an additional tax from the property of railroad and canal corporations for the

State Board of Assessors v. Central R. R. Co.

municipality in which said property is situated, and sends that money to such municipality without any provisions whatever as to the objects to which it is to be applied.   They say to these townships : " No matter that you have provided for all your wants and paid all your debts, and satisfied every legitimate demand upon your treasury, the legislature gives you a free gift of this additional money for public purposes—you may spend it for a park, or place of public amusement, or for any other extravagance you may fancy."

It must be manifest to the most casual observer that if taxes could be raised out of the property of individual citizens by this arbitrary and irresponsible method, the popular will would sweep such a law from the statute book at the first opportunity after its enactment ; but the vice of this law is that it permits these exactions to be made, not from the people, but from a class of owners of corporate property who have not the power of protecting themselves by votes which the people at large possess.   This law absolutely deprives the people themselves of the power of determining how much money they shall raise and to what purposes it shall be applied legitimately within the scope of their corporate powers. It is self-perpetuating and automatic, it requires no annual legislation to keep it in force, and it permits arbitrary sums to be raised on valuations to be made this year by this board, and next year by another board, perhaps, and put into the state treasury and sent to the various municipalities, and so, without the people in the future ever having a word to say as to how much money shall be raised, it grinds out every year a large sum of money, and these delighted assessors say in their report : " If we can only hold these valuations and the court will maintain the law, we will always have enough to pay the whole expenses of the state government and avoid any other state tax."   Hereafter if you need money to build a new state-house, enlarge your prison or erect a new asylum, or indulge in any other extravagance, all you need is to turn the railroad screw a little tighter, the valuations can be increased to meet the demands of the occasion, and if that will not

suffice there still remains forty per cent. of your franchise which can be drawn upon as the public exigencies may require.   Is this court prepared to sanction the idea that under our system of representative and responsible governments there may be set on foot an automatic machine which requires no new action for all time to come, but which enables the board every year to wring from these corporations and pour into the treasury of the state money enough not only pay all its expenses, but as much more as the arbitrary valuations of the board may enable it to produce?   If it brings in twice as much as necessary, no matter ; there is absolutely nothing to limit it, even if it creates a fund by which the state may indulge in all sorts of extravagance.   Every incentive to economy, every incentive to a vigilant watching by the representatives of the people over the expenditures of its servants is taken away by this law.   It is no answer to this argument to say that the legislature alone can correct this evil; this court is the place to correct it.   This court is the only place where these fundamental principles of taxation are to be maintained. In former times, when the kings of England were exercising their so-called prerogatives, and forcing money out of the people by ship money and other arbitrary devices, parliament was looked to for protection ; but our American writers upon taxation say that the legislature is no longer a safeguard of the people.

Mr. Burroughs, in his treatise, says (page 6): "In England the encroachments upon private rights, where made by the executive, often supported by pliant judges, the great battle for private right and individual liberty was fought by the house of commons, and when these were placed upon a firm foundation every Englishman regarded parliament as the great bulwark against oppression.   In this country the danger to private right and individual liberty has been that legislatures, influenced by popular passion and prejudice, or controlled by combinations of vicious men, should disregard everything that opposed their wills, and the courts have been looked to by the people as a protection from arbitrary acts of

the legislature." Therefore I say to your Honors that the legislature is not the place where these corporations can get relief, especially against a law which holds out a bribe to the people at large by saying: "Keep this law on the statute book, and your whole property shall be exempt from state taxation for all time."

Whatever doubts may have existed as to the power of the courts to restrain these excesses before the adoption of the constitutional amendments, since their enactment there can be no question as to the power or duty of the courts of law in the premises.

For the Morris and Essex Railroad Co., defendants in error, *Joseph D. Bedle.*

I. The whole scheme of the act contemplates and provides for a property tax, treating franchises as property, alike with all tangible personal and real property used for railroad purposes. The franchises are subjected to a valuation by the state board as property at their true value, so called.

The opinion of the Chief Justice in the Supreme Court regards (and it could not be otherwise) the whole assessment as a property tax, and from that standpoint the court declares it obnoxious to the constitutional provision that "property shall be assessed for taxes under general laws and by uniform rules, according to its true value. Art. IV., § 7, ¶ 12. That the state tax imposed is but a mere exercise of arbitrary legislative will and contrary to this provision of the constitution, is so exhaustively shown by the Chief Justice as to make it very difficult to add much to his argument.

This constitutional amendment must apply to every tax that is assessed upon a property basis or valuation, and must necessarily include all property, or else have no practicable force or protection to the citizen.

In the assessment of property it is required that there shall be general laws, uniform rules, and that the value shall be the true value.

The condition of things just previous to the time of the adoption of the amendment in 1875 was this: there were many local acts providing for different modes and principles of taxation in the various taxing districts or municipalities of the state. Notably the cities had different systems. Further, assessors almost invariably failed to assess property at its actual or true value. Taxes varied according to the laws of locality, and assessments were made upon improperly reduced values.

The great gain by this amendment was that property should be assessed by general and not local laws, and that the valuation should be the true value. That there should be uniform rules was already fundamental law, and the amendment declares it in order that the principle should be strictly enjoined as a part of the organic law of the state. This constitutional provision grew out of not only the apparent but the real need of protecting all property from unequal exactions and making it bear its equal share of the common burden.

If the amendment is to be restricted to only such property as the legislature may, for the time being, select, according to its will, for taxation, then there is no gain thereby, and no effectual constitutional protection to property from unjust taxation, particularly in restraining the legislature from determining that a part of the property should bear the burden of the whole.

It does not require argument to show that the object of the amendments of 1875 was to compel the adoption of a system of general laws for all cases practicable, and in the enumeration of particular subject matters which were to be subordinated to that system, it is particularly mentioned that "property shall be assessed for taxes under general laws and by uniform rules, according to its true value."

The mischief existing at the time of the amendment is not remedied by restricting the application of the word "property," for by such restriction the object sought, of equal and just taxation, becomes almost, if not quite, a burlesque.

There is no intention expressed to limit the word "prop-

erty " to any part thereof that the legislature may merely pick out to be taxed.

The form of expression is general, and carries with it, by natural construction, all property. It deals with property taxes without qualification, and requires that the assessment thereof shall be under general laws.

The general form of the clause, section 12, is apt and fitting for the inclusion of the whole range of taxable property. The words "according to its true value" might as well be construed as permitting the legislature to authorize an assessment upon the true value of some property and not the true value upon the rest, as to attach to the word " property " the qualification of " some."

There is no room for a limited construction. The scope of the clause is broad, and its remedial character and protective purpose require that it shall be read in its natural and comprehensive sense.

The meaning of the amendment is that taxation of property (all property) must be made according to general laws, and hence there can be no arbitrary selection of the objects of taxation, but all property shall be subjected to the force of and be protected by general laws, and the rules by which the tax is imposed upon the same shall be uniform, and the value the true value, the great object being to lighten the burden of taxation by making it common and equal.

The purpose was to break up radically the whole system of local law, where it could be done, and also unjust or capricious discriminations, so that the public would in reality have the benefit of equal taxation.

The sovereign power of taxation, uncontrolled by constitutional guards, leads to injustice and oppression, and the adjustment of a proper tax law has been the study of the wisest men of the state from its organization. Tax commissions, composed of the most learned and experienced, have not been uncommon in New Jersey, and tax discussions have elicited the best thought of the ablest men upon the subject. Local tax laws were but the results of different lines of leading thought,

all professing to be the best systems of taxation, but each being found wanting in many respects to insure an equal distribution of what should be a general and equal burden. In the light of the experience of a century, this amendment of 1875 was adopted, and it has in it radical principles striking, among other things, at the power of arbitrary selection.

Whatever interferes with the enforcement of the principles of the amendment must give way ; as, for instance, when taxes are imposed under the sovereign power of the state merely, without constitutional restriction, classification of particular property according to will may be adopted and different rates imposed upon property so classified, or some property might be classified and taxed and other property escape taxation, and hence the idea of classification of property is recognized in the law, the exact meaning of the doctrine, however, being in some respects uncertain or obscure. But when classification is sought in the light of the amendment, its meaning as a sovereign act must be abridged by the principles contained in the constitutional provision. In other words, the legislature cannot, under the mere color of the right to classify, restrain the purpose of the amendment, which is to subject all property to the operation of general laws in its taxation.

Classification to support such a tax act as this in question is nothing more than the exercise of legislative will, and while we recognize the principle of classification in making general laws on the subject of taxation, classification can be used only to make the obligation of the tax general and equal upon all property. This view clears up the confusion arising out of the argument from the standpoint of classification, for classification is only a mode by which the legislature may adjust its laws so as to give full force to the constitutional provision. Classification cannot be used to defeat or cripple its purpose. It may be an aid to accomplish it, but not to thwart it.

Let it therefore be borne in mind, I respectfully insist, that there is a vast difference between marshaling, so to speak, the property of the state for equalizing what should be a common

tax, and so dividing up property as to make one part bear the whole burden or more than its proportionate or due share.

Classification may be lawful and useful in the equal distribution of the burden, but will be unlawful if it disturbs or defeats that purpose.

The leading scheme of this act of 1884 is to raise a state tax of one-half of one per cent. out of all the railroad and canal property in the state, including franchises as a part thereof, the same to be "applied to the uses of the state according to law." See sections 12 and 14 of the act.

There is no other state tax except the annual special school tax of two mills upon the dollar. *Rev., p.* 1083.

The act of 1884 selects, out of the mass of the property of the state, railroad and canal property, to pay this tax of one-half of one per cent. for general state purposes, not school.

The Chief Justice, in referring to the principle claimed, says: "Admit the principle, and it becomes an inevitable corollary that the property used in the pottery business in this city of Trenton could, at the legislative pleasure, be encumbered annually with the entire tax necessary to defray the expenses of that municipality."

How is there any escape from the force of this suggestion? None of the vast business interests of the state would be safe from such tyranny if it were permitted. Oppressive discriminations might arise in the conflict of local interests, between town and country, farmer and manufacturer, the rich and the moderate in means, or the poor, and no protection be found but in the unbridled will of the legislature.

Until a recent period in the history of legislation it was the policy of the state to obtain, by contracts with the different railroad companies, such a revenue as would greatly assist in defraying, if not entirely, the expenses of the state. Some of these contracts were irrepealable, but the most of them were repealable; whether repealable or not, they were contracts. The decisions speak with only one voice in this respect, and the tax act of 1866, (*Rev., p.* 1156, § 15,) excepts from its operation private corporations exempted from taxation by

virtue of contracts in their charters.    The State of New Jersey has largely profited by these contracts, so much so that in many years no state tax has been necessary.

I will not stop to justify, (although it may be easily done,) a state policy with reference to railroads which has not only supplied the treasury liberally with revenue, but has built up cities, towns and villages, and has developed the wealth of the state with wonderful rapidity, and focalized here the commerce of the continent, for my purpose is merely to refer to such policy and to show that it was based upon contracts with railroad companies in granting their charters.    These contracts have been, in the main, observed by the companies, although with many the earnings were so light as to make the payments difficult and embarrassing.    The modern notion, however, has been, by disregarding the contracts, to obtain more tax for the state, and for that purpose to subject railroad companies to the general power of taxation.

The act of 1884 is founded upon that idea.    True, its purpose is broader and intended also to subject them to local taxation, but the main object of the act is to annul the contracts, so far as possible, and compel the companies to submit to a system of taxation unaffected by all contracts.    There are some contracts which cannot be disregarded consistently with good faith and the sacredness of contract obligations, but the present effort is to destroy all contracts that are repealable.

The act of 1884 provides for an imposition of tax under the sovereign power of the state, unfettered by contracts. That being so, the constitutional amendment, to which the power of the legislature is subject is as much for the protection of railroad and canal companies and other corporations as it is for private individuals.

We may revolve this amendment in our minds as much as we choose, and sometimes be on different sides of its construction, yet at last its natural reading and purpose seem to be that all property, whether corporate or individual, shall bear the common burden of taxation, upon an estimate of true value secured by general laws and uniform rules.

It does not necessarily follow that the purpose to subject all property to the common burden of taxation deprives the legislature from making certain exemptions, which are nothing more than a designation of such property as is not a proper subject of taxation consistent with the duty and correct policy of the government in encouraging and fostering public virtue, character and the elevation of the masses.

The Chief Justice, in his opinion, indicates this property as quasi public. Of course public property, strictly, is not a subject of taxation, and there is a range of property devoted to educational, religious, benevolent and other quasi public uses which, from the good that results to the people, may well be dropped by the state from the operation of a general tax act. Even if illegally exempted, in a technical sense, it would not interfere with the force of a general tax act, but I do not place this exemptive right there. It is deeper and broader and wiser, and is founded in a principle which, to my mind, every enlightened government should recognize.

In the light of the past history of the state, and in the absence of express indication, the amendment need not be construed inconsistently with these views. Such a construction would be stinted, illiberal and contrary to a uniform state policy, which has been and is founded in wisdom and the necessities of good government.

Put now the state tax in question to the test of the requirements of the amendment, and its unconstitutionality is palpable. While railroad property may be segregated this year for taxation, for the purpose of bearing the whole state tax, next year, factories, in whole or in part, or farms, may be compelled to bear it. I speak of it as a question of power. While the franchises of railroad corporations may be this year valued as property, and weighted down under ideal estimates of value with a heavy burden of tax, the next year franchises of the various manufacturing organizations of the state may be compelled to bear the same. The principle of this act of 1884 clearly leads to that result.

But take the tax upon the property assessed in the concrete,

and it is nothing more than an imposition upon arbitrarily selected property from the great body to bear the load, for the time being, of the expenses of the state, to the exclusion of all other property. Whatever lines may be run on the subject of general laws or the classification of property, is it not clear that this scheme cannot be lawful or right?

The assessment has upon its face all the elements of a special tax, and not a general tax under a general law. I ask, cannot it be seen and felt, without argument, that the law and the tax are special?

The title of the act, being " An act for the taxation of railroad and canal property," is purely special, and there is no purpose in this or any other act to compel other property to bear any part of the general tax.

Let us now look at the act in its more subordinate but substantive parts.

II. The franchise tax is illegal and void. Franchises, in their nature, are ideal largely, and have none of the characteristics of ordinary property. There is no standard of value by which they may be estimated by themselves as property. They become associated with and give value to property depending upon their use, but as distinct interests they are as capricious in taxable valuation as the whims and prejudices of men may make them. The legislature has attempted to delegate to the state board the power to value the franchise, without giving any measure or rule of valuation. Everything is left to the arbitrary will of the members of the board, and the return shows that two rules have been adopted by themselves, each of which is but an attempt to exercise legislative power, and each is the result only of arbitrary notion or will. One rule is founded on an estimate of the value of the capital stock and the securities representing the debts, less the valuation of the tangible property, and then taking sixty per cent. of the result as the value of the franchise; and the other rule is, where the value of the capital stock and the securities representing the debts are less than the tangible property, then the gross earnings are ascertained and twenty per cent. thereof

taken as the value of the franchise, which would, as the board say, make the tax upon the franchise equal to one-tenth of one per cent. upon such gross earnings.

A franchise tax, so called, may exist unless prevented by our constitution. It may be said to be the designation of such taxes as are imposed upon corporations apart from their ordinary property, and may be upon the basis of capital stock, gross or net earnings, or in other modes, but whenever the legislature requires a franchise tax it should provide the measure or rule for its assessment or exaction. The will of the legislature in this respect cannot be delegated. It would be contrary to the nature of taxation. The courts of this state, in the absence of constitutional provisions, have been rigid in preserving fundamental guards around the taxing power so as to prevent, under the pretence of its exercise, an undue invasion of the property of the citizen.

Taxation is a legislative act. The details, of course, of assessment may be delegated.

This doctrine may, perhaps, be more liberally administered in case of municipal corporations, which are a part of the machinery of state government, and upon which limited legislative powers have been immemorially bestowed. *Cooley on Taxation* 51.

But the fundamental idea underlying the right of taxation is that a standard or measure of valuation and apportionment shall be fixed by the legislature. In addition to that, equality and uniformity are essentials in the law. *State* v. *Readington*, 7 *Vroom* 70.

The administration of the law may not always work justly, but the law itself must contain these requisites.

What are the franchises? They are not the tangible property of the corporation, but they become so interwoven with much of such property as to make the separation often impossible or difficult.

Now I do not deny that the corporation has an interest in the franchise of a property nature, but it is a property interest of peculiar character.

In the *Dartmouth College Case*, 4 *Wheat.* 700, Justice Story says that franchises " are not mere naked powers granted to the corporation, but powers coupled with an interest. The property of the corporation rests upon the possession of its franchises, and whatever may be thought as to the corporators, it cannot be denied that the corporation itself has a legal interest in them."

See, also, *Society for Savings* v. *Coite*, 6 *Wall.* 606, 607. In this case these franchises seem to be put on the same general plane as trades and avocations by which the citizens acquire a livelihood.

In legal contemplation (outside of constitutional abridgment) there is undoubtedly an interest of value in franchises, (*State Railroad Tax Cases*, 92 *U. S.* 603,) but these franchises in their very nature are different from real estate or other tangible property, and cannot be estimated upon the same basis.

Examine the two rules.

Why take sixty per cent. of the estimate in one case, or figure out what would equal one-tenth of one per cent. upon the gross earnings in the other? Are the debts in the one case, and not in the other, any test of the earning capacity of the road or the value of the franchise to run it? Practically, the law might work in this way—the rate of tax for the state being fixed, and the value of the tangible property being ascertained, it is only necessary for the board to find out from the state officers how much the treasury may need for the year and then use the franchise to raise it accordingly. The sixty per cent. can be increased or diminished, or the per cent. upon the gross earnings changed as the board may think best. This entirely dispenses with legislative action or protection, and leaves the state officers and the board virtually the taxing power as to the franchises.

Notwithstanding the best efforts of the courts to the contrary, it is a fact that under color of the taxing power, rights of property can be, and have been swept away like chaff. The history of the last twenty-five years in our own state proves it. Abuses will occur in the administration of tax laws when

carefully guarded, but when the fundamental principles which underlie them are weakened or disregarded, then property is but an idle name.

The case of *Railroad Company* v. *Vance*, 96 *U. S.* 450, is relied upon in favor of this law, and also the *Illinois State Railroad Tax Cases*, 92 *U. S.* 575. The Illinois statute was passed under very broad constitutional provisions. These provisions are found in 92 *U. S.* 577.

In New Jersey, franchises have never been regarded as property in any direct sense for valuation and taxation, but if the amendment (art. IV., § 7, ¶ 12,) includes them as property, then their valuation, by reason of their nature, cannot be left without measure or standard of estimate to the board. The duty of determining the rule or rules of their assessment is still in the legislature. The true value of the amendment is not a sufficient standard in itself whereby to estimate the franchises.

Further, there is no substantial legal value to corporate franchises in New Jersey, and hence they should not be considered as taxable property in themselves.

Under the constitutional amendment of 1875, (art. IV., § 7, ¶ 11,) the legislature is prohibited from passing any special act conferring corporate powers, and is commanded to pass general laws under which corporations may be organized, and corporate powers of every nature obtained. By reason of this, there is no substantial value to franchises in contemplation of law. There is also a general railroad law upon the statute book, and the right to build and run a railroad is free to any corporation that can organize and raise the necessary funds. Competition is unrestricted, so that while the franchises may have a technical or nominal value, there are no such elements in them as to admit of any substantial assessment on the basis of their separate valuation. By this amendment it was intended to put corporations mainly upon the same footing as natural persons. *California Railroad Tax Cases*, 13 *Fed. Rep.* 722, (San Mateo *v.* Pacific Railroad Co.,) and particularly opinion of Judge Sawyer at page 779. This was a case

in United States Circuit Court of California, Judge Field presiding. If the franchises are to be valued separately, the valuation should only be nominal. In the same article and section of the constitution, section 11, the legislature is prevented from granting by special law to any corporation any exclusive privilege, immunity or franchise, or the right to lay down railroad tracks.

III. The next leading purpose of the act of April 10th, 1884, apart from the state tax of one-half of one per cent., is to raise and distribute, through the instrumentality of the state board, in the various taxing districts in which railroad property is found, certain sums for local uses. An examination of the act will show that in this respect it is also unconstitutional and illegal.

If it be claimed that there is any peculiarity about ordinary railroad property, it can only be so in connection with the franchises, but the act separates all the tangible real and personal property from the franchises, and upon said property, outside of the main stem, imposes a tax at existing local rates.

By section 5 the assessors are required to "certify to the state board the local rate of taxation for county and municipal purposes, as soon as the same shall be determined." By section 12 that local rate is to be imposed, but not exceeding one per cent. This is in addition to the state tax of one-half of one per cent., which is assessed upon the whole valuation, embracing all the property and the franchises.

The attempt to correct the difficulty and equalize the tax, in section 12, does not help the matter, for the franchises are then made subject to a local tax estimate in addition to all the tangible property, including main stem, for the purpose of saving the tax to the state. There is really no local tax upon the franchises under the act, but they are thrown into the estimate to sustain the state tax. Even with this scheme, there is still a total disregard of the failure to estimate the valuation of the tangible property or the franchises, in regulating the local rate.

Property upon which the local rate is imposed bears, in ad-

dition to that, the one-half of one per cent. for the state tax. Now, for the purpose of sustaining the whole of that, and the state tax upon the franchises and main stem, such franchises and main stem are subjected to a proportionate valuation in the district; and if the local rates thereon and upon the other property (should the same be imposed) would not require the payment of more than what would be paid by the company altogether as state and local taxes, then the assessment, as made, stands, but if it does not, then the board may equalize on that basis. There is no local taxation upon franchises, or any basis of valuation thereof provided under the general tax laws of the state, and hence this part of the act is a mere contrivance to sustain both the state and local assessments.

Corporate franchises are no part of the ratables of the taxing district, and do not affect the rate of tax therein, yet, in order to save the rate and obtain the state tax too, railroad franchises may be taken into the calculation of the board. Other franchises in the district are also totally disregarded.

In some districts, as, for instance, the city of Newark, which is full of corporate organizations, a valuation of their franchises would increase immensely the aggregate of ratables and reduce the local rate.

These difficulties are in the law itself. The scheme violates the doctrine of uniformity, which is not only inherent in the principles of taxation, but protected by our constitutional amendment and also the amendment to the constitution of the United States securing to all the equal protection of the laws. *San Mateo* v. *Southern Pacific R. R. Co.*, 13 *Fed. Rep.* 722.

But let us proceed to another objection. The local rate having been applied without allowing the value of the railroad property to be taken into the aggregate of the valuation of the district in fixing the rate, then the money raised is allotted to the various taxing districts which, as the act says, shall be at the disposal of the proper authorities for public purposes. Section 4. Whether the district needs the money or not, the assessment is to be made, and the tax collected out of railroad property.

The object of the act is to assess and levy a local tax upon railroad property in every district throughout the state in which any such property happens to be, and then pay it over to the district without regard to whether for the time being it is needed for public purposes or not. This is contrary to every just principle of municipal·taxation. The purpose should not only be public, but local. 1 *Desty on Taxation*, § 9.

There is some protection under the general laws of the state in regard to raising money by taxation in townships, or in the laws governing cities and other municipalities, that the local purpose for which a tax burden is imposed shall be either determined by the people or a municipal body so authorized; but under this act a tax is to be assessed and collected without regard to purpose or public need, and then (after collection and distribution) the boards and committees of the districts invited to spend it.

Where is the protection to property in such a law as this? The disasters to property rights in this state within the last twelve years by municipalities forbid the toleration of any such power as that. This point is radical.

Two systems like these, one ordinary and the other extraordinary and exceptional, cannot be made to work justly and equally. The fundamental idea of municipal government is to leave the people to take care of their local affairs themselves, for in that way, knowing their own condition, there can be more equality and justice and protection. Property, using that word in its ordinary sense only, which is all alike bound to bear the common burden, should not be exposed to the differing opinions and influences of different boards or officers, even if the objection is no more radical than that.

In the same taxing district the same influences ought to prevail, in order to obtain an equal valuation. State board rule and home rule will not accord in valuations.

But the chief defect of the act under this head is that the tax is to be assessed and paid without any expression of the local authorities as to the public purpose for which it is to be raised or the necessity therefor. Ordinary property is pro-

tected from excessive taxation in the locality by the judgment of the municipal authorities or the people at their elections, of the public needs for designated public purposes.

The state board, however, is authorized to pick out railroad property in the same district and to assume that although a rate has been fixed which will give the district all the money necessary, (for that is the object of tax laws affecting municipalities,) the district can dispose of more for the same public purposes. This is not a rash presumption, for I think most of the municipalities of the state would be able to spend all the money that the state in its magnanimity would raise and give them, particularly if it came out of railroad property exclusively. Many of the cities and towns of this state have shown a wonderful ability in making expenditures and calling them public.

Municipalities are a part of the recognized government of the state, and have always been intended for the better government and protection of the people and property therein. The system is a part of the common law of the state, so to speak. Take it by itself, with all its guards, both as to purpose and necessity, on the subject of taxation, and contrast it now with the system provided for in this act, that the state board, after the municipality has acted and made provision for the yearly tax, shall make another assessment, without any particular purpose or necessity indicated, and after the tax is exacted and paid, give it to the municipal authorities for disposal. In one district, as already stated, the amount was so large that the board was obliged, in some arbitrary way, to reduce it.

Uniform rules require not only an equal distribution of the common burden, but a distribution of the same tax. It is impossible, I respectfully submit, to make the two systems equal and just.

IV. Under the amendment to the state constitution the legislature cannot pass local or special laws " regulating the internal affairs of towns and counties ; appointing local offices or commissions to regulate municipal affairs." The property liable to local tax under the act of April 10th, 1884, is valued

separate from the franchises. It is not the main stem, but the other real estate of the company, which is to be valued the same as the real estate of a natural person, without reference to franchise, in order to raise the local tax. Local taxation is peculiarly an internal affair of the municipality. Under the guise of a general law the legislature has undertaken by a board or commission to control and regulate taxation within such taxing districts as happened to have any property therein used for railroad purposes. There is no relation between one taxing district and another in making the local assessment, and no general reason why such a board should be constituted for that purpose. The mere existence of property used by a railroad company in a district does not, I submit, upon any principle, make a valuation outside of the district necessary or even proper.

In view of the settled policy of the state against local commissions and legislative interference with the internal affairs of municipal bodies, and also in the light of the tax amendment, the legislature has ventured very far in this respect, and, I submit, violated all the constitutional provisions referred to.

V. The provisions (sections 10, 11) in regard to deducting mortgages and debts are a mere illusion or pretence, and cannot practically be carried out. Hence the property of the corporation cannot obtain an equal deduction for debts and mortgages with a natural person. The debts due by the corporation are therefore actually assessed against it and valued as property of the corporation. The fourteenth amendment to the United States constitution applies to this. 13 *Fed. Rep.* 722.

Sections 10 and 11 are also contrary to art. IV., § 7, ¶ 4, of our constitution, in making the provisions of the general tax act a part of this without inserting them, &c.

VI. The valuation for the year 1884 was made according to the valuation of the property as it existed January 1st, 1884. Section 21 of the act. In other words, the local tax rate for the year 1884, which was made up according to valu-

ations relating to May 20th, under the general tax law, is applied to valutions really based on the year 1883, and this will be the operation of the law every year. In a panic, a few weeks may make a vast difference in valuations. In this respect the two systems for local taxation are not uniform.

VII. The sidings, water-tanks, engine-houses, turn-tables, and other structures of every kind, including docks, wharves, piers, crib-work and bulkhead, and basins, have been rated and taxed by themselves as real estate, and the land has been valued and taxed by itself. See reason 16 in Morris and Essex return, and reason 13 in the other cases.

The returns develop this fact :

By section 3, the real estate is to be valued including these structures, &c. The plan adopted by the board was to value them separately as structures or improvements, without reference to their relation to the land of which they formed a part. Sidings on wharves and trestles and in yards and elsewhere were separately valued and assessed as real estate. Crib-work forming bulkhead is alike separately valued and so assessed, and sheds upon wharves are valued in the same way. This error in principle cannot but lead to fictitious and unjust variations. The enumeration of tracks, buildings, water-tanks, riparian rights, docks, wharves and piers, &c., was only intended to have these considered as a part of the real estate, and not by themselves as real estate.

In local assessments, lands with the buildings and other structures thereon are taxed as an entirety. Whoever would think, under the general tax act, of valuing and taxing a house separate from the land upon an estimate of the material and work represented in it ?

If the act of 1884 means a separate taxation for structures and land, then in that respect there is a want of uniformity between the general tax law and this act.

VIII. All the defects referred to are in the act itself, except perhaps the one under the last head, which may be only an error of administration by the board.

I do not see how it is possible for the court, even under the power of section 16, to maintain any of the assessments made under this act. The court cannot make a tax law. That is legislative business.

The scheme of taxation is an entirety and if the state tax falls, the whole goes. The local taxation therein provided is incidental to the main purpose, which is to raise a state tax.

If the state tax is void, no attempt can be made to collect revenue for the state under the contracts of the railroad charters without meeting at once the proviso, in most if not all of them, that no other tax or impost shall be levied or assessed upon the company, or to that effect. This proviso necessarily repudiates all other taxation, local or otherwise, except as provided in the contracts with the companies in their charters.

These contracts are not divisible or alterable. The Chief Justice dealt with that question fully. Those that are repealable may be abolished and the companies subjected to a general tax system, but the contract while it subsists is just as inviolable as though made between individuals.

The whole act should be declared illegal and void.

For the Central R. R. Co., defendant in error, *George M. Robeson.*

For the Tuckerton R. R. Co., defendant in error, *H. A. Drake.*

For Jersey City and other taxing districts, *Gilbert Collins.*

I. *The Provisions of the Act for Taxation for Local Purposes are Independent of the Provisions for Taxation for General State Purposes.*

The property taxed for local purposes is that described in section 3, II., being land not included in the main stem and buildings except passenger depots. Section 6 also provides that there shall be only one main stem for each company in a taxing district, and that branch lines there shall be taxed under

section 3, II. This prevents undue exemption from local tax- ation of the land in any taxing district. Under the general railroad law a separate charter might be taken out for every siding, and there would be no limit to the amount of the ex- emption but for section 6.

The rate of taxation on this class of property is fixed by section 12 at " the local rate as fixed and assessed for county and municipal purposes upon other property in each taxing district, * * * which tax shall also be computed by the state board of assessors, but the last-mentioned rate shall in no case exceed one per cent."

The record of this tax is kept separate from that imposed for general state purposes, and when collected it is at once paid over to the county officers. The provisions for this tax are as independent of those for state tax as if contained in a separate act.

*II. Where Part of an Act is Void the Court will Sustain the Residue, if Separable, in Order to Execute the Legislative Intent as far as Possible.*

The principle here stated is not limited to the case of inde- pendent enactments, though it of course includes them. It is applied to sustain the body of a provision where a proviso or other qualifying clause is unconstitutional.

In ' *Commonwealth* v. *Kimball,* 24 *Pick.* 361, discussing a law in part unconstitutional, Chief Justice Shaw said : " To the extent of the collision and repugnancy, the law of the state must yield, and to that extent and no further it is rendered by such repugnancy inoperative and void."

In *State* v. *Elizabeth,* 11 *Vroom* 278, it appeared that the charter provisions for assessments for improvements were void. It was argued that the failure of the power to assess for the improvement destroyed the provisions authorizing the council to order the improvement, but the court sustained the power. Dixon, J., said : " Though every provision of the charter as to assessments be obliterated, there still remains constitutional power enough for carrying on such public works."

In *Exchange Bank* v. *Hines*, 3 *Ohio St.* 1, a tax law was assailed because, in violation of the constitution, it allowed debts to be deducted from credits and moneys. The court sustained the rest of the law, and thus enforced against moneys and credits a tax on their full value without deduction. See, also, *Presser* v. *Illinois*, 116 *U. S.* 252, and cases there .cited.

Many other cases where an unconstitutional proviso or reservation has been held not to impair the force of the residue of the section or sentence, we cite under point VI.

*III. Section* 30 *of the Act Establishes the Legislative Intent that the Invalidity of Part of the Act shall not Impair the Residue.*

The reason why the court sustains an act of which part is void is that the intent of the legislature may be carried out. The question is one of intent. In this case the intent is not left in doubt. Section 30 expressly provides " that if any section of this act shall for any reasons be held to be unconstitutional or invalid, it shall not affect the other provisions of this act, or any of them.

This constitutes a controlling rule of construction for the act. It means something, and should have force given it. It means that when the court have stricken out the void part the residue shall, if possible, have effect. It closes the door to all speculations whether the legislature intended the rest to have effect independently of the void portion. It leaves only the question whether what remains can practically be carried into effect if enacted alone.

*IV. Those Provisions of Section* 12 *which Impose a Tax on Certain Railroad Lands at a Rate Uniform with that on Other Property in Each Taxing District, are Valid, and this is True whether the State Tax is Valid or Not.*

We lay aside for the present the limitation of the rate to one per cent. in certain districts. Assuming that limitation to be stricken out, can there be any doubt that the tax is lawful? It groups certain land and buildings in each taxing district,

and imposes upon them the same rate imposed upon the adjoining land and buildings for the same public purposes. The fact that the main stem and passenger stations are taxed less or not at all, furnishes no better argument to declare this local tax invalid than to declare the tax on adjoining farms invalid. Here is certain property made taxable at local rates for local purposes; if the provisions for the state tax had never been inserted in the act the validity of this local tax would not be questioned.

How can the addition of these provisions for a state tax, if void, destroy the local tax? Suppose an act made a void appropriation for a state house and a valid appropriation for a town hall, would any one claim that the unconstitutionality of the first appropriation would destroy the second?

Suppose the court considered the provision of the act in question for state tax valid and that for local tax void. Would the court in that case hold the state tax void because of the failure of the local tax? One is as much entitled to consideration as the other, but the Supreme Court has given the local tax no consideration at all. It has been too hastily assumed that the condemnation of the tax for state purposes involved that for local purposes.

The tax for local purposes is separate and independent, and requires a separate consideration as much as if it were imposed by a separate act.

V. *That Clause in Section* 12, (" *but the last-mentioned rate shall in no case exceed one per cent."*) *which in Certain Taxing Districts Reduces the Rate from the Local Rate to One Per Cent., is Void.*

Consider the effect of this limit. The rule is not uniform on railroads as a class, for it makes the rate vary according to that of the districts where the property is found. Neither is it uniform with respect to o her property in the same taxing district.

In places where the local rates are less than one per cent. the tax is apportioned equally upon this railroad land and

other property in the same taxing district. Where the local needs require an increased rate, the railroad land is assessed not at that rate, but at one per cent.

In some towns railroad land is by the law placed on the same footing with respect to local burdens as other land; in others it is given a lower fixed rate, regardless of the public wants and of the advantages the property receives by increased public expenditure.

The provision limiting the local rate on railroad land to one per cent. classifies taxing districts into two classes. One comprises those where the local rate is less than one per cent., and the other where it is more. In the first class, railroad land is assessed at the local rate; in the second it is assessed at one per cent. Is it proper classification to make a class of towns where the rate exceeds one per cent. for the purpose of discriminating in favor of railroad property in such towns? Is not this plainly one of those false classifications which " create preferences and establish inequalities?" *Van Riper* v. *Parsons,* 11 *Vroom* 9. Is this taxation by uniform rules?

It is not permissible to impose two different rates of taxation in one taxing district for the same public purposes. This is only allowed in case of assessments for special benefits. *State* v. *Fuller,* 10 *Vroom* 576.

The law says to the people of one town: " In your town the railroad land is one-tenth of all the property, and shall pay one-tenth of all the local tax;" and then to the people of the next town: " In your town the railroad land is one-tenth of all the property, but shall pay only one-twentieth of the local tax, because your rate is two per cent." This is not taxation " under general laws by uniform rules," nor according to true value. We shall fritter away all the meaning of the constitutional provision if we allow such a piece of injustice to high taxed towns to pass unchallenged. If the provision in question is valid, then it would be valid to provide that where the local rate exceeds two per cent. railroad lands shall be taxed at the rate of one-tenth of one per cent., or not at all. It is true, property may be classified for taxation, but

only " provided it is apportioned upon the rule of uniformity."
Van Syckel, J., in *State* v. *Fuller*, 10 *Vroom* 578.   In *State*
v. *Runyon*, 12 *Vroom* 105, Depue, J., said that a law which
" leaves the rate of taxation to depend on the rates to which
all other property in the taxing locality is subject " is consti-
tutional.  It is a fair inference that a provision in a law which
in some localities imposes the local rate, and in some a lesser
rate, is void.   This inference is squarely drawn in *Stratton* v.
*Collins*, 14 *Vroom* 565, where Dixon, J., said : " The property
to be taxed being thus indicated, the direction that it shall be
assessed by uniform rules according to its true value, becomes
applicable.   This direction requires and is fulfilled by such
regulations as should impose the same percentage of its actual
value upon all taxable property in the township for township
purposes, in the county for county purposes, and in the state for
state purposes."   Cites *State* v. *Runyon, supra,* and *Exchange
Bank* v. *Hines*, 3 *Ohio St.* 1, in which case Chief Justice
Bartley said : " Taxing by a uniform rule requires uniformity
not only in the rate of taxation, but also uniformity in the
mode of the assessment upon the taxable valuation.   Uni-
formity in taxing implies equality in the burden of taxation."
To the same effect see *East Portland* v. *Multnomah County*,
6 *Ore.* 62.

In *Vreeland* v. *Jersey City*, 14 *Vroom* 135, 138, Reed, J.,
said : " The uniform rules of the constitution mean rules
which fix a common standard for the assessment of taxes for
the state, and all its political subdivisions."

In *Trustees* v. *City of Trenton*, 3 *Stew. Eq.* 667, 677,
Depue, J., defined the operation of the constitutional pro-
vision as extending to the uniform apportionment of taxes as
well as assessment of property.

In *Auryansen* v. *Hackensack Improvement Commission*, 16
*Vroom* 113, a law providing for an assessment of taxes only
on holders of land worth $100 or more, was held void for
want of uniformity, because the tax should have been assessed
equally on all property.   Suppose the law had provided that
certain of the property in Hackensack should pay not over

. one per cent. and the other property should bear the rest of the public burdens, would not such a law have been equally objectionable for the same reason ?

The constitution of Wisconsin provides as follows : " The rule of taxation shall be uniform, and taxes shall be levied upon such property as the legislature shall prescribe." The legislature imposed on railroads a state tax of one per cent. on gross earnings, in lieu of other taxation. It was held void in *State* v. *Winnebago Lake Co.*, 11 *Wis.* 34, 40.

In *Gilman* v. *Sheboygan*, 2 *Black* 510, a law providing that personal property should not be taxed to pay the city debt was held void by the United States Supreme Court under the Wisconsin constitutional provision above quoted.

Cooley lays down the law in these terms : " Given a tax and a district, then the sum demanded of any one person, or laid upon any one parcel of property, must have fixed relation to the whole tax, as well as to that demanded of every other person or laid upon every other piece of property. * * * There cannot be two rules of apportionment for the same tax in the same district; if there could be, there might be any number, and in effect there would be none at all, and every man might be assessed arbitrarily." *Cooley on Taxation* 180. See, also, *Primm* v. *Belleville*, 59 *Ill.* 142, 144 ; *Hale* v. *Kenosha*, 29 *Wis.* 599.

" The tax is uniform when it operates with the same force and effect in every place where the subject of it is found." Miller, J., in *Head Money Cases*, 112 *U. S.* 580, 594.

In *People* v. *Auditor*, 7 *Mich.* 84, 96, Manning, J., said that the provisions of the Michigan constitution for a uniform rule of taxation of property, and for its assessment at its cash value, " mean that all descriptions of property subject to taxation shall pay such proportion of a tax as their cash value bears to the aggregate cash value of the whole property subject to the tax."

If it is said that our argument has equal force to destroy the tax for state purposes of one-half of one per cent., we reply :

First, it is not material to the question of the rate for local uses whether the tax for state purposes is valid or not.

Second, the tax of one-half of one per cent. is uniform throughout the state upon all that class of property used for railroad and canal purposes, and the classification is fairly made.

Third, the tax of one-half of one per cent. may perhaps be sustained as a uniform state tax on franchise, estimated on the value of the property used under the franchise.   Such a tax, not being a property tax, is not within the constitutional restraint.   On this ground a tax at the rate of one per cent. on railroads was sustained in Maine, after full consideration, in *State* v. *Maine Central R. R. Co.*, 74 *Me.* 376, 383.   This case shows the strong judicial leaning toward any reasonable construction that will save an act so vital to the public weal as a tax law.

In *State Tax on Gross Receipts*, 15 *Wall.* 284, 297, it was said : " The states may tax the franchise of companies created by them, and the tax may be proportioned either to the value of a franchise granted, or to the extent of its exercise." Why, then, may not the franchise tax be measured by the value of the property operated under the franchise ?

Fourth, admitting, for the sake of argument, that the rate for state purposes is void, the effect is, not to destroy the act, but to substitute the common rate established by the general tax law in place of the rate specified in the act.   See this discussed in point IX.

VI. *The Unconstitutionality of the Clause in Section* 12, *Limiting the Rate to One Per Cent., Does Not Destroy Any Other Part of the Act.*

Under point II. we have shown that the invalidity of one independent provision does not destroy another.   We now proceed to cite other cases to show that the same principle is applied to invalid qualifications, restraints, clauses and provisos.   The clause or proviso being invalid, it is treated as if it was stricken out or never enacted.   The body of the provi-

sion is sustained. "The striking out is not necessarily by erasing words, but it may be by disregarding the unconstitutional provisions, and reading the statute as if that provision was not there." Waite, C. J., in *Florida Central R. R. Co.* v. *Schulte*, 13 *Otto* 118, 142.

In *Supervisors of Albany County* v. *Stanley*, 15 *Otto* 305, a tax on bank stock was assailed because the owner was not allowed to deduct his debts from its value, as in the case of the general tax law relative to other personal property. Waite, C. J., said, after full discussion on this question : "So much of the law as conflicts with the act of congress in the given case is held invalid, and that part of the state law which is in accordance with the act of congress is held to be the measure of his [the tax-payer's] liability."

To like effect see *Exchange Bank* v. *Hines, supra.*

In *Tillman* v. *Cooke*, 9 *Baxt.* 429, the law provided that a party to a suit should be excluded as a witness in certain cases "unless required to testify thereto by the court." This clause was held void as a delegation of legislative power to the court, but the residue was sustained as separable, and thus the exclusion was made broader than by the terms of the statute.

So, it will be observed that in the above-cited cases of Supervisors v. Stanley, and Exchange Bank v. Hines, the effect of the constitution was to alter the amount of tax payable on certain property. In the former case the tax was diminished and in the latter increased from that imposed by the terms of the act as drawn.

In *Warren* v. *Mayor of Charlestown*, 2 *Gray* 84, 97, the rule is stated as follows : "If the main objects and purposes of the act are constitutional they may be carried into effect, although there may be isolated clauses or separate or independent enactments obnoxious to the charge of being in violation of the constitution." This is approved in *State* v. *Kelsey*, 15 *Vroom* 1, 29, which case is a close precedent for our contention. There an act provided that the secretary of state should furnish copies of the laws to the newspapers, and should "receive for his services under this act the rates now allowed by

law, provided the sum shall not exceed $1000 in any one year." (The tax law provides that certain land shall be taxed at the local rate, but the last-mentioned rate shall in no case exceed one per cent.) The secretary of state claimed fees under the act at the rates allowed in the fee bill for copies of papers, there being no other fees provided by law, but attacked the validity of the proviso as special legislation, "decreasing the percentage or allowance of public officers during the term for which said persons were elected or appointed." To this attack the attorney-general replied "that if the limitation in the proviso was void the act itself was void," and if the act was void the secretary of state could not claim fees under it. The court held the act valid and the proviso void, saying: "The judicial effort always is to uphold every act passed by the legislature, and, if the entire act cannot be sustained, to execute such parts of it as can reasonably be put in force." On this point there was no dissent. The presumption in favor of a tax law is certainly as strong as that in favor of one which makes an extravagant appropriation of public money. See, also, *Trustees* v. *Trenton*, 3 *Stew. Eq.* 667–676.

These authorities bear with double weight on our case because of the powerful presumption in favor of equal taxation. Be it observed that by the constitution, as we have shown, the tax for local purposes must be at the local rate. The constitution gives no middle ground between complete exemption and taxation at the uniform rate. *Pine Grove Township* v. *Talcott*, 19 *Wall.* 666; *People* v. *Auditor*, 7 *Mich.* 84, 96; *Hale* v. *Kenosha*, 29 *Wis.* 599, 604, and other cases cited *supra*. Therefore, in order to hold the whole provision void, the court must decide that it is clear that the legislature would have exempted the property altogether from taxation for local purposes rather than have imposed the constitutional rate upon it. Only by making this incredible presumption can the provision for local rates be invalidated. Of course, "the presumptions are always the other way." Waite, C. J., in *St. Louis, &c., R. R.* v. *Loftin*, 8 *Otto* 559. Every inducement will be made in favor of the equal imposition of the burden

of taxation. In the language of the United States Supreme Court, in *Bailey* v. *Maguire*, 22 *Wall.* 213, 227, "county and municipal taxation are quite as essential to the wants of the people as taxation for state purposes." If other property is charged with the payment of county, school and municipal taxes, why not the property of this [railroad] company? In no other way can the principle of equality in taxation, so essential to good government, be secured."

Therefore we say that apart from the provisions of section 30, the invalidity of the clause discussed in section 12, or of the state law, does not involve any other portion of the act, but if any doubt can exist as to the intent it is removed by the express terms of section 30.

*VII. Section 4 is Void if it Means that Property is to be Undervalued.*

The rule for the local assessors, prescribed by the general tax law and by their oath, is the full and fair value measured by a fair private sale. *Rev.*, *p.* 1153, § 57; *p.* 1155, § 71. If the assessors violate the law and undervalue, does section 4 mean that the railroad land is to be correspondingly undervalued? Assuming it to be so, we maintain that the section is void because it directs property to be assessed in violation of the constitutional provision that property shall be assessed by uniform rules, according to its true value.

*a.* As between the tax-payers who own this class of property, the rule of valuation in section 4 is not uniform. The land of a company in a taxing district where valuations are full will be valued by one standard; the land of another company, where the local valuations are low, will be valued by a more favorable standard.

*b.* As between taxing districts, the rule is not uniform. It furnishes a different standard of valuation of this railroad land for every taxing district. In each the question is made, not what is the land worth, but how much less than true value do the local assessors estimate land in that district?

*c.* As between the owner of railroad land and other tax-

payers in the same taxing district, the rule is not uniform. It provides, not for assessing railroad land by the standard fixed by the local assessors, but only for reducing the valuation of railroad land. If the state assessors judge the valuations of private property by the local assessors to be too high, they cannot increase their own valuation to equalize the local overvaluation. They can only reduce to equalize an undervaluation.

*d.* The assessment authorized by section 4 is not according to true value. Under the constitution, property must be assessed at its true value, and a provision that it shall be assessed at a lower valuation is invalid. See cases *infra*. Section 4 requires the state assessors, first, to ascertain the true value of railroad land; second, to ascertain the true value of all other lands in the same taxing district; third, to ascertain the assessed value of such other lands; fourth, if such assessed value is less than the true value, then to reduce the valuation of the railroad lands to the same extent.

This section seems to have caused more labor to counsel taking testimony in the case than all of the rest of the act. Under the following decisions there seems no room to doubt that it is void.

In *State* v. *Readington*, 7 *Vroom* 66, 70, Depue, J., said : " The tax must be apportioned among those who are to bear the burden upon the rule of uniformity."

In *Vreeland* v. *Jersey City*, 14 *Vroom* 135, 138, Reed, J., said : " In accordance with the constitutional provision, property is assessed at its true value."

In *Stratton* v. *Collins*, 14 *Vroom* 562, 565, Dixon, J., said that the constitution " requires only that the standard of valuation to be aimed at by each assessor shall be the true value."

Finally, this view was adopted by the Court of Errors and Appeals, in *Vreeland* v. *Jersey City*, 14 *Vroom* 638, 639, in these terms : " Under this constitutional provision, no tax can lawfully be laid upon property which is not determined either by a special benefit derived or by a valuation of the property with respect to which it is laid, upon a uniform rule of valua-

tion at its true value." See, also, *Schettler* v. *City of Fort Howard*, 43 *Wis.* 48, and *Goff* v. *Board*, 43 *Wis.* 55.

Therefore we say there can be no reduction of the tax assessed for local purposes in the cities we represent, because of any alleged undervaluation of the other property in the same taxing district. Reduction for any overvaluation by the state board of assessors, which may have been proved, is, of course, a different matter, and as to that we simply submit the facts to the court, claiming, however, that the taxing districts should have been made parties to the suits.

### VIII. It is the Duty of the Court to Raise the Rate and Valuation to the Proper Standard.

We now desire to present to the court a claim in behalf of the taxing districts that their tax should be increased because of the unconstitutionality of the proviso to section 12 of the act, limiting the local tax to one per cent. If, by the scheme of the act the "taxing districts" are presumed to be represented by the state so as to be bound by a possible reduction of the tax assessed in their favor, then surely they have a right to be heard through the state in support of their claim for an increase. Indeed, though the court should refuse to reduce because they are not parties, that is no reason why the court should not in their protection correct an erroneous assessment made at too low a rate. The court can bestow, though it cannot exact, where the party is not regularly before it.

The court has jurisdiction over the prosecutors, and they cannot complain if, as is the case, the increase is based upon a general principle evolved from the taxing act itself, and not particular facts which they might have litigated.

The authority for an increase by the court is found in section 16 of the act of 1884, and in an act approved March 25th, 1885, (*Pamph. L.*, p. 159,) entitled "An act concerning the taxation of railroad and canal property," the first section of which reads as follows :

" In all cases    *    *    *    in which a writ of *certiorari* is now pending, or shall hereafter be prosecuted in the Supreme

Court of this state, for the review of any assessment of taxes made by a state board of assessors, it shall be the duty of such * * * court * * * by whomsoever such * * · * writ has been or may be * * * prosecuted, to reduce or increase such assessment, as may be just, or to refer the same back to such * * * state board of assessors, * * * who shall correct or re-assess the said assessment in accordance with the instructions of such court."

What we ask is an increase, to the full local rate, of the tax assessment upon the property assessable, under the law, for local purposes, in cases where the limit of one per cent. adopted by the state board of assessors, in obedience to the void proviso to section 12, falls short of that rate. This is a mere matter of arithmetical calculation, the rate in each taxing district appearing by the returns of the local assessors made to the state board and now brought up and before the court by the writs of *certiorari*.

IX. *If the Rates Fixed by the Tax Law of 1884 are Void, the General Tax Law of 1866, which Applies to Railroad Property, Supplies a Lawful Rate to the State Assessors and the Court.*

The act of 1884 is readily separated into independent parts. It comprises:

1. Complete machinery for the valuation by the state assessors of the property of each railroad owner in each taxing district.

2. Provision for a separate valuation of land not included in the main stem, for local taxation.

3. Authority for estimating and correcting the tax.

4. Authority for collecting it.

All these provisions are valid; there remains only the rate of taxation which the Supreme Court holds void. This is not fatal to the other sections of the act unless the omission of the rate is destructive of the whole purpose of the act, and it is not destructive if any other valid law fixes a lawful rate. If such law exists, the state assessors must reckon the taxes at

this lawful rate.   To hold otherwise is to defeat the declared intention of the legislature by section 30, that the invalidity of part of the law shall not destroy the rest.

This important inquiry then arises : Does any valid law now in force fix a rate of taxation for railroad property ? The railroad tax laws of 1873 and 1876 do not, for the same argument that annuls the special rates of the laws of 1884 annuls the very same special rates (one-half of one per cent. and one per cent.) of the laws of 1873 and 1876.   Can we, then, resort to the special charter rates of half of one per cent. found in the charter of the Central Railroad of New Jersey and of other railroads ?   No, for all these rates that were repealed were repealed by the constitutional provisions of 1875 as interpreted by the Supreme Court.   We cannot distinguish between a fixed rate of taxation in a charter and a fixed rate in a general tax law.   The charter tax rates are still more objectionable than that of the act of 1876, for they are based on cost, and not on value, as the constitution, &c., requires.

The same constitutional ruling that destroys the rate in the act of 1884 repealed it in these special charters.   Just as the constitutional provisions of 1875 repealed inconsistent provisions in city charters, so it must have repealed special railroad charter provisions, so far as subject to repeal.   *State* v. *North Ward Bank*, 10 *Vroom* 380, 306 ; *S. C.*, 11 *Vroom* 558 ; *Trustees* v. *Trenton*, 3 *Stew. Eq.* 667, 676.

The effect of this repeal was to bring all these railroads under the terms of the general tax law of 1866.

We fall back, therefore, upon the general tax law of 1866, (*Rev.*, *p.* 1150,) and here we do find a complete provision for the taxation of all real and personal property at a uniform rate in each taxing district.   The act not only includes railroads and canals by its general terms, but expressly refers to them as included in the act.   *Rev.*, *p.* 1153, § 66.

The local assessors are superseded by state assessors under the act of 1884, but the rate, not being lawfully changed by that act, remains the same for railroad as for other property. When ascertained as prescribed by the act of 1866, (*Rev.*, *p.*

1150, § 61,) the act of 1884 (section 5) requires that it shall be certified to the state assessors. This rate it becomes their duty to impose on all the property valued by them in each taxing district. This duty, not having been properly dis-charged by the state assessors, now devolves upon the court under the provisions of the act of 1885. *Pamph. L., p.* 159.

It is true that the general tax law of 1866, as construed in *Douglass* v. *State,* 5 *Vroom* 485, exempted from its operation such corporations as had or might have a charter rate or exemption, whether repealable or not, and included only those few railroads whose charters did not fix a tax rate. But the constitutional amendment of 1875, as now interpreted by the Supreme Court, repealed the special charter rates as to the Central Railroad of New Jersey, and like charters, and therefore brought these companies within the terms of the act of 1866. They no longer have a special charter rate, and therefore their rate is fixed by the act of 1866.

Admitting, then, the correctness of the opinion of the Supreme Court, we find that the constitutional amendment of 1875 made the act of 1866 applicable to all railroads not having irrepealable exemptions from taxation; that it is still applicable, except so far as it has been lawfully modified by subsequent legislation; that it has not been lawfully changed as to the rate of taxation, but that the act of 1884 has substituted the state board for the local assessor and the state treasurer for the local collector.

The money, when collected, is brought under the appropriating power of the legislature, as all public money is. All taxes are state taxes. *Camden and Amboy R. R. Co.* v. *Commissioners,* 3 *Harr.* 71; *State* v. *Cook,* 3 *Vroom* 338, 340. It is for the legislature to say to what officer payment shall be made, and how distribution shall be made of the public revenue, and this they may say either in the same act or in a separate act, either by an appropriation in anticipation or by an appropriation after the money has been collected.

The acts of 1866 and 1884 relate to the same subject, and

the latter should be construed as if it were a supplement to the former, to which it makes frequent reference.

We submit that it requires infinitely more ingenuity to exempt the property of these corporations than to tax them. Every intendment will be made in favor of taxation at the common rate for the common benefit. The court will not go out of its way to sustain the laws creating these privileges. No injustice is so intolerable as that which is created by law. In the words of Carlyle: "To decree injustice by a law; of all anarchies and devil-worships there is none like this." The burden of demonstrating clearly their exemption rests upon these corporations. The court will require very clear demonstration before it will sanction privileges so disgraceful to the state, so unjust to its citizens and so ruinous to the cities we represent.

For the state, *John P. Stockton, Attorney-General.*

I. The act for the taxation of railroad and canal property should be construed with other acts *in pari materia.*

It is only a part of the state's system of taxation, and cannot properly be isolated in the consideration of its constitutionality.

The opinion of the Supreme Court, as delivered by Chief Justice Beasley, contains the following propositions as the grounds upon which the act was declared unconstitutional:

1. A separate, independent, property tax cannot, under the constitution of this state, be put on property arbitrarily selected for the purpose and set apart from other property of the same kind.

2. The constitutional amendment that requires that "property shall be assessed for taxes under general laws and by uniform rules," prohibits the selection, simply at the legislative will, of the property of two classes of corporations, separating it from the mass of similar property, and imposing an exclusive tax on the property so selected.

The first proposition may be divided into two, for the purpose of analysis:

*a.* The tax is a separate, independent, property tax.

*b.* It is put on property arbitrarily selected for the purpose, and set apart from property of the same kind.

If an act had been passed at the same time, entitled " An act for the taxation of all property other than railroad and canal property," and had directed that the same assessors should assess all real and personal property under the same principles of valuation, by the same mode, as railroad and canal property was assessed, and excepting from the provisions the railroad and canal property taxed under the existing act, and providing that the whole sum be paid to the treasurer, and that out of the proceeds he should distribute to each county and township in the state its proportion—would the fact that the proceeds of the tax were distributed by the state to different and separate state purposes, make the tax exclusive ? Would each tax be a complete, independent, property tax ? Could it be said that the whole state tax was levied exclusively on one class of property ?

The court is bound to give the act such a construction, if possible, as will make it constitutional. It must be clear beyond a reasonable doubt that the legislature had transcended its constitutional power before the court can declare its action unconstitutional.

One of the admitted rules of construction is " that all acts *in pari materia* are to be taken together as if they were one law." If divers statutes relate to the same thing, they ought to be all taken into consideration in construing any one of them. See 9 *Bac. Abr., tit. " Statutes,"* (*new ed.*) *p.* 243 ; *Doug.* 20 ; 2 *T. R.* 387, 586 ; 4 *Mau. & S.* 210 ; *Canal Company* v. *Railroad Company,* 4 *Gill & Johns.* 5 ; *Talbot* v. *Seeman,* 1 *Cranch* 35 ; *Church* v. *Crocker,* 3 *Mass.* 17 ; *Thayer* v. *Dudley,* 3 *Mass.* 296 ; *Holland* v. *Makepeace,* 8 *Mass.* 418 ; *Holbrook* v. *Holbrook,* 1 *Pick.* 848 ; *Mendon* v. *Worcester,* 10 *Pick.* 235 ; *Commonwealth* v. *Cambridge,* 20 *Pick.* 267 ; *Goddard* v. *Boston,* 20 *Pick.* 407 ; *Perry* v. *Orr,* 6 *Vroom* 299 ; *Newark City Bank* v. *Assessor,* 1 *Vroom* 22 ;

*State* v. *Garthwaite*, 3 *Zab.* 143; *Insurance Company* v. *Meeker*, 8 *Vroom* 282.

Let us examine the *lex scripta*.

The first section of the act of 1884, now under consideration, provides that all property of any railroad and canal company, not used for railroad and canal purposes, shall be assessed and taxed by the same assessors, and in the same manner, and at the same rate, as the taxable property of other owners in the same municipal district.

The act then provides that all other·property of any railroad or canal company—that is, that used for railroad and canal purposes—shall be taxed as thereinafter provided.

The section then provides as follows : " The tax imposed by this act shall be in lieu of all other taxation upon the property subject to taxation under the provisions of this act." This is manifestly an exemption from the operation of the act concerning corporations, which in terms exempts railway and canal property. The reference of the acts to one another is unmistakable. Immediately after this follows another reference to the General Tax act, exempting from the ratables therein taxed all property that is taxed as used for railroad purposes : " In all cases where the real estate, taxable personal property and franchise of any company are assessed and taxed under this act, the shares of stocks, and bonds and certificates of indebtedness of such company shall not be taxed in the hands of shareholders, bondholders or creditors, except as hereinafter provided."

The first section of the "Act concerning taxes," (*Rev.*, p. 1140,) enacts : " That the assessor of every township shall, between the 20th day of May and the 20th day of August, annually, take a true account and make out an exact list of the persons, lands, chattels, effects and estates, including certainties made ratable by law in that year, by which all assessments during the said year shall be regulated and made."

Section 4 of the Railroad Tax act of 1884 refers directly to the general law above quoted, in these words : "And be it enacted, that if the assessed value of the real estate of persons

other than railroad or canal corporations in any taxing district wherein such railroad or canal property may be found, as ascertained by the assessors of such taxing district, is relatively lower than that which has been laid upon the land of the several companies in said taxing district, the said board shall be required to accept such valuation of the assessors for such taxing district as a correct standard of value, and to thereby correct or reduce the separate valuation provided for in the second subdivision of section 3 of this bill."

Section 5 directly connects the machinery used for valuation in the two acts.    The local assessors appointed under the General Tax act are to certify to the board appointed under the act of 1884 a statement giving the description of such property, and showing the assessed value thereof, with a short description of real property owned or used for railroad or canal purposes, &c.    They are also required to certify the local rates of taxation for county and municipal purposes, and such other information as the board requires; and it is further provided that they shall receive $3 a day for their services.

Section 20 of the General Tax act, (*Rev.*, *p.* 1157,) provides for the deduction of mortgages, and section 10 of the Railroad Tax act of 1884, refers directly to this section as a guide, incorporating its provisions as to how the deduction is to be made, and making one act entirely dependent upon the other in that important matter.

Section 11 of the act of 1884 refers to the General Tax act by name, and adopts the provision of section 20 of that act. Section 11 is in these words: "And be it enacted, that if any railroad or canal company shall claim a deduction in any case in which such deduction could be claimed under the twentieth section of an act entitled 'A further supplement to an act entitled "An act concerning taxes," approved April 14th, 1846, which supplement was approved April 11th, 1866,' other than the deduction last hereinbefore mentioned, the said board are hereby required to allow the same, and the said indebtedness so allowed shall be taxable as other debts owing to creditors residing in this state are taxable, and at the same rate."

Section 12 of the Railroad Tax act of 1884 also directly refers to the General Tax act, and provides that in no case shall the addition of the state tax of one-half of one per cent. to the local rate, as limited by the act, compel any company to pay more tax than the tax such company would pay if they did not pay the state tax of one-half of one per cent., but did pay full local rates.

Section 14 provides that the money collected under the act for the one-half of one per cent. tax shall be applied to the uses of the state, according to law, and the amount received from property separately assessed is appropriated and allotted to the various taxing districts. It also directs the comptroller to transmit these sums to the county collector appointed under the general act, and he in turn to transmit to the taxing district officers.

In the Revision (*Rev.*, *p.* 1150,) is to be found an act entitled "A further supplement to an act concerning taxes," which provides, first, for a poll tax, and, second, for a tax on all real and personal estate. The second section is in these words : " That all real and personal estate within this state, whether owned by individuals or by corporations, shall be liable to taxation at the full and actual value thereof, on the day in each year when by law the assessment is to commence, at such rate per dollar as will be sufficient to produce the sum required to be raised, together with an addition thereto, not exceeding ten per centum of such sum, to meet contingencies, after deducting the poll tax and the tax derived from foreign insurance companies."

The fifth section exempts certain property, and is as follows : " That the following persons and property shall be exempt from taxation, viz., the property and the bonds and other securities of the United States, and the bonds and securities of this state, which are by law exempt from taxation ; the property of the counties, townships, cities and boroughs of this state, and stocks and other personal estate owned by citizens of this state, situate and being out of this state, upon which taxes shall have been actually assessed and

paid within twelve months next before the day prescribed by law for commencing the assessment; all colleges, academies and seminaries of learning, public libraries, school-houses, buildings erected and used for religious worship, and the land whereon the same are situate, necessary to the fair use and enjoyment thereof, not exceeding five acres for each one, the furniture thereof and the personal property used therein, the endowment or fund of any religious society, college, academy, seminary of learning or public library; provided, that no building so used which may be rented for such purposes and rent received by owner therefor shall be exempted; the stock of any corporation of this state which, by charter or other contract with this state, is expressly exempted from taxation, the stock of any corporation of this state, the capital thereof is by this act made taxable to and against said corporation, pews in churches, graveyards not exceeding ten acres of ground, cemeteries and all buildings erected thereon, and all buildings used exclusively for charitable purposes, with the land whereon the same are erected and which may be necessary for the fair enjoyment thereof, and the furniture and personal property used therein, the funds of all charitable institutions and associations, collected and held exclusively for the sick or disabled members thereof, or for the widows of the deceased members, or for the education, support and maintenance of the children of deceased members."

The one hundred and fifth section of the General Corporation act, approved April 7th, 1875, (*Rev., p.* 196,) provides that the real and personal estate of corporations thereafter incorporated shall be taxed as that of individuals, excepting railway, turnpike, insurance, canal and banking corporations, savings banks, cemeteries, church property, or charitable and educational associations.

A supplement to said act, approved the 7th of March, 1878, (after the constitutional amendment, which went into effect September 28th, 1875,) strikes out the word "hereafter," and maintains the exceptions as fixed in the original act.

Another supplement to the same act, approved March 14th,

1879, (*Pamph. L., p.* 348,) provided that all corporations, whether manufacturing or otherwise, should be taxed on capital stock and accumulated surplus.

The act of 1873, entitled "An act to establish just rules for the taxation of railroad corporations," &c., provides that the railroads shall pay, on the " cost, equipment and appendages of said railroad, a state tax at the rate fixed by law, and, in default thereof, at the rate of one-half of one per cent." *Rev., p.* 1176.

The act of 1876 provides that all railroad corporations occupying or using railroads shall pay an annual state tax on the true value of said roads, their equipment and appendages, at the rate of one-half of one per cent. on such value.

The act of 1884 provides that all property of any railroad or canal, used for railroad or canal purposes, shall be assessed by the state board for state purposes at one-half of one per cent., and, in addition, a tax at local rates, not to exceed one per cent.

So it is manifest, under the system adopted and by acts *in pari materia,* now on the statute book and in operation, that the real and personal property of individuals is assessed by one method ; that the property of corporations, other than railway, canal, turnpike and banking companies, insurance companies, savings banks, &c., is assessed by another method ; that the property of insurance companies is assessed by another method ; that the property of banks is assessed by another method ; that banks themselves are divided, and the property of savings banks assessed by a different method from that used for the taxation of banks of discount ; and that the property of corporations formed under general laws is assessed by a method different from that used for the taxation of corporations formed under special laws. So that we have a large collection of laws providing a variety of methods for assessing the property of the several kinds of corporations and of individuals, but all based on the effort of the state to meet the varying conditions of that property, and to require it to pay tax upon its true value, and all considered constitutional by the

Supreme Court of this state, notwithstanding the self-executing clause in the amendments of 1875.

The Railroad Tax act of 1884 is but one part of this seemingly complicated, yet simple system ; it attempts to provide a method for getting at the value of railroad property, as the other acts provide for ascertaining the value of the property of other corporations and of individuals.

Can it be possible that the Supreme Court claims that a tax is separate and independent from other taxes because, after it is collected, the legislature devotes it to one or the other of the necessities of the state ? Can it be possible that the common method of describing taxes as state, county, or township taxes has blinded the court to the fact that all taxes are raised by authority of the sovereign, and that the purposes to which its results are devoted are exclusively within the legislative discretion ?

" Taxation must be for a public purpose and this the court may consider, but to what public purpose each tax is directed, is a question for the power charged with the duty of making appropriations." See *Desty on Taxation* 15, *and cases cited ;* 3 *Harr.* 71 ; 3 *Vroom,* 338, 340.

The legislature can determine what sum shall be raised by taxation, and the purposes to which the money shall be applied ; it can make appropriation of money whenever the public well-being requires or will be promoted by it. And it is the sole judge of what is for the public good. *Wisner* v. *Village of Douglass,* 64 *N. Y.* 98 ; *Gifford* v. *Chenango County,* 13 *N. Y.* 143 ; *Desty on Taxation* 912.

The tax, as levied by the act of 1884, is not separate and independent. Its use may, in some measure, be. But it is less so than by the system heretofore existing, because the tax assessed is applied to local as well as state purposes.

Whether the money raised by one class of property is to be devoted to state purposes, and the money raised from another class of property is to be devoted to local purposes, provided always that the amount to be realized is controlled by such provisions as the legislature incorporated in the act of April

10th, 1884, cannot determine the constitutionality of the act. And the attempt to control the legislative discretion in this matter would destroy the distinction of power made by the constitution between the three departments of government.

The assumption that the tax is a separate, independent property tax, vitiates the whole opinion, and virtually decides a case totally different from the one the court should have considered.

The Chief Justice says : " There can, therefore, be no doubt as to the question to be considered by the court. Can these particular lands, tangible personal property and franchises, be set apart from all other lands, all other tangible personal property, and all other franchises, and exclusively be burdened by a state tax ?"

In this single sentence the Chief Justice assumes the whole case, and he does it by closing his eyes to the other acts *in pari materia*, by insisting that one act of a system of taxation composed of many, which are dependent on one another, and refer to one another *eo nomine*, are separate and independent from each other, and the existence of all but the one under consideration should be unknown to the court. Or else he claims that every act is unconstitutional which does not appropriate to the same purposes exact proportions of the money raised on each species of property ; and further, that it is within the province of the judiciary to supervise and control the legislature in such distribution.

No distinction can be drawn between this tax and that levied under the act of 1876. It is a tax on each railroad and canal, measured by a careful valuation of all its property used for corporate purposes.

In June Term, 1879, the Supreme Court, in the Southern Railroad case, (12 *Vroom* 235,) made a decision which was possible only upon the theory that the act of 1876 was constitutional.

Nor was this constitutional point, now made against the act of 1884, passed over in silence.

In the Camden and Atlantic Railroad case Mr. Browning

attached to the return made to the comptroller a constitutional objection to the taxes assessed.

Justice Woodhull, however, did not entertain it, and proceeded to fix the tax under the act and filed his reasons therefor.

The act of 1876 provides that all railroad corporations occupying or using railroads should pay annual state tax upon all their property used for railroad purposes. The act of 1884 provides that all property used for railroad or canal purposes shall be assessed by the board. It can hardly be believed that a court could hold one of these acts constitutional as a tax *in personam*, and the other unconstitutional as a tax *in rem*. It would be a distinction without a difference.

Each tax act, considered separate and apart as an independent system of taxation, may be unconstitutional; but taken together, construed as acts *in pari materia*, considered as parts of a system, they become constitutional.

The rules of construction require that if it be possible, they shall be so construed as to give effect to the system of taxation adopted, and forbids the segregation of the parts, especially as the result is to thereby limit and restrain the sovereign power of taxation.

The opinion invalidates not only all the acts composing this system, but also the act of 1876, which has been before the Supreme Court frequently, and has been enforced by nearly every judge of the court.

The opinion considers the "grouping" of colleges, academies of learning, banks, railways and canals, &c., as proper exemptions in the general tax law, but loses sight of the fact that if the constitution requires that all property shall be taxed, that act is unconstitutional as imposing a tax on only a part. It justifies the exemption on motives of "public policy." The reason, however, given for this exception ceases before it reaches the large class of exceptions contained in the act.. Surely public policy cannot be a reason for exempting railways and canals. They could only be exempted because they are otherwise taxed by a separate law. This reason, how-

ever, would destroy the position taken by the Chief Justice, and it would then be obvious that what could be grouped for an exemption could be classified for valuation and taxation.

The tax, as levied under the act of 1884, is not an independent and separate property tax in its relations to the constitutional mandate, because, although the clause commands property to be assessed by general laws and uniform rules, it cannot be said whether the order is violated or not until all the legislation which purports to tax property is examined and compared.   It may be separate and independent in the mode of its assessment, the machinery of its collection, the purposes to which its proceeds are dedicated, but this does not make it an independent, separate or exclusive tax on property arbitrarily selected, because the act is but one of a series under which all property is taxed for the various necessities of the state. The question whether all property is taxed can only be determined when all tax acts are before us.   The question whether the law is general or special depends upon its construction in connection with other legislation on the same subject.   If it is found that it tends to reduce inequalities before existing in that system of legislation; to tax property as a class, which by other legislation is exempted as a group, the act becomes general under the decisions of the Supreme Court heretofore made.

The constitutional amendment did not say that property should be taxed by a general law and a uniform rule. It said by general laws and uniform rules.   The reason is apparent when we remember that this court in North Ward Bank *v.* Newark, opinion by Judge Depue, said : " It executed itself, it required no legislation to enforce it, and operated as an abrogation of all special laws for assessing property for taxes." He adds that the general tax law then in force in all respects conformed to the constitutional requirements as to the valuation of property for the purpose of taxation.   See, also, *Jersey City* v. *Vreeland,* 14 *Vroom* 639 ; *Trustees of Public Schools* v. *Trenton,* 3 *Stew. Eq.* 676.

The general railroad law was passed in 1873, and was, con-

sequently, in operation when the amendments were adopted in 1875. It contained a special tax clause in reference only to railroads organized under that act.

The General Corporation act was also in force, taxing a small class of corporations, and exempting from its provisions railway, turnpike, insurance, canal and banking corporations, savings banks, cemeteries, church property and charitable associations.

The General Tax act was in force, exempting property and bonds of the United States, colleges, academies, seminaries of learning, libraries, school-houses, buildings for religious worship, banking institutions, corporations specially taxed, and mutual life insurance companies specially taxed.

The Railroad Tax act of 1873, which is as separate and independent as its successors of 1876 and 1884, was in force, entitled "An act to establish just rules for the taxation of railroad corporations, and induce their acceptance and uniform adoption." By this act railroads, their equipments and appendages, were classified and separated from other property, and an independent tax was levied upon them for state purposes.

These acts have been from time to time before the court. None of them have been held unconstitutional, and Judges Depue, Scudder and Van Syckel, sitting as the Supreme Court, declared this independent taxation in the general law constitutional.

If the opinion in the case we are considering is to be sustained, all these laws were abrogated by the adoption of the constitutional amendment, as it executed itself. But to make it so, it would seem to be necessary to add the word "all" to the constitutional clause, and change the plural "laws" and "rules" to the singular "law" and "rule."

The precise point maintained by this part of the opinion is that the constitutional amendment should read: "All property shall be assessed by a general law and a uniform rule."

We cannot find in the books any rule of construction which would authorize this change to be made, particularly when

its effect is to declare an act unconstitutional and to limit the sovereign power of taxation.

It is therefore submitted that neither the rules of construction nor the previous decisions of the court permit the segregation of the act under consideration from all other acts *in pari materia*, and that the tax is in no constitutional sense separate, independent or exclusive taxation, when the act is construed as part of the general system of taxation.

It follows that the court has misconceived the case, and the judgment was rendered under a misapprehension.

*b.* The second clause of the first proposition claims that the tax is put on property arbitrarily selected for the purpose, and set apart from other property of the same kind.

This proposition we deny, and submit that "the class affected consists of individuals distinguished by characteristics to which the purpose of the law relates," and embraces all so characterized.

The act puts a tax on all property of all railroad and canal companies used for railroad and canal purposes.

It is directed to be assessed, as all other property, at its true value.

The property of the same corporation, not used for railroad and canal purposes, is not taxed under the act. Such property is no part of the class.

The class created and made subject to the tax under this act, and exempted from the taxes levied on property not used for corporate purposes, is that used for railroad and canal purposes.

The restriction is in these words : "Property shall be assessed for taxes under general laws and by uniform rules, according to its true value."

The constitution simply requires uniform rules. It must be a rule, and it must be uniform. It must be a rule as distinguished from a "sudden, transient order," concerning a particular person. Something permanent and uniform. The word "rule," in fact, embraces in its definition, as given by Blackstone, the whole force of the expression, "uniform rule."

It would not be a rule at all unless uniform. It would not be law unless it was a rule of action. The constitution simply requires that it shall be a law.

A uniform rule is a rule which puts an equal burden on all subjects that may be brought in competition with each other.

The value of railroad property is chiefly its use under a franchise for the transportation of passengers and freight. It is important to every railroad company that its burden should be no heavier than that of its rivals. It is well known among railroad men that a corporation in the hands of a receiver is the worse competitor any road can have. They pay neither dividend nor interest, and if economically managed can afford to carry at lower rates than a prosperous company where creditors and stockholders divide the earnings; so a road that paid no tax, or that had a special irrepealable contract at a lower rate than the ordinary measure of taxation for competing roads, could " cut the rates," refuse to " pool," as it is called, and eventually ruin rival lines by this cause alone.

Equal taxation is such as is uniform on the class, and the class that possesses the inherent qualities which render it necessary that their taxes should be equal, to be just, are principally the individuals of a class who would suffer by competition in the same business if taxed more than others engaged in it.

Is it suggested that the act of 1884 levies a tax for general purposes upon the property of railroad corporations, and does not levy a tax for the same purposes upon the property of individuals? The answer is apparent. All taxes are state taxes, whether assessed for general purposes or for special purposes, and a state tax is, in effect, assessed upon all other property in the state, although such other property is taxed by the state through the instrumentality of its municipal agents, instead of its agents the state board. The difference of the agencies cannot certainly affect the constitutional power of the state.

In the case of the *Camden and Amboy Railroad Co.* v.

*Commissioners of Appeals*, 3 *Harr.* 71, it was held that an impost for township and county purposes was as much a state tax as the $30,000 payable directly to the state under the charter.    Justice Ford said : " An impost for county and township purposes is a state tax; it can be imposed by no other authority.    The state appropriates the proceeds to what purposes it pleases ; but every tax is a state tax, and if this impost be not such, it must be set aside for that reason, if there were no other."    This principle and case were fully sustained by Justice Elmer, in *Camden and Burlington Railroad Co.* v. *Cook*, 3 *Vroom* 338–340, and by Justice Reed, in *Vreeland* v. *Jersey City*, 14 *Vroom* 135.

The classifications of tariff duties by the general government are examples of the change of value by change of use, and the necessary change of duty, where it is an *ad valorem* imposition.    The raw material and the same material in the various stages of manufacture illustrate the subject.    The use of land for an artificial highway for rapid transit, the use of land for stations, wharves, passenger and freight depots in the heart of crowded cities, makes it a distinctive class ; and so with all other property applied to such purposes.

Property has always been classified for taxation according to its use, in New Jersey as well as in other states.

The constitutional amendment became operative in September, 1875.    In the November Term of the Supreme Court, in the year 1865, in the case of *State, Easton Bridge Co., pros.*, v. *Collector of Phillipsburg*, 2 *Vroom* 387, the court held that although only one-half of the structure of the plaintiffs was within the limits of New Jersey, that it should be valued as a bridge, as distinguished from the value of the material to be converted into something else.    This was a classification of property, according to its use, for the purpose of taxation.

In the case of *People* v. *Barker*, 48 *N. Y.* 70, it was held that in assessing the real estate of railroad corporations assessors are not required to assess it as isolated pieces of land, but each piece of property is to be estimated in connection with its po-

sition, its incidents, and the business and profits to be derived therefrom.

In the case of *State of Illinois* v. *Illinois Central R. R. Co.*, 27 *Ill.* 64, it was held that in assessing the value of a railroad for the purposes of taxation the inquiry should be, What is the property worth to be used for the purposes for which it was designed? and not for any other purpose to which it might be applied. In the case of *Stratton* v. *Collins*, 14 *Vroom* 562, the Supreme Court construed the provision of the constitution that property must be assessed for taxation by uniform rules and according to its true value, and held that it " does not require that all property should be taxed, and is not infringed by the taxation of bank shares, when shares in all other classes of corporations are exempt."

The Chief Justice admits that the legislature may classify property according to its use, for the purpose of taxation, but the classification of property used for railroad and canal purposes he deems an " arbitrary selection."

He says : " Property may now, as formerly, be classified, in view of taxing it, as a separate thing, but a class cannot be created at the will of the legislature, but must arise out of the nature of the thing itself. Nor can the law-maker, by the exercise of his volition, convert a fragment of a class into a class." He further says, speaking of the exemption of colleges and academies of learning in the general act : " This group of exemptions was perfectly legitimate, as such property, from its devotion to public or *quasi* public uses, was thereby differentiated from ordinary property, and thus formed a class by itself." So, use makes a class.

He cites as authority for his assumption that a classification of property such as that used for railroad and canal purposes is arbitrary selection, Van Riper v. Parsons, Pell v. Newark, Rutgers v. New Brunswick, and Anderson v. Trustees. It is a curious circumstance that there is not a word in any one of these cases going to sustain the position that the use of property for railroad and canal purposes is not within the definition of what constitutes the classification that would make a law

general.   The purpose of the law is taxation at true value. The value of the property depends almost exclusively on its use for railroad and canal purposes; all property so used is classified under the law, and all not so used, no matter who the owner, is excluded from the class.

The classification is fairly made, and the act provides that the class shall not pay more than individuals of other classes. Railroads have always been classified for the purpose of taxation, and the courts had declared that the constitutional amendment, in executing itself, did not abrogate any of the existing tax laws which grouped them for exemption and classification. Was this a "deceptive" classification, or one "contrived" to escape constitutional restrictions?

Judge Field, in the Santa Clara case, said that the constitutional clause in California did not classify property, "but made the amount of taxation depend, not on the nature of the property or its use, but upon its ownership." And again he says: "There is only one rate provided for all property. There is, therefore, as was said in the San Mateo case, no case presented for the application of the doctrine of classification, either from the peculiar character of railroad property or its use." *Pamphlet Opinion of Justice Field and Judge Sawyer*, *pp*. 38, 39.

But this precise point as to whether property used for railroad purposes could be classified for the purpose of valuation and taxation came before the Supreme Court of the United States, and was decided in October Term, 1885.   *Kentucky Tax Cases*, 115 *U. S.* 321.

It will be observed that the court not only held that the legislature had the right to classify under the constitution of Kentucky, but held that the classification of railroad property as a separate class for purposes of taxation grows out of the inherent nature of the property, and was a proper exercise of the discretion of the legislature.   This decision is in accordance with all the rulings in our own state, and I have found nothing to the contrary except the statement of the Chief Justice that it was "arbitrary selection" of a part of a class.

Justice Matthews, delivering the opinion, says: "The right to classify railroad property as a separate class for the purpose of taxation grows out of the inherent nature of the property, and the discretion vested by the constitution of the state in its legislature." This is the same proposition as that expressed by the Chief Justice in Van Riper v. Parsons, where he declares that "a law settling the methods by which all railroads should become incorporated would be special, in the sense that it would be confined in its operation to but a single kind of corporations, and so a law would be local by the same test that it should provide for the organization, under one system, of all the municipal governments in the state, as such a law would manifestly have a restricted effect with respect to locality. But who, conversant with the usage touching these terms, would venture the assertion that such statutes as these would not be general laws? All legislation is based of necessity on a classification of its subjects, and when such classification is fairly made, and the legislation founded upon it is appropriate to such classification, such legislation is as legitimate now as it would have been prior to the recent amendments to the constitution. My theory is that if a set of objects be fairly classified, a law embracing them will be a general one, and in all respects unobjectionable."

Is not the position taken by the Chief Justice in the opinion of the Supreme Court, in direct antagonism to the principle laid down by him in the Van Riper case above cited?

In the case of *City of Dubuque* v. *Chicago, D. and M. R. Railroad Company*, 42 *Iowa* 196, it was held that railroad property, with its right of way, rails, switches, depots, engine-houses and machine-shops, is an entirety.

Miller, J., in *State Railroad Tax Cases*, 2 *Otto* 611, 612, holds that the inherent qualities of railroad property make it proper to classify it as a separate class for the purpose of taxation.

In the case of *State, Trenton Iron Co., pros.*, v. *Yard*, 13 *Vroom* 357, the Supreme Court of this state held that "the supplement of March 7th, 1878, to the act concerning

corporations, which provides ' that all the real and personal estate of every corporation incorporated by any act of the legislature, or by the filing of a certificate, or otherwise, under any general law of the state, shall be taxed the same as the real and personal estate of an individual, provided that the section shall not apply to railroads, turnpikes, insurance, canal or banking corporations, or to savings banks,' is a general law, within the meaning of art. IV., § 7, ¶ 12, of the amended constitution. Corporations embraced within its provisions are taxable as therein provided."

Judge Dixon said, in delivering the opinion in *Stratton* v. *Collins*, 14 *Vroom* 562: "The constitution directs that property shall be assessed for taxes by uniform rules, according to its true value. But it is plain that this provision does not require all property to be taxed. It leaves the legislative power of selecting the subjects of taxation as untrammeled as it ever was. For taxing purposes, the real and personal estate of corporations, and also the shares of capital stock in the hands of individuals are regarded as property, and the legislature is at liberty to tax both or either of those classes of possessions. But, because a tax imposed upon both would be, in effect, double taxation, since the latter class is only representative of the former, it has been usual for the legislature to select one only of the two for taxation. This right the legislature may still exercise, and may enact that the property to be taxed shall be as to one class of corporations, that held directly by the corporation, and, as to another class, the shares of stock held by individuals. Such a selection is made by our statutes. Their general principle is that all real and personal property, whether owned by individuals or by corporations, shall be liable to taxation at the full and actual value thereof."

As a means of meeting the unavoidable conclusion of this decision, the Chief Justice resorts to the *reductio ad absurdum*, and says that if the legislature has the power of selecting the subjects of taxation "the property used in the pottery business in this city of Trenton could, at the legislative pleasure, be encumbered annually with the entire tax necessary to defray

the expenses of the municipality." But the illustration, so far from showing the unconstitutionality of the law, simply demonstrates how entirely the court have misconceived the case.

The state's system of taxation, when truly stated, could be adopted in municipal taxation without violating any clause of the constitution. If a municipal charter granted the power to the common council to assess property in its discretion, provided it violated no provision of the constitution, there would be no reason why the pottery interest should not be valued and assessed in a separate ordinance and the proceeds devoted to a distinct purpose directed by the ordinance—provided that other ordinances *in pari materia* levied the same rate of tax on all other property, and devoted, in each case, the proceeds to some other public purpose. It might be unwise; it might be unjust; but it would not be unconstitutional or illegal.

II. The constitutional amendment does not require that all property shall be taxed by one general law and one uniform rule, but simply commands that taxation on property shall be by general laws and uniform rules; while taxation on persons and business is permitted to remain without constitutional restriction.

The opinion states the views of the court on the construction of the clause in the constitutional amendments, in the second proposition of the syllabus, as follows:

"The constitutional amendment that requires that 'property shall be assessed for taxes under general laws and by uniform rules,' prohibits the selection, simply at the legislative will, of the property of two classes of corporations, separating it from the mass of similar property and imposing an exclusive tax on the property so selected."

In considering the first point, we have endeavored to demonstrate that the assumption in the opinion that the property was selected simply at the legislative will, and separated from the mass of similar property, for the purpose of taxation, was an entire misconception of the situation. If this be conceded, it would hardly be necessary to discuss the second proposition, because, in this, also, the opinion of the court assumes that the

selection is made at legislative will, and an exclusive tax imposed on the property selected.

We cannot, however, avoid an examination into the true meaning of the constitutional restriction, for the Chief Justice widens its scope to such an extent that the prohibition would render unconstitutional any classification of railroad or canal property for the purpose of taxation.

We hold it to be an axiom that the power of taxation is inherent in the legislature, unless limited by constitutional provision; that the constitution of New Jersey does not limit the power of the legislature to tax persons and business at its discretion, and in so far as it does limit the power to tax property, that limitation must be strictly construed, and cannot be broadened or extended at judicial discretion.

The opinion claims that the word "all" should be inserted in the constitution before the word "property," so that the clause will imperatively command that all property shall be taxed. The scope of the clause must be made as wide as possible; "property" must become "all property," and "all property" must be embraced in each law, or the act is unconstitutional. The argument is, the law, construed separate and apart from other laws of the same system, must itself be general; that it cannot be general unless it embraces all property. It follows that no tax law is constitutional that does not embrace all subjects of taxation. We have already observed that by this construction the plural "laws" and "rules" are converted into the singular "law" and "rule," and the constitution is forced to declare that all property shall be taxed in every tax law. It follows that all property must be taxed in every tax law, whether the proceeds be needed or not, for the addition of the word "all" gives an additional imperative force to "shall"—all property shall be taxed for all purposes in every tax act.

One of the most eminent writers on the subject of taxation has said: "Much, and by far the largest portion, of the personal property of the country is, moreover, invisible, incorporeal and intangible, and to determine its value and to assess

it would require that the persons charged with such duties should be able to see things which by all ordinary vision cannot be seen, and to know what, except by supernatural agencies, cannot be known. It needs no argument, therefore, to establish the truth of the averment that a law providing for the assessment of all property is an absurdity, even in the absence of all experience." See *Rational Principles of Taxation*, by David A. Wells.

On the part of the state it was argued by counsel that " if it had been the intention of the framers of this amendment of 1875 to prohibit the exercise of the sovereign power of selection, such intention would have been specifically expressed; that the word 'all' would have been added at the beginning of the subdivision, so that it would have read 'all property shall be assessed for taxes.'" The opinion attempts no construction which does not require an addition of new language. It limits the construction to the introduction of " all " or " some." It says :

" But in the opinion of the court, such exposition would deprive the provision of all force whatever. The word ' property,' in that connection, must include all property, else the term loses all meaning. If we substitute for a term implying totality any term implying less, the sentence becomes nonsensical, as if we should read, ' some property shall be taxed.' Besides, as ' all ' property is not here required to be assessed under general laws and by uniform rules, then it necessarily follows that all property is not to be assessed at its true value. In our judgment, the clause cannot be limited upon the ground suggested."

Is it true that the sentence becomes " nonsensical," and means " some property shall be taxed ?" This does not follow from the reasoning of the opinion itself. If the meaning is plain, as it is; if without the word " all " it agrees harmoniously with the plural " laws " and " rules," why add a word to force a meaning that would make the amendment, in executing itself, destroy a whole system of general tax and

railroad laws adopted almost contemporaneously with the amendment?

Why add anything to so plain and simple a sentence?

The subjects of taxation are divided by the commentators and the opinions of the courts into property taxes, personal taxes and business taxes. There could be no reason why the constitution should limit the taxing power of the legislature in the two latter cases. The protection of property was the object in view. It was not sought to restrain the police power by constitutional provision. It does not necessarily or properly mean "some" property shall be taxed by general laws, as the opinion intimates. It plainly means property shall be taxed only by such laws and rules, but a poll tax and a license tax may be assessed, as heretofore, without special constitutional restriction. By this construction, "shall" has its proper meaning; it no longer obliges every law to tax all property or become unconstitutional. The plurals may remain as the framers of the amendment created them; the clause has a reasonable, obvious, practical meaning.

Whenever a property tax shall be levied, it shall be by general laws and by uniform rules.

There need not, however, be any property tax if a license tax is deemed sufficient and more beneficial.

All property taxes need not be classified or provided for in one act. The system of taxation, however, must be by general laws and the rules of taxation uniform, not operating exclusively on one species of property or on one class of owners.

Is it according to the accepted rules of construction to change words to avoid so obvious and reasonable a construction? Should it be done when the necessary result is "embarrassment and confusion to the financial affairs of the state?" Why should the court make a new constitution to reach such a result? This clause of the constitution has been frequently before the Supreme Court and has been construed by it. *Stratton* v. *Collins*, 14 *Vroom* 562; *Trenton Iron Co.* v. *Yard*, 13 *Vroom* 357.

The practice under the act of 1876, with judicial recogni-

tion by the Supreme Court, was a contemporaneous construc-
tion and judicial interpretation which recognized the power
of the legislature to classify railroad property and put a sepa-
rate tax upon it.    Such interpretation was a part of the statute
of 1884, and should not be changed but for the most cogent
reasons.

The force of practice to give to a construction all the force
of a law has frequently received judicial recognition.    A long,
uniform and unchallenged practice under a law is strong evi-
dence of the real meaning of the law.    *Contemporance expo-
sitio est optima et fortissima in lege.    C. & N. W. Co.* v. *Boone
Co.*, 44 *Ill.* 243; *Rogers* v. *Goodwin*, 2 *Mass.* 477, 478;
*Packard* v. *Richardson*, 12 *Mass.* 131, 143; *Sedgw. on Con-
struction* 215, 216; *Union Insurance Co.* v. *Hoge*, 21 *How.*
35; *State* v. *Kelsey*, 15 *Vroom* 1.

But there is another portion of the opinion which is so radi-
cal in its tendency that it would seem to involve the question
whether or not we live under a constitutional government.

The opinion sets up the doctrine that a constitutional tax
may be illegal and beyond the power of the legislature to im-
pose.    It says: " When, in the exercise of this power, a tax
has been imposed without regard to the rule of natural justice
that the common burden should be sustained by common con-
tribution, and that it should be apportioned according to some
rule of equality, there has not been wanting judicial adjudica-
tion pronouncing such enactments to be void, on the ground
that they enact, not taxes, but forced contributions."

And again speaking of the taxing power, it says: " There
are authorities of the highest character that have denied that
on the general principles of jurisprudence it is without limits."

We can hardly believe that the court meant to deny the su-
premacy of the legislature on the subject of taxation, when
unrestrained by any constitutional restriction, and yet that
seems to be the doctrine.    The cases cited do not sustain any
such position.    The courts of our own state, the Supreme
Court of the United States and the commentators on constitu-
tional law unite in asserting the reverse of this proposition.

We considered the law so well settled on this point that in the brief presented to the Supreme Court it was assumed that there was no restraint on the sovereign power save the constitution.

In *McCullough* v. *Maryland*, 4 *Wheat.* 428, the question involved was the right of a state to tax a branch of the United States Bank. It was held that the power of the state was unlimited as to the mode, form and extent of taxation, when the subjects to which it applies are within her jurisdiction; but the instruments of the general government were not within state jurisdiction. See, also, *Matter of Thirty-fourth street*, 37 *Hun* 448; *Twitchell* v. *Blodgett*, 13 *Mich.* 151; *People* v. *Comstock*, 78 *N. Y.* 356; *Pennsylvania R. R. Co.* v. *Riblet*, 66 *Penna. St.* 164; *Chicago, Danville and Vincennes R. R. Co.* v. *Smith*, 62 *Ill.* 268; *Lothrop* v. *Stedman*, 42 *Conn.* 583; *S. C.*, 13 *Blatch.* 134; *Clarke* v. *City of Rochester*, 5 *Abb. Pr.* 107.

But is it true, as alleged in the opinion, that there are authorities of the highest character which " have denied that on the general principles of jurisprudence," the prerogative of sovereignty, the power of taxation is without other limit than constitutional restraint?

Is it true that the full force of the decision of the Supreme Court of the United States, in the opinion of Chief Justice Marshall in McCullough v. Maryland, has ever been seriously questioned?

The question in that case involved the very existence of the government. The court said that no tribunal could approach its consideration without a deep sense of its importance, and of the awful responsibility involved in its decision. It was a case argued by Webster, Hopkinson and William Wirt, and decided by Marshall, Washington, Johnson, Livingston, Todd, Duval and Story.

The result was the broad declaration of the foundation principle that the power of the state was unlimited as to the mode, form and extent of taxation, when the subjects to which it applies are within her jurisdiction.

Now let us examine for a moment what high authority has denied this doctrine on general principles of jurisprudence. The only two cases cited by the Chief Justice in his opinion are *State* v. *Township of Readington*, 7 *Vroom* 60, and the opinion of Justice Field, in the Circuit Court of the United States, in the case of County of San Mateo *v.* Southern Pacific Railroad; and I submit that a careful examination of these cases will show that neither of them sustains the proposition laid down by the Chief Justice. Neither of these cases holds that on general principles of jurisprudence the power of taxation is not without limit. On the contrary, both of the jurists referred to have declared, in other cases, that the taxing power is without limit, except so far as it is restrained by constitutional limitation.

Depue, J., in *Trenton Water Power Co.* v. *Parker*, 3 *Vroom* 435, said: "The power of taxation. * * * This power is necessarily unlimited in its extent, unless restrained or qualified by constitutional provisions or legislative enactment, assuming the form of an irrepealable contract, and for that reason within the protection of the constitution."

Field, J., in the case of *State Tax on Foreign Held Bonds*, 15 *Wall.* 319, says: "Unless restrained by provisions of the federal constitution, the power of the state, as to the mode, form and extent of taxation, is unlimited where the subjects to which it applies are within her jurisdiction."

Harlan, J., in the case of *Kirtland* v. *Hotchkiss*, 10 *Otto* 498, after referring to McCullough *v.* Maryland and subsequent cases in the United States Supreme Court, says: "We perceive no reason to modify the principles announced in these cases, or to question their soundness." Decision October, 1879. See, also, *State, Golding, pros.,* v. *Collector of Chambersburg,* 8 *Vroom* 260; *State* v. *Branin*, 3 *Zab.* 484; *State* v. *Newark*, 1 *Dutcher* 317; *Tatem* v. *Wright*, 3 *Zab.* 429.

III. The proviso in some special charters—that "no other tax or impost should be levied or assessed" upon the companies—does not form a contract between the companies and state, either in letter or in spirit. It is to be read in connec-

tion with the provision which reserves to the legislature the right to alter, modify or repeal at pleasure. The whole scheme is alterable at the pleasure of the legislature.

We submit that the position taken by counsel for the state in the brief submitted to the Supreme Court is fully sustained by authority. We insist that the reserved right to alter is but a. reservation of the right to resume the unlimited taxing power, and that it can be exercised in any manner which does not violate a constitutional restriction.

That the exercise of this power does not interfere with any proprietary rights, but simply subjects the property, under the terms of the contract, to a resumption of its portion of the common burden.

That even when it appears that the effect of alteration or modification of a charter subject to such reservation amounts to the taking of private property, if it be a necessary incident of the reservation of the power to alter, the state is not deprived thereby of the exercise of the right, but the incidental injury is considered the result of the exercise of the power of eminent domain, and compensation may be made therefor.

The opinion of the court refers to the above position as taken by counsel in the argument below, and argues, after stating the case broadly, that the proposition itself shows the impossibility of its correctness.

It is manifest that the construction placed by the court on these charters renders the reservation contained in them powerless, and makes the contract good only against the state.

Is the position of the Supreme Court in accordance with the law in New Jersey, as it has been declared by this court?

In the case of *State, Jersey City and Bergen R. R. Co., pros.*, v. *Mayor, &c., of Jersey City*, 2 *Vroom* 575, Chief Justice Beasley, in commenting on a proviso similar to the one he comments on in the opinion we are considering, said: "Now it seems impossible to educe from these three provisions a contract on the part of the state to exempt this company. from taxation. The whole scheme is alterable at pleasure. The present complainants claim that although they have

no irrepealable contract in their charter, still they have a contract with the state which brings them within the excepting clause; the contract which they set up is the proviso in the fourteenth section of their charter above recited, and which, following the provision fixing the annual sum they are to pay, declares that no other tax or impost shall be levied or assessed upon them. This designation of what they are to pay, connected with this proviso excluding all other burdens in the form of taxation, they contend, forms a contract between them and the state. This, I think, is an error. These statutory provisions form, in my opinion, a contract neither in letter nor in spirit."

The position assumed by the court, then, is that the reservation of the power to alter or repeal at pleasure, was simply a reservation of power to revoke the proviso exempting the company from ordinary taxation, and the exercise of the right to alter is confined to cases where no property rights are affected.

And in another part of the opinion it is said : ." It was not denied upon the argument, that the legislature has the power to alter at will the mode and amount of tax prescribed in the charters of the complainant in error."

So it would seem that however erroneous the counsel for the defendant below may have been in the positions they presented to the court, yet they may be excused for suggesting them on the ground that they seemed to have had the assent of the court of the highest resort in cases of law and equity in this state. See, also, *Pennsylvania College Cases, supra; Tomlinson* v. *Jessup,* 15 *Wall.* 454; *Railroad Company* v. *Maine,* 96 *U. S.* 499; *Sinking Fund Cases,* 99 *Id.* 700; *Railroad Company* v. *Georgia,* 98 *Id.,* 359; *McLaren* v. *Pennington, supra; Erie and Northeastern Railroad* v. *Casey, supra; Miners' Bank* v. *United States,* 1 *Greene* 553 ; 2 *Kent's Com.* 306, 307; *Northern Railroad* v. *Miller,* 10 *Barb.* 260; *Reed* v. *Frankford Bank,* 23 *Me.* 318; *Worcester* v. *Worcester Co.,* 109 *Mass.* 103; *Thornton* v. *Marginal Railroad,* 123 *Mass.* 32; *Greenwood* v. *Freight Co.,* 105 *U. S.* 17; *Spring Valley Water Works* v. *Schottler,* 110 *U. S.* 347.

We insist that the effect of the law of 1884 on charters of this description is to repeal the proviso and subject them to a general law taxing all railroad and canal property. If this is not within the power to alter or repeal at discretion, then the power to alter has no meaning or force whatever; but even if it did not apply to any corporation whose charter contained such a clause, that would not render the law, on its face, unconstitutional.

IV. The act does not authorize a franchise tax, but directs its valuation as a part of the entire property.

The question of the constitutionality of the rule adopted by the board has been fully discussed in the briefs of counsel submitted to the court below, and needs no argument before this court, as no judgment was given upon it. The opinion says : "But we do not feel that we are called on to either form or express any definite opinion in regard to this matter. The subject is not a fundamental one, for if we should condemn the method in question the tax would not be subverted, for by the sixteenth section of the statute under consideration provision is made for the emendation by this court of any of the assessments made by this board, as well—to use its own language—in cases where it is claimed that the amount of tax is excessive or insufficient, as in cases where it is claimed that the principle upon which the assessment is made is erroneous. By force of this section it would be the duty of the court, if the mode of assessment used in that instance was found to be erroneous, not to vacate the tax, but to admeasure the rate by a legal standard. But this is not the business in hand."

It is proper for us to state distinctly that the position that the franchise is separately and independently taxed, assumed by the opinion, is not admitted. There is no franchise tax authorized by the act, but simply a direction to the board to ascertain separately the value of the franchise as one of the elements of which the true value of the entire property used for railroad purposes by each company is made up. There is no more a separate, independent tax on franchises than on a "main stem" or "other tangible property."

The act commands that all property of all railroad or canal companies, used for railroad and canal purposes, shall be assessed. There is no command to make any other assessment in the act. Directions are given to the board, the object of which is manifestly to insure diligence and faithfulness in reaching the result. They are directed to ascertain separately four specific matters " in such ascertainment "—that is, in the process of reaching the result which they are first directed to ascertain or make certain—to wit: the true value of all property used for railroad or canal purposes, including its franchises. The franchise is to be included, not excluded. Included in what? Included in the valuation which the constitution, as well as the law, requires; included in the true value of all property used for railroad or canal purposes. All the directions contained in this act and all of its provisions are subordinate to the command to assess the true value of all property used for railroad or canal purposes. If this end has been obtained, the tax could not be set aside by reason of any accident to the machinery provided for reaching it.

If the entire tax is not more than the proper proportion of the burden to be borne by the company assessed, it could not be set aside, because there was no separate valuation of the franchise.

The board is directed in section 12, upon the completion of the valuation and assessment, to compute the tax upon the entire assessed valuation of each railroad and of each canal company as assessed by them; upon such valuation each company shall pay to the state a tax at the rate of one-half of one per cent., and a tax at the local rates as fixed and assessed for county and municipal purposes upon other property in each taxing district. The persistent insistment of counsel of prosecutors, in oral arguments and in briefs, has misled the court in this serious question. If the act imposed a franchise tax it might be constitutional as a license tax. *North Hudson Railroad Co.* v. *Hoboken*, 12 *Vroom* 71. But it does not. It imposes no separate franchise tax, or any tax whatever on the

franchise. It simply directs its valuation as a part of the whole.

In conclusion. It is submitted to this honorable court that an examination of the statute law of the state and decisions of the courts establishes these propositions:

1. That the act is in entire conformity with the constitution.

2. That the act of 1884 is one of a series of acts which, together, constitute a system by which all the property in the state is valued and assessed by general laws and uniform rules, at its true value, and the proceeds appropriated to the various necessities of its several departments and political divisions.

3. That it classifies property by its use, where the chief value consists in that use, and embraces all property so used.

4. That it prevents the possibility of any disproportionate or unjust assessment under its provisions by a section specially commanding a deduction whenever such a case of disproportionate valuation is found to exist.

5. That the constitutional amendment only requires that property, when subjected to taxation, shall be assessed by general laws and uniform rules, at its true value; but does not command "all" property to be assessed at all times for all purposes, and that the act is in entire accord with the provision.

6. That a tax act which violates no constitutional restriction is legal, and the court has no power to declare it invalid, or to consider whether it be such a system as the court would adopt if it had legislative power.

7. That under the reservation to alter or repeal at discretion, the legislature may levy any tax which is constitutional.

8. That the act of 1884 creates no franchise tax, but directs the separate valuation of the franchise in conformity to the constitutional mandate that property shall be taxed at its "true value."

9. That the practice under the act of 1876, with judicial recognition, in connection with the construction given by the Supreme Court to the constitutional amendment, was a contemporaneous construction and judicial interpretation, which

recognized the power of the legislature to classify railroad property and put a separate tax upon it.

10. That such interpretation was a part of the statute of 1884, and should not be changed but for the most cogent reason.

THE CHANCELLOR. The judgments of the Supreme Court which are brought up for review by the proceedings in these cases set aside and annul, as being entirely void, the assessment and tax levied upon the respective defendants under the act "for the taxation of railroad and canal property," approved April 10th, 1884. *Pamph. L., p.* 142. The ground upon which those judgments are based is that the act is in contravention of the constitutional requirement, adopted in the amendments of 1875, that "property shall be assessed for taxes under general laws and by uniform rules, according to its true value." The act, after providing that all the property of any railroad or canal company, not used for railroad or canal purposes, shall be assessed and taxed by the same assessors, and in the same manner, and at the same rate as the taxable property of other owners in the same municipal division or taxing district, creates a state board of assessors to assess all the property of railroad and canal companies used for railroad or canal purposes, including their franchises, and directs that the board shall ascertain the true value of such property, and that in so doing they shall ascertain separately, first, the length and value of the main stem of each railroad, and of the water-way of each canal and the length of such main stem and water-way in each taxing district; second, the value of the other real estate used for railroad or canal purposes in each taxing district, including the road-bed (other than main stem) water-ways, reservoirs, tracks, buildings, water-tanks, riparian rights, docks, wharves and piers, and all other real estate except lands not used for railroad or canal purposes; third, the value of all the tangible personal property of each railroad and of each canal company; and fourth, the value of the franchise. It then declares that the term "main stem" is

to be held to include the road-bed not exceeding one hundred feet in width, with its rails and sleepers and the passenger depots; and that the term "water-way" is to be held to include the towing path and berme·bank. It defines also the terms "taxing district" and "tangible personal property" as used in the act. It provides that the state board of assessors shall be governed by the valuation of the local assessors, if lower than theirs, in ascertaining the value of the real estate used for railroad or canal purposes not included in the main stem or water-way, and that the local assessors shall certify to the board a description of the property of any railroad or canal company within their taxing district, both that which is not used for railroad or canal purposes and that used for such purposes, excepting the main stem and water-way as defined by the act; also their valuation of those properties and the local rate of taxation for county and municipal purposes. If in any taxing district there should be several branch lines of railroads belonging to or controlled by one company, or operated under one management, the assessors are to designate one of them as main stem, and the others are to be treated as "other real estate used for railroad purposes." The board are to compute the tax upon the entire assessed valuation of each railroad and canal company as ascertained by them, and the taxation is to be as follows: the company is to pay upon the valuation, to the state for state purposes, one-half of one per cent. annually, and, in addition thereto, the local rate for county and municipal purposes on the valuation of the real estate other than main stem or water-way that is used for railroad or canal purposes in the taxing district; but such local rate is not to exceed one per cent. of such last-mentioned valuation. The act provides that the sum of the estimates or computations for each company shall constitute the tax to be paid by it, and that if upon complaint the board shall find that the amount of the state tax and local rate as limited in the act, combined, exceed the amount which the company would have to pay if assessed at and required to pay full local rates alone, then they shall reduce the whole tax to the amount which the

company would be required to pay at the last-mentioned rate ; and in order to ascertain that amount (but for no other purpose) they may apportion the value of the franchise among the local taxing districts. Of the taxes assessed under the act, the one-half of one per cent. is to be appropriated to state purposes, and the money received for tax upon property separately assessed in the different taxing districts is to be allotted to those districts, giving to each the amount derived from the property of each railroad or canal company therein. The foregoing are all the provisions of the act which it is necessary or important to state for the consideration of the question which is now before the court.

In this connection it will be proper to refer, briefly, to the history of the legislation other than such as is contained in special charters, by which taxes have been imposed upon railroad and canal companies in this state. By the act of 1866, (*Rev.*, *p.* 1150,) it was provided that all real and personal estate within this state, whether owned by individuals or by corporations, (except such as was owned by corporations which, by their charters, were expressly exempted from taxation,) should be liable to taxation at the full and actual value thereof. The railroad tax law of 1873, (*Rev.*, *p.* 1166,) after reciting that for the encouragement of railroad enterprise, laws creating and regulating railways in this state usually provide for the payment by them, in consideration of their charter privileges, of a fixed rate upon their capital stock or the cost of their works, in lieu of all other public impositions whatsoever, and that it was nevertheless intended that the property of such corporations, being largely acquired for or through the growth and extension of their prosperity, should contribute to the charges and expenses essential for municipal and county purposes, and that it was desirable, in order to the avoidance of litigation and future dissatisfaction, that such municipal and county taxation should be authorized, and that it should be permanently fixed and regulated, provided that railroad companies occupying and using railroads in this state, whether as lessees or

otherwise, should pay, upon the cost, equipment and append-
ages of their respective railroads, a state tax, after such rate
of taxation as might have theretofore been fixed by law upon
such companies, or in default thereof, after the rate of one-
half of one per centum upon such cost; and that they should
pay upon all the real property by them occupied, used or
owned for the purposes of their roads or otherwise, excepting
the main stem or road-bed and track not exceeding one
hundred feet in width, and excepting also a tract of land, not
exceeding ten acres, at the termini, a county and municipal
tax for the benefit of the counties, townships and cities
respectively where such real property was situated, after the
rate of one per centum upon a valuation thereof, and of all
the improvements thereon, not by way of repairs, then or
thereafter to be made.  The act provided for the voluntary
surrender, by any railroad company, of any privilege which
it might claim of exemption from taxation under its charter,
and for its acceptance, in lieu thereof, of the taxation pro-
vided by the act.  That act was in force when the amend-
ments to the constitution were adopted, among which was
the before-mentioned provision that property shall be as-
sessed for taxes under general laws and by uniform rules,
according to its true value.  It will have been seen that
under the act of 1873, the property was assessed for taxes for
state purposes, not according to its true value, but according
to its cost; and as to taxes for county and municipal pur-
poses, it was assessed upon a valuation.  The cost for the
assessment of the tax for state purposes was to be ascertained
by a return thereof, on oath or affirmation by the president
of the company to the comptroller of the state, and the valu-
ation for the assessment of tax for county and municipal
purposes was to be fixed by a commissioner appointed by the
governor.  The act gave an action to the state against the
corporation for false return, in case the comptroller should be
dissatisfied with the return of the president.  By the general
railroad law, (*Rev., p.* 925,) passed in 1873, it was provided
that the companies incorporated thereunder should pay to the

state an annual tax of one-half of one per cent. upon the cost, equipment and appendages of their road, including the cost of their road-bed, and such other taxes as might be assessed, from time to time, by a general law applicable to all railroads over which the legislature should have power for that purpose at the time of passing such law, and that they should be regularly assessed and pay tax for the value of their real estate (except the road-bed, one hundred feet wide,) and the improvements thereon, and their personal property, as taxed at the time when that act was approved, in the city or cities, township or townships wherein it lay, at the same time and rate, and in the same manner and for the same purposes, and by the same person or persons, as the other taxes assessed in such cities or townships. The act of 1876 (*Rev., p.* 1168) provided that all railroad corporations and companies occupying or using railroads in this state, whether as lessees or otherwise, liable to be taxed as such by a general law taxing railroads for state purposes, should pay an annual state tax upon the true value of such railroads and their equipments and appendages at and after the rate of one-half of one per centum upon such value. The act contained a declaration (inserted, as it says, for greater certainty) that it should not apply to or affect any county, municipal or local taxation whatever. The act provided for a return of the valuation by the president of the company, and for the review of the valuation, or for the making of an original one if none should be returned, by a board of railroad commissioners, and it gave to the company an appeal to a justice of the Supreme Court from the decision of the commissioners. By the general canal law, (*Rev., p.* 936,) passed in 1877, it was provided that the companies formed under that act should pay to the state an annual tax of one-half of one per cent. upon the cost of their canals, including equipment, appendages and expenses; the amount of the cost in each case to be ascertained by the annual statement of the president of the company, under oath or affirmation.

Up to the time of the passage of the act of 1884, the

General Railroad Tax acts of 1873 and 1876, (the provisions of the latter were expressly confined to the tax for state purposes,) were recognized as valid and were enforced. The question of their constitutionality, however, was never brought to a judicial test. It was held in 1879 that under the act of 1876, railroad corporations were required to pay a tax for state purposes, upon the value of their railroads and equipment and appendages. *State, N. J. Southern R. R. Co., pros.,* v. *Railroad Commissioners,* 12 *Vroom* 235. And that they were required to pay county and municipal taxes under the act of 1873. *State, Central Railroad Co., pros.,* v. *Mutchler,* 12 *Vroom* 96, and *State, Pennsylvania R. R. Co., pros.,* v. *Wetherill, Id.* 147.

The act of 1884 covers both railroad and canal property. It fixes the same rate of taxation for state purposes which had previously existed for many years, but assesses it upon the valuation of all the property of the company used for its purposes, including the franchise, and provides for local taxation on part only of such property as the general railroad tax law of 1873 did ; and while that act fixed a rate of one per cent. for local taxation, the act for 1884 provides that the rate for local taxation shall not exceed one per cent.

It will be seen that the act of 1884 introduced no novelty in railroad taxation, but that on the contrary the same method, substantially, of taxing railroad companies had existed from 1873, under the act of that year, which act was modified in 1876, merely in order thus to conform it to the constitutional requirement.

The fact that railroad property, when the act of 1884 was passed, had been separately taxed under similar legislation, both for state and local purposes, for so many years, and that the validity of such legislation on the ground of unconstitutionality had not been brought to any judicial test, although immense interests in the hands of vigilant guardians had been annually affected by it, is an important circumstance in the consideration of the question now before the court; because so practical and contemporaneous a construction of the consti-

tutional provision, acquiesced in for so long a time under such circumstances, and one so clear and uniform, must have weight with the court in settling judicially the construction of the provision, if the construction were otherwise doubtful.

The power of taxation is an essential inherent attribute of sovereignty. In our state government it is vested in the legislative department. It is unlimited in extent, except as it may be restrained by constitutional provision or irrepealable legislative contract. Of course, to be exercised legitimately, it must be exercised within the scope of governmental authority as limited and circumscribed in our polity. To exercise it outside of the sphere of such authority would be usurpation. It is the province of the judiciary to determine whether in any legislation submitted for its decision, the constitutional restraints or limitations have been disregarded or transcended. But unless the legislation is found to be clearly in contravention of some constitutional provision, or to be outside of the limit of governmental authority, the court will not annul it. With the policy or impolicy, justice or injustice of the legislation, irrespective of such constitutional considerations, the courts have nothing whatever to do.

The prosecutors complain and insist that in the act of 1884 the constitutional restraints and limitations have been ignored and exceeded; that the property of railroad and canal companies has been segregated, by arbitrary selection, for special and exclusive taxation, and made to bear, practically alone, the entire burden of taxation to raise money for state purposes instead of its due proportion thereof only. And they insist that the legislation thus brought into question is in violation of the before-mentioned provision of the state constitution that property shall be assessed for taxes under general laws and by uniform rules, according to its true value, and of the provision of the federal constitution that no state shall deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

In the act under consideration the legislature has separated

for taxation, not all the property of railroad and canal companies, but only so much of it as is used for the particular purposes of those corporations, and has imposed upon the property so separated a tax for state purposes and tax for county and municipal purposes. The property of such companies not used for such special purposes is left to be taxed in the same manner as other like property. The property separated, so far from being taken by mere arbitrary selection, is, all of it, so circumstanced by reason of the peculiar use to which it is put as to make it on that account a class by itself. To value and tax such property in the same way in which other property is valued would be unjust. To do justice to the companies, and in common fairness, not only must the main stem of a railroad and the water-way of a canal be each valued and taxed as a unit, but the other property used in connection therewith and for the same purposes must also be valued and taxed with reference to such use. To make a just valuation thereof, property used for railroad or canal purposes must be estimated with regard to its value for such purposes. For example: the true value, for purposes of taxation, of railroad cuts and embankments and canal locks is not their cost, but what they are worth in connection with the works of which they form part. This subject is well discussed and forcibly illustrated by Mr. Commissioner Hunt in delivering the unanimous opinion of the court in *People* v. *Barker*, 48 *N. Y.* 70. See, also, to the same effect, the opinion of the United States Supreme Court in *State Railroad Tax Cases*, 92 *U. S.* 575, 608 (1875), and in *Kentucky Tax Cases*, 115 *U. S.* 321 (1885).

This peculiarity of the property in question constitutes it a legitimate class for the purposes of taxation—a class which, in order to deal with it fairly in the matter of taxation, must be treated separately. In the leading case of *Van Riper* v. *Parsons*, 11 *Vroom* 123, it was held that a law framed in general terms, restricted to no locality and operating equally upon all of a group of objects which, having regard to the purposes of legislation, are distinguished by characteristics sufficiently marked and important to make them a class by

themselves, is not a special or local law, but a general law. See, also, *S. C., Id.* 1, 8. Railroad and canal property has such characteristics, and the act under consideration extends to and operates equally upon all such property. The law, therefore, is a general law. In *State Railroad Tax Cases, ubi supra,* it was said that railroads by themselves constitute a class for the purposes of taxation.

The constitutional provision requires not only that the assessment shall be under general laws, but that it shall be by uniform rules also. It does not require that all property shall be assessed for taxes, but that property when assessed for taxes—or in other words, such property as shall be assessed for taxes—shall be assessed under general laws, &c. Certain property has been exempt from taxation ever since the amendments to the constitution were adopted, and such exemption has received the judicial sanction. The property is of the same kind as that which is taxed, but the use to which it is devoted—the purposes of religion, education, benevolence, &c.—makes it a class and justifies the exemption.

The constitutional provision does not take away from the legislature the power of selecting the subjects of taxation. *State, Vail's Ex'rs, pros.,* v. *Runyon,* 12 *Vroom* 98 ; *State, Stratton, pros.,* v. *Collins,* 14 *Vroom* 562. But it does require that all the members of the class selected shall be included in the taxing law, and that the rule applied thereto shall be uniform as to the whole of the class, and that the assessment shall be made at the true value of the property constituting the class ; and if these requirements are answered by the law, it is not in conflict with the constitutional provision.

If the legislature has power to exempt, on account of the special use to which they are put, certain kinds of property from the taxation to which other property of the same kind, but put to general uses, is subjected, it has the right to provide, in its discretion, that such special property shall be assessed at a different rate and in a different way from the other. Judge Cooley, in his work on Constitutional Limitations, says (page 497) that constitutional requirements that

taxation upon property shall be according to value do not
include every species of taxation, but that all special cases,
such as those which he specifies, among which are those where
corporations are required to pay a certain sum annually, in
proportion to their capital stock or by some other standard,
which methods are regarded by the state as most convenient
and suitable for the taxation of such organizations, are by
implication excepted. In fact, under our laws various methods,
which have received express judicial sanction, are employed
for the taxation of the property of various kinds of corpora-
tions in order that such property may be taxed at, and not
beyond, its true value.

Railroad and canal property being peculiar property, which
cannot in justice to the owner be valued in the same way as
other property of a like nature, the legislature was bound to
provide a proper method of valuing it justly for the purposes
of taxation. Such method must be a peculiar one. The
machinery provided for the purpose by the act—a state board
of assessors—is appropriate, and such as is necessary in view
of the peculiar character of the property. If by the method
adopted the companies are required to bear no more than their
just share of the public burden of taxation, they surely have
no ground of complaint. Whether the tax which they pay is
appropriated to state purposes alone, or to state and county and
municipal purposes, is a matter which does not concern them.
All taxes, whether levied for state, county or municipal pur-
poses, are state taxes—they can be imposed by no other
authority than that of the state. The state appropriates the
proceeds to what purposes it sees fit; but however the proceeds
may be appropriated, every tax is a state tax. *Camden and
Amboy R. R.* v. *Commissioners of Appeals*, 3 *Harr.* 71; *State,
Camden and Burlington R. R. Co., pros.*, v. *Cook*, 3 *Vroom*
338; *Vreeland* v. *Jersey City*, 14 *Vroom* 135.

If the legislative provision for the taxation of the property
of railroad and canal companies is not in contravention of the
constitution it will stand; the apportionment of the proceeds
of the taxation cannot affect the assessment. The power of

apportionment is not limited or affected by the constitution, and the judiciary has no control whatever over it. The legislature, in the act of 1884, takes pains to secure the railroad and canal companies against being required to pay more than their full share of tax. The act provides that if the state board of assessors, upon complaint of any company, shall in any case ascertain that the addition of the state tax of one-half of one per cent. to the local rate as limited by the act would compel any company to pay more tax than such company would pay if it did not pay that state tax but did pay full local rates on all its property used for railroad or canal purposes and its tangible personal property and franchises, without any other exemption than such as would be allowed to an individual citizen on such property, then and in such case the board shall make such deduction as will make the tax equal to the amount that the company would pay upon all that property, including the franchises, if assessed at full local rates, without any state tax; and that for the purpose of ascertaining the amount (but for no other purpose) the board may apportion the value of the franchise among the taxing districts. Nor can it be successfully contended that under the act one company may be required to pay a greater proportion of tax for state purposes than another; for, as before stated, the apportionment does not affect the constitutionality of the tax, and each company is to be assessed upon the same kind of property at precisely the same rate and by exactly the same method of valuation. The assessment for tax for state purposes is to be upon the entire assessed valuation of each railroad and each canal company as ascertained by the state board of assessors. And here it may be observed that if the legislature may tax the property separately and by a peculiar rule, the peculiar character of which is made necessary in justice to the owners of the property as well as to those who own other taxable property, in view and by reason of the use to which the property is applied, the fact that only part of the property is taken into account in one part of the method (i. e., in making up the amount to be paid in respect of county and municipal tax), is of no moment.

The tax applied to state purposes and that applied to county and municipal purposes are one tax and are to be so regarded. The act provides that the sum of the estimates or computations for each company shall constitute the tax to be paid by each company. It may be added that no system of taxation can be devised which will be free from criticism on the ground that in some way or other it works unequally or lacks complete uniformity. Said the court in State Railroad Tax Cases: "Perfect equality and perfect uniformity of taxation as regards individuals or corporations, or the different classes of property subject to taxation, is a dream unrealized. It may be admitted that the system which most nearly attains this is the best. But the most complete system which can be devised must, when we consider the immense variety of subjects which it necessarily embraces, be imperfect."

The objection is made that under the act only the property mentioned in subdivision 2 of section 3 (real estate used for railroad or canal purposes, not including main stem or waterway), is subjected to assessment for taxation for county and municipal purposes, whereby it is argued the companies escape their share of county and municipal taxation in respect of the main stems or the water-ways and the tangible personal property in the taxing districts. But if the taxes be but one tax, and the legislature has the right to fix the amount of that tax by the means adopted, it follows that the objection is without actual foundation; for the legislature has the right to say what tax the companies, in view of the peculiar character of their property, shall pay, and in what way it shall be assessed, provided it makes the assessment under general laws and by uniform rules, according to the true value of the property. To hold otherwise would be to hold that the legislature is bound to tax all property at the same rate and in the same way, without regard to the use to which it is put.

To summarize the views above presented. The power of taxation is in the legislative branch of the government alone. It is unbounded except as it may be limited by constitutional restraint. A law which taxes a class of property separately is

not unconstitutional if it embraces all property of that class, and applies to it uniform rules and taxes it according to its true value. The constitutionality of such a law is to be determined in the same way in which it would be determined if the property taxed were the only property taxed in the state.

It is manifest from the provision that the companies shall not be required to pay more tax for all purposes under the act than they would be required to pay at full local rates, that the act is not liable to the criticism that it selects the property of two classes of corporations from the mass of similar property, not to put upon it a proportionate part of a general tax, but to charge it with the whole amount of a separate tax; for, so far from putting upon the property a separate tax, the legislature has carefully provided that it shall not pay any more than it would pay if taxed at precisely the same local rates as other property, without any taxation for state purposes. Moreover, it may be remarked, railroad and canal companies are not the only corporations which are required to pay taxes for state purposes. Another act of 1884, entitled "An act to provide for the imposition of state taxes upon certain corporations, and for the collection thereof," requires other corporations to pay license tax to the state upon their franchises.

And here it will not be out of place to speak as to the taxability of franchises. They are undoubtedly property, and as such are taxable. *Burroughs on Taxation*, § 85 ; *Society for Savings* v. *Coite*, 6 *Wall.* 594; *State Railroad Tax Cases*, 92 *U. S.* 575. The act provides that the state board of assessors shall ascertain the value of the franchises separately. They are to ascertain their true value. They have a value which can be estimated. *State Railroad Tax Cases, supra.*

There is no substance in the objection that the law in question contravenes the provision of the fourteenth amendment to the federal constitution that no state shall deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws. The act provides that a hearing be given to the companies interested touching the valuation and assessment

of the property, and for a review of the assessment by the
board, upon complaint of any company or person aggrieved,
or of the attorney-general, or of any member of the board in
behalf of the state, that the property is assessed too low or
that property has been omitted, and for the correction thereof
by the board as shall seem just; and that if such complaint
be by the attorney-general or a member of the board, there
must be notice to the company or person to be affected by the
proceedings.    The act also provides that any company or per-
son assessed, or the attorney-general in behalf of the state, may
contest by *certiorari* the validity or amount of any tax levied
under the act, and that upon the writ relief may be had as
well in cases where it is claimed that the amount of tax is ex-
cessive or insufficient as in cases where it is claimed that the
principle upon which the assessment is made is erroneous.
This present proceeding is an illustration of the extent to
which and the thoroughness with which such matters may be
litigated.    Without entering upon the question raised upon
the hearing, whether artificial persons are within the scope of
the fourteenth amendment to the federal constitution, it is
enough to say that in the Supreme Court of the United States
it has been held that laws similar to that under considera-
tion are not in violation of the provisions of that amendment.
In *Davidson* v. *New Orleans*, 96 *U. S.* 97 (1877), it was held
that whenever by the laws of a state or by state authority, a
tax, assessment, servitude or other burden is imposed upon
property for the public use, whether it be for the whole state or
some more limited portion of the community, and those laws
provide for a mode of confirming or contesting the charge thus
imposed, in the ordinary courts of justice, with such notice to
the person, or such proceeding in regard to the property as is
appropriate to the nature of the case, the judgment in such
proceedings cannot be said to deprive the owner of his prop-
erty without due process of law.    And the same doctrine was
affirmed in *Kentucky R. R. Tax Cases*, 115 *U. S.* 321 (1885.)

In that case it was insisted that the law of Kentucky made
an unjust and unconstitutional discrimination against railroad

companies and their property, because such property, though called real estate in the legislation, was classed by itself as being distinct from other real estate, such as farms and city lots, and subjected to different means and methods for ascertaining its value for purposes of taxation, which methods differed also from those which were applied to the property of corporations chartered for other purposes, such as bridge, mining, street railway, manufacturing, gas and water companies. And it was urged that such discrimination and difference were in violation of the rights of the railroad company under that clause of the fourteenth amendment which provides that no state shall deny to any person within its jurisdiction the equal protection of the laws. The court said, on this point, that there is nothing in the constitution of Kentucky which requires that taxes shall be levied by uniform method upon all descriptions of property; but the whole matter is left to the discretion of the legislative power, and that there is nothing to forbid the classification of property for purposes of taxation, and the valuation of different classes by different methods; that the rule of equality in respect to the subject only requires that the same means and methods be applied impartially to all the constituents of each class, so that the law shall operate equally and uniformly upon all persons in similar circumstances, and that there is therefore no objection to the discrimination made as between railroad companies and other corporations in the methods and instrumentalities by which the value of their property is ascertained, and that the different nature and uses of their property justify the discrimination in that respect which the legislature has seen fit to make. It may be remarked that in what are known as the *San Mateo Case*, 8 *Am. & Eng. R. R. Cas.* 1, and the *Santa Clara Case*, 9 *Sawy.* 165, in the United States Circuit Court for the district of California, the adjudication in reference to the fourteenth amendment was upon a provision of the constitution of California denying to railroad and other *quasi* public corporations the same right of exemption from the taxable value of their property of the amount of a mortgage debt thereon

which was allowed to others.    This discrimination was held
to be a denial of the equal protection of the laws.    Those cases
deal with a constitutional discrimination.    They have no bear-
ing upon the cases in hand to which the authoritative deci-
sions of the United States Supreme Court above referred to
are pertinent.

It remains to consider the objection that the act is inap-
plicable to those railroad companies whose charters contain a
provision that the company shall pay a state tax of one-half
of one per centum upon the cost of the railroad, " provided
that no other tax or impost shall be levied or assessed upon
said company."    By the act " concerning corporations " it is
provided that the charter of every company which shall there-
after (that part of· the act was passed in 1846) be granted by
or created under any of the acts of the legislature, shall be
subject to alteration, suspension and repeal in the discretion
of the legislature.    Every charter granted since the passage
of that section is subject to it.    A similar provision is con-
tained in most of the railroad charters.    It has been held in
this court that no irrepealable contract can result from the pro-
visions of a charter which is made in terms subject to altera-
tion, amendment or repeal by the power granting it.    *State, M.
& E. R. R. Co., pros.,* v. *Miller, Collector,* 2 *Vroom* 521 ;
*State, J. C. & B. R. R. Co., pros.,* v. *Jersey City, Id.* 575.
The provision in the charter as to tax was merely a declara-
tion that the legislature at the time of passing the charter in-
tended that the companies should not then be chargeable with
any other tax than the one-half of one per centum.    *Little* v.
*Bowers,* 17 *Vroom* 300.    And those charters being subject to
alteration, the provision as to tax contained therein presents
no obstacle to the application of the act of 1884 to the prop-
.erty of the companies.    By the reservation of the power to
alter, the legislature retained the power to tax.

On the hearing of these cases this court declared that it
would not hear argument at that time upon the subject of the
liability of companies claiming to have irrepealable contracts
protecting them from the operation of the act.    But four of

the prosecutors, viz., the Morris Canal and Banking Company, the Morris and Essex Railroad Company, the Paterson and Hudson River Railroad Company, and the Paterson and Ramapo Railroad Company, claim to have such contracts. The judgments of the Supreme Court in all the cases except those in which those companies are prosecutors, should be reversed, and the records remitted to the Supreme Court to be proceeded upon according to law. In those cases the records should be retained for argument upon the question reserved as to whether those companies have such irrepealable contracts.

SCUDDER, J. I have prepared an opinion stating my conclusions, without discussing the whole subject in controversy. The questions raised and discussed on the writs of error to this court relate to the validity of the act entitled "An act for the taxation of railroad and canal property," approved April 10th, 1884; and whether, if said law be invalid, there is any other statute under which this court may make or direct a legal assessment. It is not necessary to add anything to what has been already said by other members of the court on the latter part of this proposition, and I entirely agree with the conclusion that no prior statute exists by which these disputed assessments against railroad corporations can be amended or sustained if this law be invalid, or by which any new assessments can be substituted in the place of these by any action of this court. The former part of the proposition is more difficult to determine. Is this law invalid so that it cannot be executed without violating the fundamental law of our state? If it be not thus controlled and annulled, it is the duty of this court to give it effect. It is not our province to say whether the law is impolitic, or even oppressive or unjust in its provisions, so long as it does not violate the constitutional rights of these corporations in the enforcement of what is designed to be strictly a tax law. The judicial power cannot legitimately question the policy, or refuse to sanction the provisions of any law not inconsistent with the fundamental law of the state. *Cooley on Taxation,* 34. The power to tax may

be exercised oppressively upon persons, but the responsibility of the legislature is not to the courts, but to the people by whom its members are elected. So, if a particular tax bears heavily upon a corporation or a class of corporations, it cannot for that reason only be pronounced contrary to the constitution. *Veasie Bank* v. *Fenno*, 8 *Wall.* 548.

A mere suggestion of these familiar principles of law giving the well-defined duties and powers of the co-ordinate branches of our government will dispose of many points in the arguments of counsel and bring us to the real issue which we have the power at this time to decide, under the assignment of errors before us. Is this tax law, of which these railroad corporations complain, unconstitutional? If so, this case is ended. If not, further proceedings may correct its alleged defective execution. That part of the constitution which is said to be violated by its enactments is art. IV., § 7, ¶ 12: "Property shall be assessed for taxes under general laws and by uniform rules, according to its true value."

There can be no question that this law imposes a tax on property, and it is not a franchise tax. By subdivision 4 of section 3 of the act, the value of the franchise is to be estimated and included in ascertaining the true value of all property used for railroad and canal purposes, and the tax is imposed on this total valuation. All is designated in the act as property, and is within the scope of this paragraph of the constitution. That the franchise of a railroad or canal company may be thus valued and assessed for general taxes is abundantly settled both by authority and precedent in legislative acts and in the decisions of courts. It has an appreciable market value not in all cases easy to measure, and not always determinable by the same rule or estimate. Corporate rights and privileges by grant from the government are not mere abstractions or so involved with the other property of the corporation that they cannot be valued. The land, road-bed, rails, buildings and materials of which a railroad are composed have a value, and the added worth given to them by the uses to which they may be applied by the public grant of a fran-

chise for such uses may be approximately if not exactly esti-
mated. It has often been done, and sanctioned by courts.
How this may best be done must be left largely to legislative
discretion and judgment. The whole aggregate property of
the railroad is thus to be valued and brought together for
taxation, and the assessment is laid upon it to supply a reve-
nue for the government of the state. This is an assessment
of property for taxation within the above-cited paragraph of
the constitution, and by its terms must be made under general
laws. This I hold is a general law, applicable to all the rail-
roads and canal companies in the state, unless they are pro-
tected by express limitations of taxation in their charter, and
by what are called, in some cases, irrepealable contracts beyond
legislative control. Railroad corporations have peculiar qual-
ities which distinguish them from mere private corporations,
or other public or *quasi* public corporations, in the right of
eminent domain to condemn lands, conferred on them by
charter; in the uses to which their railroads may be applied
by them as carriers of passengers and freight, receiving tolls
or fares for the same; in the employment of steam power, a
dangerous agency, in passing through the state, and their pro-
tection in the careful use of such agency; in the structure of
the road, with its rails, cuts, embankments, often built and
maintained at great detriment to other property; in the extent
of the road, often through several counties or across the state;
in the depots, freight-houses, wharves, and the great accumu-
lation of property at the termini and other points on the line
of the railway. Canals have some of the same peculiarities
in the construction and maintenance of their water-ways.
These characteristics, which so clearly distinguish them from
other corporations, make it almost a necessity that they should
form a class by themselves, and the right to do this for taxa-
tion has been recognized in the charters of companies, in our
General Railroad act, the General Canal act, and laws passed
prior to and since the amendments to the constitution in 1875,
notably the tax laws of 1873 and 1876, all of which have
been enforced and acquiesced in. In the *Kentucky Railroad*

*Tax Cases,* 115 *U. S.* 321, the classification of the property of railroads for taxation is recognized, and in the opinion of the court Justice Matthews says : " The right to classify railroad property as a separate class for purposes of taxation grows out of the inherent nature of the property and the discretion vested by the constitution of the state in its legislature, and necessarily involves the right on its part to devise and carry into effect a distinct scheme with different tribunals in the proceeding to value it." We have no right to assume that this discretion will be abused and railroads taxed out of existence, as has been said, and to strain the power of the court to protect them in anticipation of such an attempt at destruction. If the property of railroad and canal companies admits of this distinctive classification, founded on real differences and not on mere devices for the manifest purpose to oppress and harass them by unequal taxation, then the law which classifies them for taxation is general within the description of such a law in the well-known and oft-quoted decisions of our own courts.

The word "all," does not precede the word "property" in the paragraph referred to, and property may therefore be classified, and even exempted from taxation, as is sometimes done, without violating the express words of the constitution.

Besides the requirement that property shall be assessed for taxes under general laws it must also be assessed " by uniform rules." The word " uniform " is defined as " not variable," " not different," " having the same form or manner." As it stands in this paragraph of the constitution it means that rules must not be variable in their application to the subject of taxation included in the classification of property. In the *Head Money Cases,* 112 *U. S.* 580, 594, in construing the clause of the constitution of the United States that " all duties, imposts and excises shall be uniform throughout the United States," the court said : " The tax is uniform when it operates with the same force and effect in every place where the subject is found ; " but that " perfect uniformity and perfect equality of taxation in all aspects in which the human mind

can view it, is a baseless dream, as this court has said more than once;" citing *State Railroad Tax Cases*, 92 *U. S.* 575, 612. The rules for taxation must be uniform as to the property in the class on which it operates. As to railroad property, all property in that class must be assessed for taxes by the same rules. But suppose the law by its uniformity does produce unequal and unjust results in some cases, is it therefore to be annulled? Suppose, as in this case, that the main stem which includes the road-bed not exceeding one hundred feet in width, with its rails, sleepers and depot buildings used for passengers, connected therewith, is assessed at one rate, and the other real estate used for railroad purposes in each taxing district is assessed at another rate, and no good reason is assigned for such difference; or suppose, as in section 6 of this act of 1884, it is enacted " that whenever in any taxing district there shall be several branch lines of railroad belonging to or controlled by one company, or operated under one management, the assessors shall designate one of said lines as the main stem, and the value of the others shall be included in the separate valuation provided for in the second subdivision of section 3 in this bill," (that is, the value of the real estate used for railroad purposes in each taxing district in this state, other than the main stem,) and that this rule applied to some of the railroads produces unequal and unjust results, will these invalidate the law in whole or in part? These inequalities arise mainly from the fact that some railroad corporations have acquired more of a certain kind of property than others, and they have extended their holding, in many cases, far beyond the width of one hundred feet for the main stem of the road as originally intended and provided for in their charters. If all are taxed alike for such excess, the rule of uniformity is not thereby violated. Have not the legislature the legal right to say that for the main stem of the road one hundred feet in width, which the original charters contemplated the railroad companies should hold and use, they will tax at the rate of one-half of one per cent. for state purposes, which was the amount originally fixed in most, if not all of the charters;

but for all acquired beyond one hundred feet in width a greater tax shall be paid, not to exceed in the aggregate of both taxes the local rate as fixed and assessed for county and municipal purposes? The same rule is applied, by this separation, to all in the class, and they are, by this law, carefully guarded, not only against assessment at a higher rate than others of the class, but also against a higher rate than is imposed on other property-holders in the several taxing districts where their property is located.

The objection that the property of railroads by this law is not assessed by taxes according to its true value, because it can only be truly valued as an entirety, and not in parcels, as provided for in the act, is not well taken. The method of determining the true value of property must be left to the discretion of the legislature. If this value is fixed as the basis of taxation, the method and the agencies to be used to ascertain it, belong to the legislative and not to the judicial province.

Nothing is said in the constitution as to the appropriation of taxes after they are assessed and collected. If as in this case, one-half of one per cent. is reserved for state purposes, and one per cent. be distributed for local expenses for which general taxes may be assessed, this court cannot interfere with such apportionment, for the reason that there is no restriction in the constitution of the power of the legislature to make such apportionment. This is but a convenient form of collection and distribution of taxes when collected, without increasing the general rate of either the individual tax-payer or the railroad and canal company.

It is argued that " the equal protection of the laws," under the fourteenth amendment of the constitution of the United States, exempts from any greater burden or charges than such as are equally imposed upon all others under like circumstances, and that this equal protection forbids unequal exactions of any kind, and among them that of unequal taxation. Admitting this to be so, and I am not disposed to deny it, the limitation to all persons and property in like circumstances

restricts the comparison to all those within the same classification for taxation. This law does not stand alone in the classification of property for taxation, but is part of a system of tax laws by which this burden is distributed among all classes of persons and upon all taxable property, with slight exemptions within the state, and taxes are thereby raised for the expenses of the state, county and municipal governments in their different departments, and according to their several requirements. Thus far, as it appears to me, there has been a fair effort throughout this whole system to place all persons and property, so far as may be practicable, within the equal protection of the laws, both constitutional and legislative. That there are errors in details, and in some of the methods of assessment, all will probably admit, and doubtless when these are made plain by the practical working of the laws they will be corrected. But substantial and not exact equality is all that can be required under any system of legislation for taxes. Unless this law is manifestly wrong it should be sustained. In my opinion it is not, and the judgment should be reversed.

PARKER, J. On the 10th day of April, 1884, an act was passed by the legislature of the State of New Jersey entitled "An act for the taxation of railroad and canal property." Under that act the Central Railroad Company of New Jersey, and other like companies, were taxed on their property used by them for railroad and canal purposes. The validity of these assessments was contested in the Supreme Court, and they were by said court adjudged invalid, on the ground of the unconstitutionality of the act. An abstract of the act of 1884 is given in the opinion which has just been read by the Chancellor, and I will not repeat it.

At the opening of the argument in this court it was announced that counsel would be heard upon two questions, viz. : (1) whether, if the act of 1884 be invalid, there is any lawful method of assessing taxes upon said companies in reference to the subjects of taxation mentioned in that act; and (2) whether the act of 1884 is constitutional.

In order to answer the first question the course of legislation in this state on the subject of taxation of corporations of this character should be considered. In the infancy of this class of corporations, when struggling for existence, the amount of tax they were required to pay into the state treasury was small. The state favored them by limiting the annual tax to be paid by such corporations to the one-half of one per cent. on the cost of their respective roads. This tax was for state purposes, and they were not assessed for local taxes. The wise and liberal policy adopted by the state was founded in part on the fact that the enterprises in which such companies were engaged were at that time of doubtful success, and in part on the belief that if successful they would contribute vastly to the public good.

As time progressed, these corporations extended their business operations and acquired additional property, often of great value, until in some sections of the state, especially in the cities, the exemptions from local taxation became so great as to encumber the property of citizens liable to be taxed with a heavy burden.

To prevent injustice arising from inequality of taxation, and to equalize as far as possible the public burdens, the legislature, on the 2d day of April, 1873, passed an act the avowed object of which was to establish just rules for the taxation of railroad property. This act made a radical change in the system. It provided not only that railroad companies should pay, upon the cost, equipment and appendages of their roads, a state tax at such rate as had before been fixed by law, but also, upon all real property of such companies, owned by them (excepting the main stem not exceeding one hundred feet in width), a county and municipal tax for the benefit of the counties, townships and cities of the state respectively where the same were situated, after the rate of one per cent., exempting, however, from such tax land not exceeding ten acres lying in one parcel at the termini of the respective roads.

The law of 1873 was passed before the adoption of the constitutional amendment in reference to taxation, and therefore

its validity cannot be wholly tested by the same standard as the act of 1884. But upon the question now under consideration, viz., whether, if the act of 1884 be invalid, there is any lawful method in the act of 1873 of making these assessments on the subjects of taxation mentioned in the act of 1884, it is sufficient to remark that although based on the same general principle as the act of 1884, yet inasmuch as by the act of 1873 the assessment was to be made on cost, and not on true value, as the constitutional amendment prescribes, the act of 1873 will not sustain these assessments.

On the same day that the act of 1873 was approved the then governor signed what is termed the general railroad law, the nineteenth section of which provides that after any railroad constructed under that act should be in operation the corporation owning it should pay to the state treasurer a tax of one-half of one per cent., annually, on the cost, equipment and appendages of said road-bed, and also pay such other taxes as might be assessed from time to time by general law, applicable to all railroads over which the legislature should have power, for that purpose, and that such railroads should be taxed for the value of their real estate (except the road-bed of one hundred feet in width), and on personal property, as then taxed in the cities or townships where it should lie.

The act of 1876, providing for state taxes on railroads, was passed after the adoption of the constitutional amendment. This act is almost identical with the act of 1873. The chief object of the act of 1876 seems to have been to make the system of railroad taxation conform to the constitutional amendment that took effect in 1875, which prescribed that the assessment should be on true value instead of on cost. Where the acts of 1873 and 1876 did not conflict, the former stood, and under those two acts both the state and local taxes on railroad property in this state were assessed and collected up to the enactment of the law of 1884. Upon an examination of those acts, in comparison with that of 1884, it will be seen that they are grounded on the same general principle. If the act of 1884 be unconstitutional, so is the act of 1876, and

these assessments cannot therefore be upheld under the act of 1876.

Neither can they be supported by the general law of 1866, because that law has no reference to taxation on railroad and canal property.

If the act of 1884 be unconstitutional and void, the sixteenth section of that act, which authorizes the Supreme Court to increase or reduce the assessment, will not avail, for the Supreme Court has no power to adjust or refer back an assessment made under an unconstitutional act, unless after the original assessment an act had been passed whereby a legal assessment can be made. Such was the decision of this court in construing the act of 1881, reported in *Elizabeth* v. *Meeker,* 16 *Vroom* 157.

Where the principle on which the act rests is in conflict with the constitution, one part of the assessment should not be set aside and the other part be sustained. In this case there cannot be a separation of the parts without doing violence to the general scheme and running counter to the intent of the law-making power. If the act of 1884 is void as to local taxation, it is also a nullity as to state taxes.

Having seen that if the act of 1884 be unconstitutional and void there is no lawful method of assessment upon these companies in reference to the subjects of taxation mentioned in such act, the vital question now arises whether the act of 1884 is constitutional. Upon the answer to this question depends the decision of this cause.

I agree with the Supreme Court in that part of the opinion which holds the act of 1884 not invalid because it directs that the valuation and assessment shall be made by a board of assessors specially appointed for the purpose. It matters not what the machinery set in motion by the legislature to execute a tax law may be, so long as the principle lying at the root of the act is not antagonistic to the constitution. Nor would it affect the case if such machinery be found defective or if the board should make mistakes. The act gives the Supreme

Court ample power to correct mistakes in the application of the act.

Nor is the act of 1884 invalid because in the ascertainment of the value of the property of the companies the franchise is to be taken into account as one element of value. The opinion of the Supreme Court rightly holds " that this subject is not debatable at the present day, and the doctrine has become already accredited by many decisions as well of the federal as of the state courts."

One so-called vice of the act of 1884 is stated in the opinion of the Supreme Court in the form of an interrogatory. It is asked " whether by the law and constitution of the state it is competent for the legislature, at will, to select the property of two classes of corporations and impose a tax upon such property, at the same time exempting all other property from the burden ?" If the act of 1884 was the only tax law on the statute book, the answer should be that it was not competent so to do. But that act is only one of a series of tax laws under which property in the state is taxed. If by virtue of the various tax laws in force all the property in the state (except that which is devoted to collegiate, academic, religious or charitable purposes) is taxed, how can it be said that the legislature, at will, selected the property of two classes of corporations and imposed a tax upon such property, and at the same time exempted all other property from the burden of taxation? All taxes are, in one sense, state taxes. They are assessed and raised under different laws enacted by the legislature of the state, all forming one general scheme of taxation, designed to bring all the property in the state (liable to tax) under general laws and uniform rules according to its true value. Different agencies are employed to assess and collect, and the sums raised are applied to various public purposes. But this does not vitiate the system of taxation nor render invalid any one of the acts which, with others, constitute the system, if the constitutional prohibition be not violated.

While the taxing power is an inherent attribute of state

sovereignty, to be exercised only by the legislative branch of the government, yet it is controlled by constitutional limitations, which the people have adopted. So long as the legislative branch of the government conforms to the constitution, it is supreme on the subject of taxation. It has the power and the right to enact that local officers in each taxing district shall assess and collect for their respective districts the county, township and city taxes, and distribute the money without its passing through the state treasury; or to enact that a state board shall assess and collect all taxes and bring all the money into the treasury, in part to be distributed by the state among the municipalities; or to provide for a state board to assess and collect one portion of the tax, and local boards the residue. So long as all property (not exempt by statute) is reached and taxed according to its true value by general laws and uniform rules, it matters not whether the end be accomplished through one statute or through many forming one general system.

The mode of taxation under the "Act to establish a system of public instruction," approved March 27th, 1874, is pertinent in this connection as an illustration. Under that act a state school tax was directed to be raised (in lieu of township school taxes), to be levied and collected by the local officers, to be paid through the several county collectors into the state treasury, and be redistributed by the state so as finally to reach the several school districts. This act is an instance of direction by the legislature of the specific channel into which a tax raised for a specific purpose may be made to go before it will reach the contemplated object. It shows the power of the legislature over the subject of taxation, restrained only by constitutional provisions. In this connection it is proper to remark that the money raised for school purposes under that act is not retained by the state to aid in carrying on the state government, but passes back through the state treasury to the districts. There are not two modes of raising taxes to be used for state purposes.

Another somewhat similar instance is the act in reference to insurance companies of the state, the thirty-ninth section

of which requires that every company organized under the act shall pay—not as a license fee, but as tax—into the state treasury, one-quarter of one per cent. per annum, on its capital stock, for a special purpose, *i. e.*, for the school fund. Foreign insurance companies are required, not only to pay a license fee for the privilege of transacting business within the state, but also a tax of two per cent. on all premiums received in the state, to be distributed among organized fire departments, for the use of disabled firemen.

Enough has been stated to show the power of the legislature over the subject of taxation, and to demonstrate that in forming a judgment as to the validity of a specified act, it must be taken in connection with all other laws operative on the same subject.

When the state government desires to raise a tax for state purposes, through the local officers in the several taxing districts, it becomes necessary to fix the amount to be raised, and apportion it among the counties on the basis of ratables, but when the state chooses to levy a state tax direct through the machinery of its own officers selected for the purpose, an apportionment is not needed, and it is only required to ascertain the true value of the property to be assessed and to fix the rate.

It is alleged that the act of 1884 is unconstitutional and void, because it violates the clause of the amended constitution which requires property to be taxed "under general laws and by uniform rules, according to its true value." In the arguments addressed to the court by the several counsel of defendants in error, this objection to the act was elaborated and enforced, and the court is called upon to consider this branch of the case very fully.

In the first place, it will be observed that the word " all " is omitted from the sentence which contains the constitutional restriction on the power of taxation. This omission by the commission that prepared the amendment and by the legislature that submitted it to the people, was not accidental. It was intended that some property should be exempt, and that upon

the classes of property which the legislature saw fit to tax, the assessment should be according to the true value and by uniform rules, affecting alike all property of a class.

In the opinion of the Supreme Court in this case it is conceded that the legislature has the power to classify property for the purpose of taxation, but it is maintained that a class must not be declared arbitrarily, and that it must arise out of the nature of the things classed. This is true, but is not property used by railroad and canal companies for the purposes of their business, a class of property arising out of its nature? It is a class universally recognized as different from any other class in many respects. It is not the abstract value of the rails and ties as so much steel and wood, or of the land on which they rest as farm land or building lots, or of the tangible personal property in itself considered, which are alone to be taken into account in ascertaining the true value of property used for railroad purposes, but the franchise also, which puts life into what otherwise would be comparatively dead property, of little value. The true value of property used for railroad or canal purposes cannot be arrived at except by treating it as a class by itself.

This view is sustained, not only by our common knowledge gained by observation, but is held by numerous decisions of the courts.

In 9 *Otto* 722, Chief Justice Waite says: " Railroads are a peculiar species of property, and railroad corporations are in some respects peculiar corporations."

In the case of Louisville and Nashville R. R. Co. *v.* State of Kentucky, Justice Matthews said : " The right to classify railroad property as a separate class, for purposes of taxation, grows out of the inherent nature of the property."

As has been seen already, the acts of 1873 and 1876 were grounded on the same general principle as the act of 1884, and it becomes important in this connection to inquire how the courts have practically regarded these former acts. In the case of *State, Central R. R. Co., pros.,* v. *Mutchler, Collector of Phillipsburg,* reported in 12 *Vroom, p.* 96, a bridge within

the main stem (one hundred feet wide) of the railroad of said company was assessed for local taxes, and the company claimed exemption from such assessment, under the laws then existing on the subject of railroad taxation.    Those laws were the acts of 1873 and 1876 before mentioned.    On page 97 the court in its opinion, delivered in 1879, said : " The first section of the act for the taxation of railroad corporations, of April 2d, 1873, exempts from county, township and municipal taxation the main stem or road-bed and track of such corporation not exceeding one hundred feet in width.    The last-mentioned act was modified by the act of April 13th, 1876, but the act of 1873 was not repealed.    Its provisions, except so far as altered by the act of 1876, are still in force.    In the respects mentioned it is in force, and lands held by such corporations within the prescribed limits are exempt from taxation for county, township and municipal purposes, if used exclusively for railroad purposes.    It purports to establish a uniform rule of taxation on this subject.    A uniform rule must necessarily be the only rule applicable to the entire class of subjects embraced within the provisions of the statute, and by implication it supersedes and excludes all other rules on the same subject.    The act of 1873 is expressly made applicable to all railroad corporations occupying or using railroads in this state, whether as lessees or otherwise."    The local assessment on the bridge was set aside. It does not appear that the question of the constitutionality of the acts of 1873 and 1876 was directly raised, or that it suggested itself to court or counsel on that occasion.    The validity of the acts was taken for granted, and the result was that the company had the benefit of those acts in being declared exempt from the tax on the bridge.    Had those acts been unconstitutional and void, the assessment for local tax on the bridge was lawful.

In *Van Riper* v. *Parsons,* 11 *Vroom* 1, 8, the Supreme Court uses the following language, viz. : "A law settling the methods by which all railroads should become incorporated would be special in the sense that it would be confined in its operation to but a single kind of corporations, and so a law would be

local, by this test, that should provide for the organization, under one system, of all the municipal governments in the state, as such law would manifestly have a restricted effect with respect to locality. But who, conversant with the usage touching these terms, would venture the assertion that such statutes as these would not be general laws. All legislation is based, of necessity, on a classification of its subjects, and where such classification is fairly made, and the legislation founded upon it is appropriate to such classification, it is as legitimate now as it would have been prior to the recent amendments to the constitution. If a set of objects be fairly classified, a law embracing them will be a general one and in all respects unobjectionable."

The case of Van Riper *v.* Parsons came before the Supreme Court again, and on page 123 of 11th Vroom the syllabus of the decision is tersely stated thus, viz.: "A law framed in general terms, restricted to no locality, and operating equally upon all of a group of objects, which, having regard to the purposes of the legislation, are distinguished by characteristics sufficiently marked and important to make them a class by themselves, is not a special or local law, but a general law." If property used for railroad and canal purposes be not distinguished from all other property by marked and important characteristics, it would be difficult to find any property which could be classified."

It should be observed that at the time the constitutional amendment was adopted, the act of 1873, which treated property used for railroad purposes as a separate class, was in force, and that feature of the act has never been changed.

The case of the *New Jersey Southern Railroad Co.* v. *Board of Railroad Commissioners*, reported in 12 *Vroom* 235, was decided more than three years after the amendment to the constitution took effect. That opinion is founded on the assumption that the acts of 1873 and 1876 for the taxation of property used for railroad purposes were constitutional and valid laws. The question of constitutionality was not in that case distinctly raised, but the validity of those acts was taken

for granted and acted upon, as has been repeatedly done by the courts during a period of ten years after the adoption of the constitutional amendment in reference to taxation. In the case to which reference is last made, the justice who delivered the opinion said : " In 1877 a state tax was laid on each of these corporations by the board of railroad commissioners, pursuant to the provisions of the act entitled ' An act providing for state taxes on railroads and a more efficient collection thereof,' approved April 13th, 1876. These writs of *certiorari* were sued out to review the legality of such assessments." The court held the assessments legal and properly made.

Although no case is reported wherein the constitutional objection to the act of 1876, or 1873, was expressly made, yet it appears by the files and records in the office of the clerk of the Supreme Court that each of the then justices had before him for review assessments on railroad property under the fourth section of the act of 1876, on claim of reduction, and that each justice proceeded to act under that section as if the law was constitutional. In one case the validity of the act was attacked, but the justice disregarded the objection and fixed the amount of the tax. A *certiorari* was taken, and to the return was attached by counsel of the company the following, viz. : " The constitution of the State of New Jersey provides that property shall be assessed for taxes under general laws and by uniform rules, according to its true value. It is submitted that the statute under which the taxes in question have been assessed is not a general, but a special law, applicable to corporate property in railroads only, and that the act is unconstitutional and void." The *certiorari* in that case was dismissed for want of prosecution, but was reinstated by consent. The writ was again dismissed and a writ of error taken, but the case was never brought to a hearing.

Under the act of 1876 large sums of money were each year collected as taxes on property used for railroad purposes and paid into the state treasury. After such action on the part of the state, and acquiescence on the part of the companies for so long a period of time under the acts of 1876 and 1873, the

question of the constitutionality of a similar act is now raised. Such acquiescence on the part of the companies affected may not be decisive upon the question of constitutionality now distinctly raised, yet the practical construction given by the courts and acted upon so long by the companies may be taken as some evidence of contemporaneous opinion. As was said by the Supreme Court in the case of *State* v. *Kelsey*, 15 *Vroom* 1, " such a course of practice may amount to a practical exposition."

The uniformity of rules in taxation which the constitution requires is that uniformity which operates on the whole of a class. A tax upon property of railway corporations should be governed by uniform rules as to the property of all such companies used for railroad purposes. The act of 1884, now under examination, is within this rule. It operates uniformly upon the property of all railroad corporations used for railroad purposes, being, as has been already demonstrated, a distinctive class, by reason of inherent qualities, and therefore not antagonistic to the constitutional requirement of uniformity.

Still another question has arisen which should here be disposed of. It is whether these companies are exempt from the assessments, made under the act of 1884, by reason of the clause inserted in their respective charters that the tax of one-half of one per cent. is in lieu of all other taxes or imposts. This is accompanied by a subsequent clause in the same connection which provides that the charter may be altered, modified or repealed. This provision is also expressed in the sixth section of the General Corporation act. Charters of this nature have received construction repeatedly in the New Jersey courts.

In *State, Jersey City and Bergen R. R. Co., pros.,* v. *Jersey City,* 2 *Vroom* 574, the justice who delivered the opinion of the Court of Errors, after quoting the clauses in the charter of the company, providing for the payment to the treasurer of the state, annually, by the company, of one-half of one per cent. on the cost of the road, and that no other tax or impost should be assessed or levied upon said company, and that the legislature might at any time alter, modify or repeal the same, said :

" The contract which is set up in the proviso in the fourteenth section of their charter before cited, which, following the provision fixing the annual sum they are to pay, declares that no other tax or impost shall be levied or assessed upon them. This designation of what they are to pay, connected with the proviso excluding all other burdens in the form of taxation, they contend, forms a contract between them and the state. These statutory provisions form, in my opinion, a contract neither in letter nor spirit. They are to be read in connection with the other provision in the charter which reserves to the legislature the right to alter, modify or repeal."

In 1 *Vroom* 368, it is decided, in referring to the latter clause, that " the language extends to all the provisions of the charter."

In *Little* v. *Bowers*, 17 *Vroom* 300, it was adjudged, in effect, that such provision in a railroad charter was not a contract, and that a railroad corporation having a repealable charter, was subject to additional taxation.

In *Tomlinson* v. *Jessup*, reported in 15 *Wall.* 454, the Supreme Court of the United States held that " the reservation affects the entire relation between the state and the corporation, and places under legislative control, all rights, privileges and immunities derived by its charter directly from the state."

Having considered the question of the constitutionality of the act of 1884 in all its bearings, after a careful examination of the organic law, and all the statutes relating to the assessment of taxes on railroad and canal property, and consulted the authorities on the subject, I have reached the conclusion that the said act does not in any particular violate the constitution of the State of New Jersey, and that it is a valid law.

The act in question is not only constitutional, but is founded on a just basis. While it requires of the companies the payment of one-half of one per cent. for state purposes, it so guards against imposition in the assessment of local taxes that in no case can a company be forced to pay more than the local rate, but may pay much less. If there be any inequality, it is favorable to the companies, and of this they have no legal

right to complain.   It is the injured party who has the right
to move for the correction of errors.

But it is contended that the act of 1884 is in violation of
the fourteenth amendment of the federal constitution, which
provides that no state shall deny to any person within its
jurisdiction the equal protection of the laws.   To sustain this
contention the case of the County of San Mateo *v.* Southern
Pacific R. R. Co., is cited.   A critical examination of that
case leads to the conclusion that it does not have the slightest
application to the question now before the court.

The county of San Mateo brought suit against the company
to recover state and county taxes claimed to be due from that
corporation.   The company had expended a large sum of
money in the construction of its road, and to secure a portion
of the indebtedness had executed a mortgage upon its railroad,
rolling-stock, appurtenances and franchises, and also upon
some land not used for railroad purposes.   The board of
equalization of the State of California assessed against the
company taxes on the whole of its property, without any
deduction from its value on account of the mortgage given
upon it to secure its indebtedness.   Under the constitution of
that state, persons operating a railroad only in one county
had the right to deduct from the valuation for mortgage debts,
while those operating a railroad in more counties than one,
could not claim deduction therefor.

There was also another distinction made in the constitution
of California, between property held by individuals and that
held by railroad corporations, which worked inequality.   In
the opinion delivered by Justice Field, in the United States
Circuit Court for California, in the San Mateo case, he said:
" If we look at the scheme of taxation prescribed by the con-
stitution of California for the property of railroad companies,
we will perceive a flagrant departure from the rule of equality
and uniformity, so essential in the distribution of the burdens
of government.   Wherever an individual holds property en-
cumbered with a mortgage, he is assessed at its value, after
deducting from it the amount of the mortgage.   If a railroad

corporation holds property subject to a mortgage it is assessed at its full value without any deduction for the mortgage, and as if the property was unencumbered.".

It will at once be seen that the facts in the San Mateo case are entirely different from those developed by an examination of the act of 1884, and how the decision in that case can be tortured into an authority to show that the act of 1884 violated, in any respect, the fourteenth amendment to the constitution of the United States, is beyond my comprehension.

The act of 1884 makes no such discrimination in the valuation of railroad property encumbered by mortgage as is made by the constitution of California. On the contrary, the act of 1884, in the tenth section, expressly provides that in case any railroad or canal company shall claim a deduction, on account of any mortgage, or debt secured thereby, the state board of assessors shall allow the same, in the cases in which and to the extent to which the local assessors are authorized by law to allow a deduction in the case of any other owner of mortgaged lands.

Upon the whole case, I am clear in the opinion that the "Act for the taxation of railroad and canal property," approved April 10th, 1884, is not unconstitutional and void, but is constitutional and valid in all its parts.

The judgment of the Supreme Court should be reversed.

DIXON, J. Under "An act for the taxation of railroad and canal property," approved April 10th, 1884, taxes were levied in that year upon all property used for railroad or canal purposes under a franchise in this state. The Central Railroad Company of New Jersey, and thirty-three other railroad and canal corporations, sued out writs of *certiorari* to review the assessments thus made, and thereupon the Supreme Court held the act to be unconstitutional, and for that reason set aside the taxes. Writs of error were then brought on behalf of the state, and the records are now before us. Although it is within the province of this court, on writ of error, not only to reverse or affirm the judgment brought up, but also, in case

of reversal, to render such judgment as should have been entered below, if the necessary facts have been settled, yet upon the argument the court confined the present inquiry to the question, in substance, whether the judgments of the Supreme Court should stand.

The defendants in error insist that the statute is invalid because it violates fundamental principles which must be observed in every exercise of the taxing power, because it does not conform to paragraph 12 of section 7 of article IV. of the state constitution, and because it infringes the fourteenth amendment of the constitution of the United States.

The general principles of taxation need but slight notice. It is laid down that the power to tax belongs to the legislature and its agents exclusively, and that the courts, in the absence of constitutional restriction, have no control over its exercise beyond seeing that the will of the legislature is enforced. By this is meant, not that the power of taxation is a limitless power, but only that the legislative authority over the subject, taxation, is absolute. Taxation is a thing capable of definition, the boundaries of which, in our system of government, are to be ascertained from the history of the English and American peoples, but over the area thus determined the will of the legislature is the supreme law. No doubt impolitic or unjust taxes may be levied, but the only remedy for such impositions is by appeal to the legislature. The courts may decide whether any particular exaction is a tax or not, but if found to be a tax, such as they whose institutions we inherit recognized as coming within the range of the taxing power, it is the duty of the judiciary to uphold the levy, regardless of their own views of its wisdom or equity. The struggle for fairness of taxation must remain in the parliamentary arena, except as it may be removed to some other sphere by constitutional provision.

With regard to the present law, nothing has been urged against it on the general principles of taxation which may not, with equal force, be urged against it on the words of our constitution, except the assertion that the legislature cannot au-

thorize a levy to be made without first determining how much is needed for governmental purposes, and confining the levy to that sum. I know of nothing in the history of taxation which gives countenance to this claim, and therefore pass on to consider the constitutional restrictions.

The state constitution declares that "property shall be assessed for taxes under general laws and by uniform rules, according to its true value."

It is clear that the case in hand is subject to this provision —that it is one wherein property is assessed for taxes. This is manifest both from the title of the statute, "An act for the *taxation* of railroad and canal *property*," and from the body of the law, by which the ownership or possession of *property* is made the sole ground for and measure of assessment. It is necessary, therefore, to ascertain the meaning of this constitutional clause.

The sentence does not import that all the property within the jurisdiction of the taxing body must be assessed. Such an aim has never been deemed attainable by theorists; such an object has never been sought after by the legislature of this state; such an interpretation has never, by any branch of the government, been put upon the provision, and its language does not fairly support such a meaning. This clause was engrafted upon our organic law by amendment, adopted September 7th, 1875, when it was still, as it long had been and yet is, an open question among political economists, how taxes should be distributed over property so that their burdens may be borne by those best fitted to sustain them, and it is reasonable to suppose that if there had been entertained a design to settle this question by constitutional edict, the design would have been plainly declared. But such an intention cannot be made apparent on the face of this amendment without adding to it a word the importance of which the framers could not have overlooked. "Property" and "all property" are not interchangeable terms, and we are not warranted in substituting one for the other. The whole purpose of the sentence appears to be to define the mode in which property shall be

dealt with when it is assessed for taxes. It requires three things in such assessments : first, that they shall be made under general laws ; secondly, that they shall be made by uniform rules ; thirdly, that they shall be made according to the true value of the property assessed. The signification of these three clauses will afford us the proper tests of the validity of the statute under review.

First. What are general laws ?

Since the expression "general laws" became prominent in our theories of constitutional construction, it has been on all hands agreed that a law operating equally throughout the state, and embracing all of a group of objects which naturally form a class by themselves, or which are fairly classified by the legislature for legislation touching the basis of classification, is a general law. This principle was enunciated by the Chief Justice in *Van Riper* v. *Parsons*, 11 *Vroom* 1, and is now firmly imbedded in our jurisprudence. For present purposes the phrase "general laws" needs no further definition.

Secondly. What are uniform rules for the assessment of property ?

In *Stratton* v. *Collins*, 14 *Vroom* 562, it was said that this clause requires that the same imposition should be made upon all the taxable property in the township for township purposes, in the county for county purposes, and in the state for state purposes. This statement, although sufficiently exact for the case then before the court, is broader than the constitution seems, on reflection, to demand. The expression "uniform rules" is not of wider import than the expression "general laws," and if the latter may be confined to a class, with equal propriety may the former. Indeed, strictly speaking, a prescript may be a uniform rule without prevailing over even a class ; for it would be a rule if designed for the government of a single individual, and if designed for the government of more than one, could be called a uniform rule. But such an interpretation would be too narrow for this constitutional phrase. Its collocation with the words "general laws" indicates that it was to have a corresponding meaning, and the

whole sentence becomes harmonious by holding that it requires the same regulations to be applied to every member of each class which the general laws recognize or establish. This signification of the word " uniform " is common. Thus, the laws of nature are uniform, although none of them is universal, and many operate in single classes only. The same idea is well illustrated in the practice of the United States government. The federal constitution provides that all duties, imposts and excises shall be uniform throughout the United States ; yet these taxes have always been levied in divers methods and amounts upon the different classes of property and business. So, it empowers congress " to establish an uniform rule of naturalization, and uniform laws on the subject of bankruptcies throughout the United States." But various rules of naturalization have been prescribed, and maintained without question, for distinct classes of aliens, as widows, minors, soldiers, seamen, and those residing here before specified dates ; and the laws for the bankruptcy of bankers and traders have differed from those concerning other persons. This diversity in uniformity can rest only on the right to classify. The same import is expressly affixed to the word in the constitutions of Pennsylvania and Illinois, which enjoin uniformity in each class only, but it is held to be implied with equal force in the constitution of Wisconsin under the provision that "the rule of taxation shall be uniform." *Wisconsin Central Railroad Co.* v. *Taylor County*, 52 *Wis.* 37. Similar views of the meaning of the term are expressed in *Youngblood* v. *Sexton*, 32 *Mich.* 406.

The third clause of the provision, that property shall be assessed for taxes according to its true value, excludes an assessment according to cost, number, weight, measure, fineness, or any other standard except true value—that is, the value which it has in exchange for money—and requires that the tax exacted from each person owning or possessing property of the class assessed shall bear the same proportion to the whole amount of taxes exacted from all persons having property of that class

as the true value of each one's classified property bears to the true value of all the property.

With these explanations of the constitutional provision, we come to examine the statute in question.

This enactment is susceptible of two interpretations : one, as being designed to authorize a single annual tax, levied upon all property in the state used for railroad or canal purposes under a franchise ; the other, as being designed to authorize such a tax for the direct use of the state, and also an annual tax for each taxing district, to be levied upon so much of the real estate, used for railroad or canal purposes in each district, as is described in subdivision 2 of section 3 of the statute. A perusal of section 12 shows that while the whole sum chargeable in each year against any company is made a unit for the purpose of collection, constituting a single lien, a single debt, recoverable by a single action, yet up to the point of ascertaining what each company shall pay for the use of the state and what for the use of each taxing district in which its property lies, the processes of assessment are distinct, or at least quite distinguishable.   The court is therefore at liberty to adopt whichever view of the act will most accord with the constitution and effectuate the legislative purpose to tax.

Let us first consider the law as one to impose a tax for the state and a separate tax for each district.

With regard to the state tax, the law provides for a board of assessors and directs these officers to ascertain the true value of all property, used for railroad or canal purposes, of each railroad and of each canal company in this state, including its franchises, and embracing in the term "company" not only corporations, but also individuals and associations owning or operating railroads or canals under a franchise ; and it imposes an annual tax of one-half of one per centum of such value upon each company.   These are the essential features of the assessment.   The act contains, besides, some instructions as to the mode of ascertaining true value and of claiming and allowing deductions for debts, &c., but these are only subsidiary to the main design, and if in themselves misleading or

unconstitutional, can be rectified or disregarded, under that provision of the act which requires the Supreme Court to correct assessments appearing to have been made upon erroneous principles or for improper amounts. If, therefore, these essential features of the law are consistent with the constitution, the law is valid, and this tax can be maintained, either as it was levied by the assessors or as it may be modified by the Supreme Court. Is the law, then, with reference to these features, constitutional?

The property to be assessed is all property used for railroad purposes and all property used for canal purposes. This is, in my judgment, legitimate classification. It is true that things used for railroad and canal purposes are not in essence different from such things when put to other uses. But classification of property need not rest upon the essence of things. The use made of them forms as just and as common a basis of classification as does their essence. So prominent in the very conception of property is the use of things that it would be singular if property as such had not been often classed upon that basis. Accordingly we find in our Crimes acts, Execution acts, Tax acts, and other statutes, that the use for which property is held is constantly made the ground for legislation concerning it. It would be a waste of time to particularize the instances. As long as railroad and canal corporations have existed in this state the property employed by them under their franchises has been placed apart from other property for both the method and the amount of taxation. The same custom has prevailed elsewhere, and has received the approval of the highest judicial authority. Said the court in *Kentucky Railroad Tax Cases*, 115 *U. S.* 321 : " The right to classify railroad property, as a separate class, for purposes of taxation, grows out of the inherent nature of the property, and the discretion vested by the constitution of the state in the legislature." Inasmuch, therefore, as the law is to prevail everywhere in the state, and also relates to entire classes of property, it meets the requirement that laws for the assessment of property shall be general.

The law also directs that the assessments upon these classes of property shall be made by uniform rules, according to the true value of the property. Its simple mandate is that each company shall pay an annual tax equal to one-half of one per centum of the true value of its property used for railroad or canal purposes, including its franchises. Some objection has been interposed to the inclusion of railroad franchises, to the effect that they are not property, and that they have no exchange value, since similar franchises may be acquired by any persons organizing under the general railroad law. It suffices to say that this act imposes no tax upon franchises, but merely requires that they shall be considered in ascertaining the value of the property assessed. The franchises intended are but the legal privileges which the company enjoys in the use of its property, and of course, therefore, should not be disregarded in determining what that property is worth to its present possessor, and would be worth to any other possessor having the same privileges; and their importance is by no means destroyed because any other person who can obtain the same kind of property may use it in the same manner.

The imposition of the tax of one-half of one per cent. is in compliance with the constitution.

Let us turn now to the local tax.

Concerning this, the law directs (section 3) that the board of assessors shall ascertain separately :

I. The length and value of the main stem of each railroad, and of the water-way of each canal—the term " main stem " to include the road-bed not exceeding one hundred feet in width, with its rails and sleepers and depot buildings used for passengers connected therewith ; the term " water-way " to include the towing-path and berme-bank.

II. The value of the other real estate used for railroad or canal purposes in each taxing district in this state.

III. The value of all the tangible personal property of each railroad and of each canal company.

IV. The value of the franchise.

It further provides (section 6) that whenever in any taxing

district there shall be several branch lines of railroad belonging to or controlled by one company, the assessors shall designate one of said lines as the main stem, and the value of the others shall be included in the separate valuation provided for in subdivision 2 of section 3.

It then enacts (section 12) that each company shall pay, in addition to said tax of one-half of one per cent., a tax at the local rate, as fixed and assessed for county and municipal purposes upon other property in each taxing district, upon the valuation of its property in the several taxing districts, separately valued and assessed under the provisions of subdivision 2 in section 3 of the act, which tax shall also be computed by the state board of assessors; but the last-mentioned rate shall in no case exceed one per cent. of the valuation of the property valued under the provisions of subdivision 2 of section 3. This tax, when collected by the state, is to be transmitted to the several taxing districts for their local uses.

The first question here again arising is whether the law for the imposition of this tax is general—whether it embraces entire classes of property. In making the assessment, the property to be valued, and upon the valuation of which the tax is to be computed, is that described in subdivision 2, exclusive of the property mentioned in the other subdivisions. Is such property capable of being regarded as a class or classes of property?

There must be conceded to the legislature a large discretion on the subject of classification, and the judiciary has no right to thwart its reasonable exercise. But with this in mind, I have not been able to find any fair basis on which the property thus subjected to special taxation for local uses can stand as a class by itself. How does the main stem of a railroad to the width of one hundred feet differ, as a class of property, from the main stem lying beyond that width? On what principle are passenger depots ranked with the main stem, and freight depots, water-tanks, and all the other necessary adjuncts of a railroad excluded? What stamps the locks and berme-bank of a canal with one character, and its planes and

feeders with another?   Or how can the mere designation of one branch line of railroad as a main stem cause it to differ from other branch lines controlled by the same company in the same district?   How will you describe, or conceive of as classes of property, groups so segregated?   The divisions thus constituted by the legislature seem to me to be defined by no substantial distinctions, but to be purely arbitrary or fanciful, and a law which deals with them exclusively is special, and not general.

That feature of the statute which limits the tax for local uses to one per cent. when the local tax on other property exceeds one per cent., has also been assailed.   But in my judgment such a limitation is permissible, provided the property so favored forms a class by itself.   As before stated, the constitution is satisfied if in each taxing district the same rules of assessment are applied to all members of the same class.

It is not plain, however, that this local tax can, under the act, be assessed according to the true value of the property on account of which it is levied.   The intention expressed in the statute is that the property described in subdivision 2 shall be valued separately from that mentioned in the other sub-divisions.   For the purposes of the state tax this direction is only a means to an end, the end being the valuation of the whole railroad and canal property; and the courts may, and in obedience to the act itself must, if necessary, renounce the designated means for the sake of the more important end.   But for the purpose of local taxes the valuation of this segregated property is the end itself, the very basis on which the tax is to be computed, and it cannot be disregarded without over-throwing the tax.   Now the question arises whether the true value of this property can be ascertained by any process of estimation which leaves out of view the main stem of the railroad, the water-way of the canal, and the franchises under which alone the property can be utilized.   This question appears to be a serious one; but it is unnecessary to pursue the matter, because, for the reason already stated, the law, so far

as it provides for the local tax, is deemed not general, and
therefore unconstitutional.   If the act had directed the assess-
ors to ascertain the true value of all the real property used
for railroad or canal purposes in each taxing district, and had
authorized taxes to be levied thereon for local uses by uni-
form rules, according to that value, the difficulties here stated
would have been avoided.   The property designated would
have composed a class, and its true value could have been de-
termined with reference to the value of the system to which
it·pertains.

Recurring, then, to the view of the statute thus far consid-
ered, it appears that the law, so far as it directs a tax of one-
half of one per cent. for state uses, is valid, and so far as it
directs a tax for local uses, is invalid.   There are no insuper-
able obstacles in the way of upholding the one tax without
the other, and the chief perplexities pointed out in argument
as attending upon the practical enforcement of the law, will
disappear if the local tax fails.

But it was said that the act might be interpreted as being
designed to authorize a single tax to be levied annually upon
all property in the state used for railroad or canal purposes,
which tax, when collected by the state, would be retained in
part for state uses, and in part be distributed among local tax-
ing districts for local uses.   If the law can be maintained for
the accomplishment of this design, it is our duty to support it.

Under this interpretation, the legislative scheme would be
that the assessors should ascertain the true value of all prop-
erty used for railroad or canal purposes ; that they should also
ascertain the true value of the property included in subdi-
vision 2 of section 3 ; that they should then determine how
much money would enable the state to retain for itself one-
half of one per cent. of the value of all the property, and to
pay over to each taxing district an ascertainable percentage of
the value of such part of that property situate in the district
as is described in subdivision 2.

So far, the steps of the law would not transgress the consti-
tution.   Considering the property to be assessed as the whole

property used for railroad or canal purposes, the valuation of the designated portions of this property might be regarded as made only in order to aid in ascertaining the gross sum to be raised, and in distributing it when collected.    And if the law had then directed or permitted the assessment of this gross sum upon the property assessed, by uniform rules, according to the true value of the property, it might have been upheld. But it does not permit such an assessment.    It requires the tax to be apportioned among the several companies, not according to the true value of each company's property as classified and assessed, but only in part according to that value, and in part according to the value of a portion arbitrarily selected from that property, and the inevitable result is that the tax exacted from each company does not bear the same proportion to the whole tax as the value of its classified property bears to the value of all the property in the class.

To illustrate this conclusion :

The total valuation of all the property in the
   state, used for railroad and canal purposes, is, $190,437,998
The total tax levied is,    -    -    -    -    1,273,670
   Which is equal to $6.68 on each $1000.
The valuation of all the property of the Central
   Railroad Company, used for railroad or canal
   purposes, is, -    -    -    -    -    -    38,756,838
Its whole tax under the act is,    -    -    -    271,840
   Which is equal to $7.01 on each $1000.
The valuation of all the property of the Easton
   and Amboy Railroad Company, used for rail-
   road or canal purposes, is,    -    -    -    8,638,062
Its whole tax under the act is,    -    -    -    53,115
   Which is equal to $6.15 on each $1000.
The valuation of all the property of the New
   York, Susquehanna and Western Railroad
   Company, used for railroad or canal purposes,
   is,    -    -    -    -    -    -    -    4,893,428
Its whole tax under the act is,    -    -    -    25,195
   Which is equal to $5.15 on each $1000.

These discrepancies in the rates of taxation do not spring from any errors of the assessors, but are necessitated by the statute itself, and no process of rational construction can conform the act to any rule of assessment which will obviate them, if the whole sum chargeable against each company is treated as an entire, indivisible tax. If, therefore, the court were shut up to this interpretation, I should be constrained to hold the whole tax invalid, because assessed in violation of the constitution.

Hence the construction first indicated should be adopted, under which the tax of one-half of one per cent. can be sustained.

It remains to consider whether this state tax is opposed to the fourteenth amendment to the federal constitution, which prohibits any state from denying to any person within its jurisdiction the equal protection of the laws.

The general object of this provision, as declared by the Supreme Court of the United States, was to prevent unjust discriminations among persons, based upon differences of race or social condition. *Slaughter House Cases*, 16 *Wall.* 36. No such discrimination is observable in the imposition of this tax. The same court has also expressly adjudged that a state law which designates railroad property as a class by itself, and provides a distinct mode of taxation for that class, but which requires the application of the same methods to all constituents of the class, so that the law will operate equally and uniformly upon all persons in similar circumstances, denies to no person the equal protection of the laws, within the meaning of the constitution of the United States. *Kentucky Railroad Tax Cases*, 115 *U. S.* 321.

The state tax is in all respects constitutional.

One other suggestion deserves notice. It is that the court may look behind the statute for other enactments to support state and local taxes against these companies. If this act had failed to impose any tax, I should have thought the court at liberty to seek elsewhere for legal taxation of railroad and canal property; but the first section of the act declares

that the tax imposed by it shall be in lieu of all other taxation upon the property subject to taxation under the provisions of the act, and having concluded that this act does impose a tax upon all the property used for railroad and canal purposes in the state, no other tax on that property can be maintained consistently with the legislative will.

The judgment of the Supreme Court, so far as it annuls the tax of one-half of one per cent., should be reversed.

REED, J. First. The constitution does not require all property to be subjected to the imposition of a tax levy.

At the time of framing the twelfth paragraph, there were in existence several state constitutions in which, in variant shapes, was the provision that all property should be taxed. The commission which drafted our amendment deliberately refrained from employing the word " all." Nor do I understand that the assertion in the opinion of the Supreme Court, that the requirement was that all and not some property should be taxed, meant that a law, to conform to the constitutional standard, must impose a tax levy upon every kind of property. I think it could only have been intended to signify that all property must be subjected to the operation of tax statutes, but that the law may operate as well by the way of exemption as by imposition. This seems apparent from the admission that it is within the scope of legislative ability to provide that certain kinds of property may be relieved from the burden of taxation, and from the recognition of property used for church, school, college and the like purposes as a kind that may be exempted.

This power of exemption was exercised in the general tax act of 1866, which statute was recognized in the case of the *North Ward Bank* v. *Newark*, 10 *Vroom* 380; *S. C.*, 11 *Vroom* 558, as a general law. Since then, in no case, in no argument, in no expression of judicial opinion, has the exercise of this power in the act of 1866 been challenged as opposed to the constitution.

Second. If, then, the legislature can impose upon some and

relieve other property from the tax rate, upon what rule must the separation of property for these purposes be made? I think it may be assumed that this cannot be done capriciously. Whether the legislature could so act, even if unfettered by a constitutional limitation, is not a question needing an answer now. That it cannot so act, in view of the twelfth paragraph of the constitutional amendment, is clear. The degree of the limitation is that both imposition and exemption must operate generally. Generality of operation has, by a long line of cases, been definitely settled to mean operation upon all of a class. Property must be taxed by general laws, namely, laws each of which includes all property included within its class; so, conversely, property must of necessity be exempted by a class or classes. The line which separates taxed from exempt property must be a line which divides classes.

Third. If taxation must be by laws each of which includes a class, does property used for railroad purposes include a class by itself? Property may be classed by reason of its inherent qualities. Real estate and personalty, tangible and intangible property, are obvious instances of differences which might be the basis of segregation for taxation by reason of inherent qualities. But I think differences may be impressed upon property by reason of the purpose for which it is used, which differences may also be the foundation of classification. A college owns lands and buildings; so does the owner of a hotel. The former may own scientific apparatus and books; so does the dealer in books and telescopes. The property of the college is, by the Tax act of 1866, exempt, but the same kind of property belonging to the owner of a hotel or a dealer in scientific instruments is subjected to taxation.

If the tax act of 1866 is a general law, and the exemption clause in that act is to be regarded as based upon a proper classification, then the exemption of the property of colleges, seminaries and cemeteries, grounded entirely upon a classification arising by reason of use, must be considered as establishing the right to select property for taxation in accordance with the same rule. I think, also, that the use of property for rail-

road purposes is in a degree distinctive as compared with all other uses of property. In the opinions of distinguished judges such property has been noticed as *sui generis*. It.is impossible to think of this property in respect to its character for the purposes of taxation without connecting the tangible things themselves with the franchise by which they are utilized. By reason of the manner of its use under a railroad charter, a belt of land which stretches through a hundred taxing districts is welded into something which, for the purposes of valuation, becomes a unit. Its property, both real and personal, is shaped and constructed for the attainment of a purpose which, without a franchise peculiar to railway companies, would be impracticable. The property stripped of the peculiar power of utilization conferred by such a franchise would be comparatively valueless. The graded road-bed, the track, the depots, the engines, the cars, for other uses than railroading, would be of little worth ; and railroading without the state's charter of power and privileges could be hardly considered a practicable undertaking. ·The public character of the functions which a railroad company performs; its right to demand fares and freight charges, and to invoke the state's prerogative to condemn lands ; its power to run trains across highways and through cities at a high degree of speed; its power to carry an element which, with all practicable guards, is still a menace to adjoining property—these and other powers, while in some respects they may be common to other corporations, are, in the aggregate, peculiar to railroad charters. Certainly the purpose for which property is used under such a charter impresses it with a distinct character, if we once admit that use can be the basis of classification. I conclude, therefore, that a law which includes in its operation all property used for railroad purposes is general.

Fourth. Must property be taxed at a uniform rate by reason of the requirement that property shall be taxed by uniform rules as well as by general laws? The constitution does not require that property shall be taxed by a single rule, but by uniform·rules. If we assent to the proposition that property

may be ranged into classes for any purpose of taxation, and also to the proposition that a law which includes all of a class is a general law, I am unable to perceive how a rule that also applies to a class lacks uniformity of operation. Judicial sentiment has been in favor of the view that the constitutional amendment was not intended to affect mere methods of procedure in levying or collecting taxes, but was designed to fix the rules by which the burden of taxation was to be distributed. Inasmuch as all property taxed is to be taxed at its true value by the express terms of the amendment, if it is also held that all property must be taxed at a uniform rate, then the power of classification is a barren privilege. Besides, I think it would follow from this construction that there is no power in the legislature to exempt property from taxation. And, conversely, if the admitted power to relieve a class or classes of property from taxation exists, how can it be said that uniformity of rule requires uniformity of rate to be imposed upon all property? And if there exists the power to deal with property so as to exempt a class entirely, there must exist the power to relieve a class partially as to rate, and so the right to legislate for classes as to rate of taxation must be recognized.

Fifth. If the statute under consideration be valid, as tested by the views above expressed in regard to the requirements of the constitution, so far as it provides for the imposition of a tax at the rate of one-half of one per cent. upon railroad property used for railroad purposes, I regard it as sound. It includes in its operation an entire class of property, and the imposition of a tax of one-half of one per cent. upon all property within this class is within the constitutional authority of the legislature. Nor do I think there is any doubt concerning the validity of the provision now involved, however, which taxes all property owned by railroad companies, but not used for railway purposes, in the same manner as other property of the same kind is taxed for local purposes. This property is segregated from other property of such companies by the fact that it is used differently or is unused, and

so it is with propriety thrown into the mass of taxable property in the several local taxing districts where it happens to be situate, and is taxed at the local rates.

But there is a further provision in the act for the taxation of a part of the property owned by these companies and used by them for the purposes of their business for local purposes. The provision selects all the property so used, excepting a main stem one hundred feet in width and the passenger depots, and imposes upon the part of such property which may be considered as belonging to each taxing district a tax at the local rate of not exceeding one per cent. The act provides that where there shall be several branch lines belonging to one corporation or operated under one management, one of the said lines shall be designated as the main stem, and the others be taxed. These features of the act I am unable to regard as either general or uniform in their operation upon a class. It exempts from local taxation a strip of land one hundred feet in width, with its tracks, and it also exempts passenger depots, whether within or outside the strip; but, at the same time, taxes other property similar in kind and devoted to similar purposes.

The commissioners are empowered to select one of two or more lines owned or managed by one company, for exemption. The one selected is in no respect different from the others which are left for taxation. And upon what ground can a passenger depot be put in one class and a freight depot in another? No ingenuity can discover here a ground for a classification which is not entirely illusive. It must be remembered that this exemption is not an accidental failure to include something within the words of the act which might properly belong to the class, but it is a well-matured design to exempt an important, in some instances the most important, part of the class from the burdens imposed upon the remainder of the class. I am compelled to view it as an arbitrary selection of property for taxation and also for exemption, and so opposed to the text of the twelfth paragraph.

It may be further observed that this lack of generality is

accompanied in this, as I think in all cases, by want of uniformity in the operation of this part of the statute.

Uniformity requires an equality of operation upon all property of the same class. It means that each owner of property of the class shall bear his proportion of the tax levied upon all the property comprising the class. If the value of the main stem and passenger depots of each one of all the companies in the state bear a like proportion to the value of its other property of the same class, then the practical operation of this part of the law would be uniform.

But no such condition of affairs as this is conceivable as an existing fact. In truth, the proportions which the two sections of property bear to each other among the different owners vary greatly. The result is that the company having a large amount of outlying property is heavily taxed, while the company whose property consists almost entirely of main stem and passenger depots pays, in comparison, next to nothing.

It is because laws of this kind operate in the way of discrimination in favor of some and adversely to other owners of the same class, that they are prescribed by the constitutional requirement of generality and uniformity of operation. This part of the statute is, in my judgment, void for these reasons, and the local taxes levied under it should be set aside.

This part of the act is severable from those portions which provide for the levy of the tax for state purposes, and the record should be remitted to the Supreme Court for its consideration of those objections to the latter tax, other than constitutional, which were reserved.

PATERSON, J. I have reached a conclusion in harmony with the opinion of the court, and therefore shall set forth the reasons for so doing but briefly on the record. Nor would I consider it at all necessary, if such reasons were similar precisely to those formulated in the judgment to be rendered. I think, besides, from the gravity of the matters involved in the determination of the case, that these views should be expressed by more than a mere signification of assent. This is

why I propose to add something to what has been said, though not required to sustain or strengthen the decision about to be given.

Until thirty-five years ago, state revenue was raised in New Jersey by assessments imposed on land and certainties, so called; that is, gold and silver coin and other property of a visible and tangible nature. This system had the merit of simplicity, but public sentiment, after a century and a half of practice, demanded a change because the burden of taxation was distributed unequally and unjustly. So, to remedy this, another species of property, invisible, incorporeal and intangible, was brought under the reach of the assessor. But under the new departure, though intended to remove the dissatisfaction existing previously, complaints of injustice were none the less frequent than before, and while the essential features were preserved, the plan was subject to constant modification. Equal taxation, like other abstract propositions, was easy to lay down in words, but to carry out in practice *hic labor, hoc opus erat.* Finally, after a quarter of a century of experimental economy, constitutional restriction, to which the legislative authority had not been subjected previously, interposed, and declared that property should be assessed for taxes under general laws and by uniform rules, according to its true value. The words are imposing and equitable in sound, but, like all similar declarations of a general nature, when submitted to the touchstone of human ingenuity, sharpened by legal acumen, are capable of various interpretations when sought to be applied to a practical result. The case now under consideration is an illustration in point. Difficulties arise at once in establishing any principle of impost on property for purposes of state revenue. Note here how learned legal critics differ as to the meaning of state tax. While that phraseology may be, and for ordinary and distinctive purposes is, distinguished from what, for similar convenience, are recognized as local or municipal assessments, still, when considered as a system or science, no tax can be regarded as other than an impost of the state, because no other authority can lay a custom levy. It is in such a

character and connection only that a judicial tribunal can contemplate the word "taxes" in a constitutional aspect. As matter of fact, any ordinary state tax, whenever laid, is collected through municipal instrumentality. Any argument drawn from a specious distinction between state and local taxation, must be outside of constitutional intent, and therefore fallacious, and should be disregarded in arriving at a final determination of this controversy.

Then, too, the single and simple word "property," the very first in the amendment restricting legislative power in this particular, has elicited vigorous judicial criticism, as well as sharp and spicy legal sparring. Who would suppose so little a phrase would involve such a wide variation as shown in the argument; that so much could have been said, so many learned words uttered, in attempting to prove the meaning of the classical little *logos* as used in the constitutional sentence? Property was to be assessed for taxes; nothing else could be. There is a popular definition of the word, in which those who have none are not concerned, and those who have generally try to keep but little on hand during the summer months. The word would seem to have but one signification for practical purposes. It is something seen and handled, touched, of which there is a visible, fixed sign. All agree to that. But it is said "property," as used in the amendment, implies totality, and if it does not, then some only, and not all, is assessed. In opposition to this, it is claimed that whatever property is assessed is a totality, is all that is required by the constitution. Here a difficulty is started that must be settled by a judicial tribunal. What meaning is contemplated by the use of the word? "Property" is the single *logos*. It is in the beginning of the sentence, single and simple, not qualified by any limitations. It must signify all or only some. The constitution does not declare that the whole or part only of property should be assessed for taxes. What is the natural construction of the word in connection with practice and contemporary exposition? Legislative power had been the sole arbiter in matters of financial economy for nearly two centu-

ries in the history of the commonwealth prior to the restric-
tions of 1875, and the latter in this respect did not limit the
discretion of that power.   The same rule has obtained since as
was followed before the amendment was adopted.   There have
been ten years of practice under the new dispensation, and
that should go far toward determining the construction of the
term.   " Property " here is a totality, and " all property "
could be no more, for the reason that both would mean what-
ever property was assessed in the exercise of legislative discre-
tion.   The construction that seems to me to be natural and
proper is that whatever property the legislature should deter-
mine to assess, whether all or a part, must be taxed after cer-
tain mode and manner.   That body, untrammeled and sove-
reign as to this, might select whatever it chose to bear the
burden of custom, tithe and tribute, and that would be a to-
tality because it would be all the property made subject to
taxation.   In my judgment there was error in the opinion of
the Supreme Court in this respect.

This leads to the consideration of the constitutionality of
the law, which is the only action a judicial tribunal can take.
The taxing power is a legislative function exclusively, and is
the life of a state government.   Taxation is a prominent factor
in state sovereignty.   The power that exercises a prerogative
of that high character cannot be stigmatized as a heresy.   The
exalted nature of the power is dwarfed because the use is so
common.   That other prerogative, the authority to declare
war, is regarded generally as the *ultima thule*, the limit beyond
which a state cannot go ; but that must be furnished with the
means of existence, or it becomes unavailing as an engine of
destruction.   It is wondrous because comparatively so uncom-
mon.   The light of the sun exceeds in intensity any product
of human ingenuity, but is matter of everyday occurrence, and
the radiance of his lustre excites no astonishment among men
because so common to the eye.   State taxation is before the
people continually, and so the transcendent nature of the
power it wields, the innate, inherent sovereign attributes it
possesses, are not recognized as if exercised less frequently.

Taxation is always with us.   Such a power, of necessity, must be arbitrary, more or less, in the execution of its details and destructions.   Judicial decision can only restrain the exercise of this power within the limits of the constitution; all other relief is legislative.   In New Jersey this prerogative of the legislature can be restricted by the interposition of a legal or equitable tribunal simply and solely because it has run beyond the bounds imposed on it.   In that case it is within the province of a court to grant relief.   A township assessor is as much an autocrat in his homœopathic domain as the quadrilateral created by the act under review is within the limits of its more imperial sway.   The acts of each may be supervised by legal authority, but such supervision does not touch or question the right of the legislature in the premises.

The issue, then, to be determined here is whether this act does or does not conflict with the constitution.   Had the legislature authority, under the restrictive amendments of 1875, to pass this particular law for the taxation of railroad and canal property?

Three essential requirements are prescribed.   Property taxed is to be assessed under general laws, by uniform rules and according to its true value.   My reflections have led me to the conclusion that the last two elements will follow the determination of the first, or that this case turns on the question whether the statute is a general law of the kind contemplated by the constitution.   I shall consider them in the reverse order.

Property is to be assessed according to its true value.   The act requires the assessors to do this, and the opinion admits that such valuation has been made under the law.   This is just what the local assessor is required to do, and if he is governed exclusively by municipal interests, is rather apt not to do.   The state assessors were appointed to perform this work; they report that in the exercise of the discretion entrusted and the powers vested in them, they have determined what they consider to be a true value of the property to be assessed. They have taken all elements into consideration, and have

fulfilled the purpose for which they were commissioned.    The properties in question, therefore, have been assessed according to the intent of the constitution; that is, at a true value through agents appointed by law.

Property, when taxed, is to be assessed by uniform rules. If it be found that the act sought to be overthrown is a general law within the limits of the constitution, then I fail to see in what way the assessors have done otherwise than cause the property they were required to tax to be so taxed by a uniform rule.    The records show that just the same plan was adopted in each case.    No discrimination in this respect is manifest.    If there was, and it appeared that one road was assessed by one rule, and one by another, and a third by a mode different from either, a multiplicity of rules must have been shown in the result of the work of the commission. After a thorough and careful examination of the records, I find no evidence of this.    Should the law stand the constitutional test, I think it clear that all the requisite essentials of uniform rules are preserved in its enactment.    Let us see how this may be.

A general law, in the abstract, must be defined in some way before it can be carried out practically.    It is by no means difficult to declare that property must be assessed under general laws.    This, laid down as a general principle, would seem to command universal assent.    Who will venture to disagree with the proposition ?    No better illustration, however, of the difficulties and differences attending on its execution can be found than is shown in the history of this statute of 1884. Take a specimen.    The appellants insist that the law is general in operation, and the framers designed to adhere to the letter and spirit of the constitution.    No legislator proposed to set up law in contravention of that.    "Oh, no," say the respondents; "that is a mighty mistake; the law is special, and not general."    I quote directly from the record.    Both are satisfied with the sound of the abstract declaration.    But when a departure is attempted from that, a variation appears that is as divergent as many minds.    Other instances of this diver-

gence could be adduced from the books of the case, of all which it may be said that like two parallel lines when extended, they run on but never meet, though, unlike those lines in this aspect, they become wider and still more wide apart upon their onward way. I can only say farther, in this connection, that it is the province of the court under such circumstances, to settle and determine the matters in litigation; and, in my view, this must be decided ultimately by ascertaining whether the statute in question is or is not a general law in the intent of the constitution. If not, the whole superstructure of the law must fall.

Property in the state is to be taxed in that way only. Then, to be so taxed, a law must run or be co-extensive with the jurisdiction of the commonwealth, and not affect simply a portion of the territorial limits. This includes all state territory, for the application of its prescription is not confined to any portion or portions, county or counties, city or cities; not even so much as a township is excepted from its operation. In this view it must be regarded as general. But the purport of the statute is to tax the property of railroads and canals, and no other kind. Is that within the meaning of the restriction? I think so, for the reason that if the word "general" is to have a signification broader or more extended than this, then taxation could be accomplished only under one single law, sweeping in all classes of individuals and property. This would be absurd, manifestly, and next to impossible, almost, to execute. A strict construction would require a repetition of this process whenever an alteration or amendment was necessary.. The true intent must be that the law-making power could not select certain property—say, for instance, that of the West End Railroad Company, or a pottery in Trenton, or an oyster fishery in Perth Amboy—and take those properties by one method and under one law, and another railroad company, pottery or oyster fishery by another method and under another law. But it does seem to me that it can take a "homogeneous mass of property" throughout the state, and now to be found in every county, without such being arbitrary

in any sense other than what is justified by the necessity always existing under any system of taxation. Selection in this way is the same as classification. I do not understand that there is any controversy but what a general law permits classification of property, and as that of railroads and canals all over the state is included in the act, I fail to see by what reasoning it can be part, and not the whole of a class. All is brought in alike and taxed; that is, all of this particular property. It is a class by itself, and but one part of a whole system. Acts for this purpose have been passed before, and no court has declared them to be contrary to the meaning of the constitution. Even corporations created by special laws have been regarded under the state system as a separate class, and to be assessed by a separate method from other corporations and railroads and canals would as certainly be a proper classification. Without extending these remarks, it is clear to me that the act must be regarded as a general law within the pale of the constitution, and I shall vote to reverse the judgment below.

No reference has been made to authorities, as those appear in the opinions already given to sustain the law, nor shall I review or criticise any of those which are adduced to maintain the contrary, than to say that I have not been able to discover any analogy between the principle involved in the San Mateo case and this.

DEPUE, J. (dissenting.) The writs of *certiorari* in these cases brought to the Supreme Court, for review, the valuation and assessment of the property of the several prosecutors, consisting of real estate used for railroad purposes, tangible personal property and franchises, made by the state board of assessors, and the taxes assessed thereon by the said board for the year 1884, pursuant to the provisions of an act of the legislature, approved April 10th, 1884, entitled "An act for the taxation of railroad and canal property." *Pamph. L.* 1884, *p.*   .

Some of the prosecutors have irrepealable charters. The

court directed the argument as to the effect of the act of 1884 upon charters having an irrepealable quality to stand over until the next term. The charters of the greater part of the prosecutors are such as contain a provision for the payment to the state, annually, of a certain sum—as, for instance, a per centum on cost or capital stock—with proviso that no other tax or impost should be laid or levied on them, and a clause reserving to the legislature the power of altering or repealing the charter. These corporations have no contract with the state on the subject of taxation. The only semblance of a contract there is under such a charter is on the part of the company to pay the sum named in its charter as a condition on which its corporate franchises were granted. The proviso that other taxes shall not be imposed is a mere legislative concession, revocable at the will of the legislature, and revoked whenever the legislature, in the exercise of its power of taxation, subjects such corporations to other or additional taxation. *State, M. & E. R. R. Co., pros.,* v. *Commissioner,* 8 *Vroom* 228, 9 *Id.* 472 ; *Little* v. *Bowers,* 17 *Vroom* 300. These corporations, in virtue of the reserved power of alteration or repeal, are liable to taxation the same as private persons, and are equally entitled to dispute the validity of the law by which taxes are imposed as not being a constitutional exercise of the power of taxation.

The tax laid by the act of 1884 is a tax upon property. The act is entitled "An act for the taxation of railroad and canal property," and the provisions in it which designate the subjects of taxation, the mode of assessment and valuation thereof, and the computation of the taxes thereon, indicate taxation on property as the purpose of the act. The tax to be assessed and levied has none of the qualities of a tax *in personam*—none of the characteristics of indirect taxation for franchises. The franchises of the corporations comprised in this act are made taxable on the true value thereof as property, and as part of the property of such corporations. The counsel on both sides discussed the case on the assumption that taxation by the act of 1884 was taxation upon property, and in

that view I concur.   The inquiry which arises, therefore, is whether the taxation provided for by the act of 1884 is in compliance with the provision introduced into the constitution by the amendments of 1875, that "property shall be assessed for taxes under general laws and by uniform rules, according to its true value."   *Const., art. IV.*, § 7, ¶ 12.

The theory of our government is that the sovereign power of taxation is unlimited, except as qualified or restrained by constitutional limitations ; that this power of taxation consists primarily in the power to select and classify the persons or property which shall be made the subjects of taxation, and when the classes of persons or kind of property set apart for taxation have been designated, then to apportion the tax among those of the class which is to bear the burden, upon the principle of uniformity—that where the burden is common there shall be a common contribution to discharge it.   *State* v. *Parker*, 3 *Vroom* 426 ; *State* v. *Township Committee of Readington*, 7 *Id.* 66.   The problem for consideration is how far the constitutional prescription that " property shall be assessed for taxes under general laws and by uniform rules, according to its true value," has restrained the power of the legislature in the selection and classification of property for the purpose of taxation.

In the distribution of the powers of government, the power of taxation is lodged in the legislative branch.   For an unwise, unjust, oppressive or unnecessary exercise of the power by the legislature there is no redress except by an appeal to the people.   So long as constitutional limitations are not exceeded or the constitutional rights of the citizen are not violated, the legislature is the supreme authority, which the courts as well as others must obey.   *Cooley on Taxation* (2d ed.), *pp.* 43–45.   But the same plan of government which lodges the power of taxation in the legislative department of the government has conferred upon the judiciary the power, and has imposed upon that branch of the government the duty to determine whether the legislature, in the method of taxation

adopted by it, has exceeded constitutional limitations or invaded the constitutional rights of citizens. Every intendment will be made in favor of the legislative act that is permissible, and any construction which is within rational bounds will be resorted to in the endeavor to harmonize the legislative plan with constitutional limitations. But if, on an investigation conducted in this spirit, it be found that the legislative act is in violation of constitutional limitations, or an infringement upon the constitutional rights of those who are made the subjects of taxation, the duty of the judiciary in the premises can neither be cast off nor evaded.

The constitutional provision invoked relates only to taxation upon property. It leaves unimpaired that branch of the taxing power which consists of the imposition of indirect taxes for the exercise of franchises or the pursuit of business, trades or occupations. Over this subject the discretion of the legislature is unrestrained, save only by the need of conforming to that essential quality of taxation, that when a class of persons or things is selected for taxation, the tax must be imposed upon individuals of the class under a rule of uniformity.

Nor does this constitutional provision require the taxation of all property which is legitimately the subject of taxation. On that construction, the argument of Mr. Collins, who appeared in this suit for the several municipalities, and contended in their behalf that by force of this constitutional provision the property of these companies became subject to taxation in the several taxing districts of the state, in common with other property in those districts, would be irresistible. The second section of the General Tax act of 1866, (*Rev.*, *p.* 1150,) and the enacting clause of the act of 1878, (*Pamph. L.*, *p.* 61,) in designating the property to be taxed, are comprehensive enough to embrace the real and personal property of all railroads and canals. The taxation of such property was taken out of the provisions of these acts by section 5 of the act of 1866 and the proviso in the act of 1878. The constitutional provision being self-executing and *proprio vigore* abrogating all special legislation on the subject, (*State,*

*North Ward Bank, pros.*, v. *Newark*, 10 *Vroom* 380, 11 *Id.* 558,) and making void all such legislation in the future, it is difficult to see how, in the light of the decisions of our courts, the exemption in the fifth section of the act of 1866, of corporations having repealable charters, from taxation on real and personal property, or that contained in the proviso in the act of 1878, could stand consistently with a constitutional requirement of such import. If special charters may be repealed by a general law, as was held by this court and the Supreme Court in *State, M. & E. R. R. Co., pros.*, v. *Commissioner of Taxation*, 8 *Vroom* 228, 9 *Id.* 472, much more clearly would the same result be effected by a self-executing constitutional provision, which, as the supreme law of the land, must operate to efface from the statute book every legislative act repugnant to its provisions.

But I do not assent to this interpretation of the constitutional provision. The power of taxation is not derived from a constitutional grant. Immediately upon the organization of the colony as a free and independent government, and the establishment of a legislative department of the government, the legislature was *ipso facto* invested with the power of taxation by a fundamental principle of government, derived from the mother country, that taxation is a legislative act, and is necessarily inherent in the legislative branch of the government. Neither of our state constitutions nor the amendments of 1875 contain any grant of the power to tax. The only provision on that subject is the amendment under discussion, and that is a restriction on the power of taxation which the legislature possessed from the organization of the government. And it is a fundamental doctrine in the interpretation of constitutional limitations derogatory to the powers of a co-ordinate branch of the government that construction should not be pushed beyond a fair and reasonable interpretation of the letter of the limitation.

The framers of the constitutional amendments, recognizing the reasonableness of exempting churches, charitable institutions and institutions of learning from taxation, and the wis-

dom and justice, in some instances, of indirect taxation, as by
taxes on franchises, trades or occupations, with the General
Tax act of 1866, which did exempt religious, charitable and
educational institutions and corporations from taxation upon
property, and the Railroad Taxation act of 1873, which laid a
tax upon franchises, before them, seemed to have avoided that
expression in the constitutional amendment which would read-
ily have occurred to them if they designed a constitutional
provision which would require all property to be taxed. The
provision adopted and recommended to the legislature, and
approved by the legislature and the people, does not require
that construction. It interdicted taxation on property unless
under general laws and by uniform rules, and according to
true values, but left unimpaired the power of the legislature,
by proper classifications, to designate the property which
should be brought under a property tax. The Supreme
Court so held in *State* v. *Yard*, 13 *Vroom* 357, and in *Strat-
ton* v. *Collins*, 14 *Id.* 562, and in that construction of the con-
stitutional provision I concur. But with the selection of the
property to be taxed the power of the legislature to discrimi-
nate ends. The rule of uniformity prescribed for taxation
prevents property from being classified, and taxed as classed,
by different rules. *Township of Pine Grove* v. *Talcott*, 19.
*Wall.* 666, 675; *Gilman* v. *City of Sheboygan*, 2 *Black* 510,
518.

In the next place, the constitutional provision does not
touch the machinery by which taxes shall be assessed or col-
lected. Every system of taxation consists of two parts—the
one relating to the assessment (the designation of the persons
or things which shall be the subjects of taxation, and the ap-
portionment of taxation among such persons or things in the
ratio prescribed by law); the other the collection of taxes by
the enforced payment thereof. The constitutional provision
in question relates only to the assessment of taxes, and in that
respect concerns only such equalization of the burden of taxa-
tion as would result from the designation of the property
which shall be the subject of taxation, and the apportionment

of the taxes thereon, under general laws and by uniform rules, according to its true value. The mere machinery by which taxes shall be assessed or collected is left in legislative discretion. *Trustees of Public Schools* v. *City of Trenton,* 3 *Stew. Eq.* 668. A railroad or canal is a peculiar kind of property, and the appraisement and valuation of such property, including the rolling stock, property used in transportation, and franchises, as a unit, by a state board of assessors, instead of an appraisal of it by local assessors in detached parts, would be indispensable in estimating such property at true value, which is the basis of taxation under the constitutional provision. A law providing for such an appraisement and valuation of all railroads and canals, and the apportionment of the valuation thereof among the proper taxing districts, to be taxed by local assessors in common with other taxable property, or providing for the entire process of laying the taxes and the collection thereof by state officers, by a sale in its entirety of the property assessed, would be a general law in compliance with the constitutional requirement that property should be assessed for taxes under general laws.

But the constitutional provision does not stop with the requirement that property should be assessed for taxes under general laws. It adds the further prescription that the assessment should be by uniform rules and at true values. The object of the constitutional provision was two-fold : the equalization of the burden of taxation in the apportionment of taxes for state purposes among the several counties, and of taxes for state and county purposes among the minor taxation districts, in which all taxes are in fact levied and collected ; and also the equalization of the burden upon all those who are subject to taxation in the political division for the use of which taxes are laid—in the state if for state purposes, in the county if for county purposes, and in the minor political divisions—townships, cities or wards—if for municipal or local purposes. By uniform rules is meant uniformity in the standard of valuation and rate of taxation. How that uniformity shall be attained will depend upon the purpose for which the particular

tax is laid. If it be for state purposes, it must be at the rate of taxation uniformly applied in the state in taxation for state purposes; if for county or municipal purposes, at the same rate at which property is taxed for such purposes. *State, Vail's Ex'rs, pros.*, v. *Runyon*, 12 *Vroom* 98. As was said by Mr. Justice Dixon, the constitutional provision requires and is satisfied by such regulations as would impose the same percentage of its actual value upon all taxable property in the township for township purposes, in the county for county purposes, and in the state for state purposes. *Stratton* v. *Collins*, 14 *Vroom* 563.

That part of the act of 1884 which provides for taxation on the property of railroad and canal companies, not used for railroad or canal purposes, is not in dispute. The controversy relates solely to the taxation of property used for those purposes. The act provides (in section 3) that property of that description shall be assessed by a state board of assessors, and at true value, and that the board should in such ascertainment ascertain separately—

" I. The length and value of the main stem of each railroad, and of the water-way of each canal, and the length of such main stem and water-way in each taxing district.

" II. The value of the other real estate used for railroad or canal purposes in each taxing district in this state, including the road-bed (other than main stem,) water-ways, reservoirs, tracks, buildings, water-tanks, water-works, riparian rights, docks, wharves and piers, and all other real estate, except lands not used for railroad or canal purposes.

" III. The value of all the tangible personal property of each railroad and of each canal company.

" IV. The value of the franchise."

Upon the entire assessed valuation of the property in these subdivisions an annual state tax is laid at the rate of one-half of one per cent. Besides the state tax, an additional tax is laid upon the property named in subdivision 2, for the benefit of the several taxing districts, at the local rates at which other property is assessed in such taxing districts for county and

municipal purposes; but it was provided that in no case should the last-mentioned rate exceed one per cent., and it is further provided that in case the state tax of one-half of one per cent. and the local tax as limited in the act would compel any company to pay more tax than the tax such company would pay if it did not pay the state tax but did pay full local rates on all the property and franchises mentioned in section 3, without any other exemptions than would be allowed to an individual citizen on such property, such deductions should then be made as would make the tax equal to the amount such company would pay on all the property and franchises mentioned in section 3 if assessed at full local rates, without any state tax.

The rate fixed by the act for local taxation upon that part of the companies' property used for railroad and canal purposes made liable to such taxation is manifestly a departure from the constitutional rule. In taxing districts where the rate of taxation for county and municipal purposes exceeds one per cent., the limitation of the tax on these companies to one per cent. produces a discrimination in assessing taxes, prejudicial to other tax-payers in such districts, and is in violation of the constitutional rule of uniformity. It is said that the discrimination being in favor of the prosecutors, they cannot avail themselves of that fact to annul the tax assessed against them. If the legislative power to lay the tax was not in controversy, and the objection was simply for inequalities in the execution of the law, the objection would not be heeded. But that presentation of the case does not correctly represent the position in which the matter is placed before the court. Taxes have been assessed against the prosecutors, the collection of which is about to be enforced. They dispute the validity of the law under which the taxes were laid, and if they present legal grounds for sustaining their contention, the court cannot refuse relief on any notion of the propriety or reasonableness of the conduct of parties. The prosecutors say that under their charters and the laws antecedent to the act of 1884 they were exempt from local taxation on this part of their property, and they insist that that exemption has not been

taken away by the act of 1884, because of the nonconformity of that law to constitutional requirements. It is the prerogative of every citizen and tax-payer to say to the government: "Tax me according to law, or not at all;" and it would be no response to the assertion of that prerogative to reply: "If you had been taxed according to law, you would have fared worse."

To avoid recurring to this subject again, I may say here, in response to the argument, so freely used, that these companies are still a favored class in the matter of taxation, that that fact would be a substantial objection to this law on constitutional grounds; for, as it seems to me, it would be impossible to sustain the law as being constitutional as applied to these prosecutors, and pronounce it to be unconstitutional when other persons, upon whose property taxes have been assessed, make resistance on the ground that the taxes assessed upon their property have not been laid upon all property liable to be assessed for taxes by a uniform rule. In *State* v. *Yard*, 13 *Vroom* 357, and in Stratton v. Collins, the constitutional question was raised by persons whose property had been assessed, on the ground that other property not assessed should have been brought in and subjected to taxation in common with their property, and at an equal rate.

The tax levied on the prosecutors for state purposes is a state tax, and is laid exclusively on the property of the prosecutors. The rate of tax fixed by the act is one-half of one per cent., subject to a certain adjustment, which I will refer to presently.

I have already said that uniformity in the rate of taxation is determined by the territory or political division for the use of which the tax is laid—that the constitution requires the same percentage of actual value upon all taxable property in the township if for township purposes, in the county if for county purposes, and in the state if for state purposes. That is the principle enunciated in Stratton v. Collins, and sustained by an unvarying line of judicial decisions. The method of laying state taxes in this state is by an equal percentage upon

all the taxable valuations in the state, and the apportionment, of the amount to be raised among the several counties in the ratio of taxable valuations in each, for assessment and collection, as other taxes are assessed and collected.

At the time the act of 1884 was passed, the act of 1881, laying a state tax for the support of schools, was in force. The tax laid by that act was laid, as I have mentioned, by an apportionment among the several counties in proportion to the amount of taxable real and personal property in each, to be assessed and collected in the manner in which other taxes were assessed, levied and collected. *Pamph. L.* 1881, *p.* 120. By these two acts—the act of 1881 and the act of 1884—we have this situation of affairs : two state taxes, the one levied exclusively on the taxable valuations of the property of railroad and canal companies, the other exclusively upon the other taxable valuations in the state. These two systems of taxation cannot stand together or be brought into harmony with uniformity in the rules of taxation. That they will inevitably produce inequality of rates in taxation is apparent. That in fact they bring about that result is demonstrated by a few figures taken from the report of the state comptroller for 1885. The total valuations of real and personal property in the state, (other than railroad and canal property,) on which the state school tax for 1884 was laid was $554,828,114.34. The state tax raised thereon was $1,424,244, and the rate of taxation to raise that sum was a small fraction over two and a half mills on each dollar. The valuation of the real and personal property of railroad and canal companies, assessed under the act of 1884, was $140,236,605.43. The tax for state purposes on that property was $701,182.05, and the rate of taxation was five mills on each dollar. The gross amount of taxable valuations of real and personal property in the state, including the real and personal property of railroad and canal companies, was $695,064,719.76. The state school tax and the tax on the real and personal property of these companies aggregated $2,125,426.05, and, laid on the gross valuation of

property in the state, would require a tax of a small fraction over three mills (three and six-hundredths) on each dollar.

But it is said that the rate of taxation named in the act of 1884 was so adjusted by the twelfth section as to secure equality in the rates of taxation both for state and local purposes. The plan adopted by that section is that in cases where the state tax and the local tax exceed the tax the companies would pay if taxed at local rates upon all their property, used for railroad or canal purposes, such deduction should be made as would make the tax equal to the amount such company would pay on all its property and franchises if assessed at full local rates without the state tax.

This plan of adjustment is plainly inefficacious to secure equality and uniformity in the rate of state taxes. Local rates are determined by that percentage on taxable valuations in the locality which is necessary for all the local purposes for which such tax is required to be laid—the expenses of local government, the supply of water, the expenses of police and fire departments, the cost of erecting school-houses, the cost of public improvements above assessments for benefits, the interest or principal of municipal indebtedness, and the like—and vary with the extravagances or misfortunes in conducting local governments. The state school tax for 1884 was raised by a rate of two and a half mills—one-quarter of one per cent. The local tax rate for the same year in Newark was two and three-hundredths per cent., in Orange two and sixty-two hundredths, and in Jersey City two and ninety-eight hundredths. A uniform rate of taxation for state purposes can be obtained only on a ratio of the tax to be raised to the taxable valuations in the state.

But I need not pursue this matter further. As I understand the views of the majority of the court, it is not claimed that the act of 1884 provides for taxation either for state or local purposes on a rule uniform with that on which taxes, state or local, are laid under the General Tax act of 1866. The position taken is this: that the constitutional provision allows a classification of property for taxation under general

.laws, and that upon such a classification the rule of uniformity prescribed by the constitution is complied with if the tax be laid upon property within the classification at an equal percentage, without regard to the rate of taxation upon other taxable property in the state; that local taxes may be laid on property in the classification at one rate and upon other property at a different rate, and state taxes be levied with the same diversity in rates, provided only that a uniform rate be observed in the tax upon property within each class; and that property used for railroad and canal purposes may be segregated into a class and subjected to taxation at any rate that may be prescribed by the legislature.

·The power of discrimination asserted in this proposition may well challenge the closest scrutiny. The classification made by the act of 1884 is either upon the use which is made of property or upon the ownership of it. On the principle adopted, lands used for agricultural purposes, city lots, lands improved or unimproved, timber, mining or mineral lands, mills, lands used for manufacturing purposes, and the implements used in agriculture or in the various branches of mechanical pursuits, may be set apart into classes and taxed at any variety of discordant rates, provided uniformity of rate be observed within each particular class. Indeed, the capacity which lies within the doctrine of classification is aptly illustrated in this case. A classification of the main stem of a railroad not exceeding one hundred feet in width, and depot buildings used for passengers, connected therewith, into one class, and other indispensable parts of the structure, such as switches, turn-outs, engine houses, freight depots, if beyond the one hundred feet, into another class, is regarded as a legitimate classification.

The authority pressed upon the attention of the court with the most confidence, as justifying this construction of our constitutional provision, is the decision of the Supreme Court of the United States in the *State Railroad Tax Cases*, reported 96 *U. S.* 575. The tax in that case had been laid under a statute of Illinois, which provided that the entire taxable property of

railroad companies should be ascertained by the state board of equalization, and that the state, county and city taxes should be collected within each municipality on this assessment in the proportion the length of the road in such municipality bears to the whole length of the road within the state. The rule for the apportionment and assessment adopted was uniform in its action on all railroad companies, but was not uniform with the method by which other property was taxed under the general tax laws. The question before the court was whether this mode of taxing railroad companies was consistent with section 1 of article IX. of the constitution of Illinois, which is in these words: "The general assembly shall provide such revenue as may be needful by levying a tax by valuation, so that every person and corporation shall pay a tax in proportion to the value of his, her or its property, such value to be ascertained by some person or persons to be elected or appointed in such manner as the general assembly shall direct, and not otherwise; but the general assembly shall have power to tax peddlers, auctioneers, brokers, hawkers, merchants, commission merchants, showmen, jugglers, inn-keepers, grocery-keepers, liquor dealers, toll bridges, ferries, insurance, telegraph and express interests or business, venders of patents, and persons or corporations owning or using franchises and privileges, in such manner as it shall, from time to time, direct by general law, uniform as to the class upon which it operates."

The court sustained the tax, upon the peculiar features of the state constitution, which expressly excepted certain classes of persons and things, among which were persons or corporations owning or using franchises and privileges, out of the general equality clause, and adopted a special equality clause for taxing such persons or things, by providing that they should be taxed *in such a manner as the legislature should from time to time direct, by general law uniform as to the class upon which it operated.* Mr. Justice Miller, in delivering the opinion of the court, placed the decision distinctly on that discrimination in the constitutional provision, "because," as he

says, "the latter part of the section, in express terms, autho-
rizes the legislature to tax persons and corporations owning
or using franchises, in such manner as it shall from time to
time direct, by general law;" and the only restriction on the
power, as applied to this class, is that it shall be "uniform as
to the class upon which it operates." He then adds: "There
can be no doubt that all the classes named in this clause
*   *   *   *   are taken out of the general rule of uniformity pre-
scribed by the first clause, and the only limitation as to them is
that of uniformity as to the class upon which the law shall
operate."

In this respect the constitution of Illinois and the constitu-
tion of this state are totally dissimilar. Our constitution
makes no discrimination in the property which the legislature
has subjected to taxation, with respect to the rules by which
it shall be taxed. The rules must be uniform whatever
method may be adopted in making the assessment, and in the
machinery by which the tax is assessed, laid or collected.
The case cited is no precedent for the construction of our con-
stitutional provision.

Another precedent cited with a great deal of confidence is
the case known as the *Kentucky Railroad Tax Cases*, reported
115 *U. S.* 321. The complaint in that case was of a statute
which discriminated against railroad companies in the fact
that railroad property, though called real estate, was classified
by itself, distinct from other real estate, and different means
were provided for ascertaining its value for the purpose of
taxation; and the protection of the fourteenth amendment of
the constitution of the United States was appealed to for relief.
The court denied relief on the ground that no constitutional
provision of the State of Kentucky had been violated. Mr.
Justice Matthews, who read the opinion of the court, puts the
decision on the ground—to quote his own language—that
"there is nothing in the constitution of Kentucky that re-
quires taxes to be levied by a uniform method upon all de-
scriptions of property. The whole matter is left to the dis-
cretion of the legislative power, and there is nothing to forbid

the classification of property for purposes of taxation, and the valuation of different classes by different methods. The rule of equality in respect to the subject only requires the same means and methods to be applied impartially to all the constituents of each class, so that the law shall operate equally and uniformly upon all persons in similar circumstances." This case is simply an elucidation of the general doctrine that where the power of the legislature is not restrained by express constitutional limitations the designation of property to be taxed and the manner of taxation·are matters within the discretion of the legislature. It is a precedent irrelevant to the construction of express constitutional limitations upon the legislative powers of taxation. *Union Pacific* v. *Cheyenne,* 113 *U. S.* 517, is a case of the same import. The court held that a statute for assessing and taxing the property of railroad and telegraph companies as a whole, and distributing it ratably among the different counties and the several taxing districts, in proportion to the number of miles in each, was valid. The tax was laid in the Territory of Wyoming, and there was not there any express constitutional restraint upon the power of taxation.

Another class of cases cited from federal and state courts is also inapplicable to this subject. I refer to decisions on the legislative power of indirect taxation by taxes on privileges, franchises, trades and occupations, and excise duties, of which *Society for Savings* v. *Coite,* 6 *Wall.* 594 ; *Head Money Cases,* 112 *U. S.* 580, 594 ; *Commonwealth* v. *Cary Imp. Co.,* 98 *Mass.* 19 ; *Youngblood* v. *Sexton,* 32 *Mich.* 406 ; *New Orleans* v. *Kauffman,* 29 *La. Ann.* 283 ; *Kittitinny Coal Co.* v. *Commonwealth,* 79 *Penna. St.* 109, are types. This branch of the legislative power of taxation is universally admitted not to come within the equality clauses in constitutional provisions relative to taxation upon property ; and in constitutions which simply provide that all taxation shall be equal, a distinction is made between taxes on property and taxes on franchises, occupations and pursuits, for the reason that in property there is always present the element of market value as the basis on

which equality in taxation can be attained by the application of a uniform rate on such values. But in franchises, trades or occupations, there is no element of value in common, and hence the rule of equality is not violated by taxation on these subjects by a rule which is uniform as to each class. The cases on this subject are cited by Mr. Justice Cooley in discussing the constitutional provisions of the several states. *Cooley on Taxation* (2d ed.), *pp.* 176–200, 379.

It may also be remarked that in *State, N. J. Southern R. R. Co., pros.,* v. *Railroad Commissioners,* 12 *Vroom* 235, and *State, Central R. R. Co. of N. J., pros.,* v. *Mutchler, Id.* 96, no constitutional question was raised or considered. The first case was submitted on briefs, which appear in the printed report of the case, and neither in the reasons filed nor in the argument of counsel, was any constitutional question presented. Nor was any question of that character raised by counsel or considered by the court in the other case, and in that case the company was, by its charter and by the General Tax act of 1866, exempt from taxation such as that of which it was relieved, irrespective of the act of 1873. *State* v. *Township of Readington,* 7 *Vroom* 66, was decided before the constitutional amendments were adopted.

With the exception of the decisions upon the peculiar language of the constitution of Illinois, the precedents in state and federal courts on express constitutional limitations upon the powers of taxation, designed to secure equality in taxation, are uniformly against any discriminations in taxation upon property. In Ohio the constitutional provision is that "laws shall be framed *taxing, by a uniform rule,* all moneys, credits, investments," &c., " and all real and personal property according to its true value in money." The Supreme Court of Ohio, in a case so often quoted, in construing the language "taxing by a uniform rule," said : "Taxing by a uniform rule requires uniformity, not only in the rate of taxation, but also uniformity in the mode of assessment upon the taxable valuation. * * * But this is not all. The uniformity must be co-extensive with the territory to which it applies. If a state

tax, it must be uniform all over the state; if a county, town or city tax, it must be uniform throughout the extent of the territory to which it is applicable. But the uniformity in the rule required by the constitution does not stop here. It must be extended to all property ·subject to taxation, so that all property must be taxed alike—equally—which is taxing by uniform rules." *Exchange Bank* v. *Hines*, 3 *Ohio St.* 1, 15. The constitutional provision in Wisconsin is "that the rule of taxation shall be uniform, and taxes shall be levied upon such property as the legislature shall direct." The charter of the city of Janesville provided for an annual tax upon all the property in the city subject to taxation, not exceeding one per cent., for current expenses, and such additional taxes for roads, bridges and the support of the poor as the common council might deem necessary. Within the corporate limits of the city, but outside of the recorded plat of the original village of Janesville, was a large quantity of farming or agricultural lands. By a subsequent act the legislature provided that lands used, occupied or reserved for agricultural or horticultural purposes should not be taxed, for city purposes, beyond one-half of one per cent., nor, for roads, bridges and support of poor, more than one-half as much per dollar as should be levied for such purposes on property within the recorded village plat. This latter act was held to be unconstitutional, as being in violation of the constitutional rule of uniformity. *Knowlton* v. *Supervisors of Rich County*, 9 *Wis.* 410. In a later case in the same court, a city charter provided for taxation upon real and personal property, and in one section gave the common council power to lay and collect a tax on all the lots and land in the city, not including any improvements thereon, to pay the city's bonded debt. This section was held to be in violation of the constitutional rule of uniformity. Mr. Justice Lyon, in the opinion of the court, said : " The true doctrine unquestionably is that while the legislature may by law exempt certain specific property or classes of property from taxation, such exemption, to be valid and operative, must be absolute and total. The legislature has no power to ex-

empt property from one tax, or from taxation for one purpose, and hold it liable to taxation for other purposes ; and this, for the reason already indicated, that it is impossible to do so without violating the rule of uniformity which the constitution requires the legislature to observe." *Hale* v. *City of Kenosha,* 29 *Wis.* 599, 604.

The Supreme Court of the United States, dealing with a statute of the same state, empowering a city to lay a tax for a particular purpose on real estate exclusively—real and personal property being taxed for other purposes—held it to be unconstitutional, and Mr. Justice Swayne, in the opinion of the court, said that " it was beyond the constitutional power of the legislature to make any discrimination. Property must be wholly exempted, or not exempted at all. No partial exemption or discrimination is permitted. To impose certain taxes exclusively upon one class of taxable property is as much a discrimination as to vary the rates of the same or other taxes upon different classes of property." *Gilman* v. *City of Sheboygan,* 2 *Black* 519.

In a later case the same learned judge, speaking of the constitutional provision of the State of Michigan, that the legislature shall provide a uniform rule of taxation except as to property paying specific taxes, said : " The object of this provision was to prevent unjust discriminations. It prevents property from being classed, and taxed as classed, by different rules. All kinds of property must be taxed uniformly or be entirely exempt." *Township of Pine Grove* v. *Talcott,* 19 *Wall.* 666, 675. The decision of the court in *Cummings* v. *National Bank,* 101 *U. S.* 154, though directed against systems of valuation intended to operate unequally, has a direct application to laws which are so framed as to produce that inequality.

These decisions establish the principle by which constitutional provisions designed for the protection of property from unequal taxation must be construed.

The endeavor in this case is to take the constitutional limitation out of this rule upon the words " under general laws."

The words " general laws " were brought into prominence

by the peculiar provisions of paragraph 11 of section 7 of article IV. of the amended constitution, which provides that the legislature shall not pass private, local or special laws in certain enumerated cases—as, for instance, regulating the internal affairs of towns and counties—but shall provide therefor by general laws. The place this expression has in this paragraph is totally unlike that which it occupies in the paragraph on the subject of taxation. In paragraph 11 the only restriction on the legislative power is that it shall legislate by general laws, and when a classification by a general law is once made, the power of the legislature to legislate over that class is unlimited. In paragraph 12, relating to taxation, an additional restriction is added. The mandate is that property shall be assessed for taxes under general laws and by uniform rules, at its true value. A construction which gives a controlling effect to the words " general law " practically exscinds the other member of the sentence; for, independent of the constitutional prescription, it is an essential quality of taxation that when a class of persons or things is selected for taxation the burden must be distributed among the members of the class on the rule of uniformity.

In the construction of constitutions, as well as of statutes, it is a cardinal principle that words are to be taken in their natural and ordinary sense, and that every word shall have a part, if possible, in declaring the intention of the maker. The words " under general laws," in this paragraph, can have full scope and operation without detracting from the effect of the other words in it. I have already said that for the purpose of assessment and valuation, and even the completion of the whole process of taxation upon railroad and canal property, the act of 1884 is for that purpose a general law. It accomplishes the purpose contemplated by the constitution by securing the true value of property, which otherwise would be valued inadequately. It fulfills the purpose of the constitution in requiring the assessment of taxes under general laws, in order that special modes of assessment and valuation, which might produce inequalities in taxation, should not be resorted

to.    But the words " under general laws " cannot be permitted to control the whole sentence of which they are only part, without overriding a fundamental rule of construction.

A construction which conforms to proper rules, at the same time, will secure the object such constitutional restrictions are presumed to have been adopted to promote—equality in taxation, which can be secured only by the application of uniform rates of taxation to property at its true value.    The language of this constitutional provision, giving words their natural meaning and the sentence a grammatical construction, can be made to signify nothing else.    If the language had been that " property shall be assessed for taxes under general laws, by uniform rules, according to its true value," it would be possible, by a refinement of construction, to impute to it the meaning that all that was required was that property should be classified for taxation and then taxed by rules uniform as between members of the same class.    But the paragraph as inserted in the constitution is given a complex form by the conjunction of the two members of the sentence in the use of the word " and," which lexicographers define to signify " that a word or part of a sentence is to be added to what precedes." *Webster's Dic.*, "*And.*"    Property is to be taxed " under general laws *and* by uniform rules, according to its true value." Both the constituent parts of the sentence, " general laws " and " uniform rules," are made essential to a valid act of taxation.    A simple reading of the sentence carries with it at once that meaning.    Contrasting the language of this paragraph with the proviso in the constitution of Illinois, or even with the language used in opinions read this morning to express a different construction, will indicate the difference in language and expression necessary to effect that purpose.    A constitutional provision expressed in that language, placed alongside of this constitutional provision, would appear to be another and a different instrument.

Under an organic law for taxing property at its true value, there can be no classification except as a means of ascertaining true values.    Different kinds of property have different grades

of value, but true value is a characteristic of all kinds of property, and peculiar to no one species so as to make it a class by itself. The classification adopted in this act is upon the use to which the property is devoted; but the use to which property is applied does not alter its true value. An engine is of the same market value in the shop of the manufacturer as when placed upon a railroad track. A locomotive moving a train of cars on the track of a railroad has no characteristics distinguishing it from an engine moving the machinery in a factory, except that the one is movable and the other stationary. Passenger cars on a steam railroad track have no characteristics distinguishing them from passenger cars on a horse railroad track, except that the former are more costly and of greater true value. Horses drawing boats for a canal company have no characteristics distinguishing them from horses drawing drays upon the streets of a city. Boats used in transportation upon canals have no peculiarities distinguishing them from boats of the same kind used in the carrying business upon the Passaic and the Hudson. The docks along the Hudson, from which ocean steamers and vessels employed in freighting or carrying passengers to domestic ports sail, have no characteristics distinguishing them from the adjacent slips from which the ferryboats of railroad companies run. The miles of wharves along the Passaic, used for the shipping and discharge of freight by private owners or navigation companies, are not characterized by any peculiarities distinguishing them from the wharves owned by the canal company, which would put them in one group for one rate of taxation, and the canal company's wharves into another group for taxation at another rate.

The Supreme Court of Pennsylvania, under a constitutional provision of that state that "all taxes shall be uniform upon the same class of subjects," held that the legislature might select its subjects of taxation, but that the tax, upon whatever laid, must be uniform, and that in the taxation of property there was no distinction between natural persons and corporations. *Fox's Appeal,* 3 *Cent. Rep.* 561, 566. In the *Rail-*

*road Tax Cases*, 92 *U. S.* 575, the tax in question was not laid upon railroad property exclusively, nor was the rate of taxation different from the rate upon other property. The property of railroad companies was included in the taxable valuations in common with other property, and the rate of taxation thereon was the same. The objection was with respect to the mode in which such property was valued and its value apportioned among the several taxing districts. The court sustained the rule adopted for the valuation and apportionment under the peculiar provision of the Illinois constitution, and, as appears by the opinion of the court on page 611, held that taxes assessed upon such property by that rule were uniform when the rate of taxation was the same on the assessment thus ascertained as it was upon other property. The constitutions of these states recognize classification in the assessment of taxes, but, as construed by judicial decisions, afford no warrant for the classification of property for the purpose of laying a particular tax on one class exclusively, or of taxing it at a different rate.

But it is said that the property of these companies possesses peculiar qualities distinguishing it.from the property of private individuals or of other corporations, in the fact that it is associated with and is necessary for the exercise of corporate franchises or the business of operating railroads or canals, and therefore may be disassociated from other property intrinsically of the same nature, for a different sort of taxation or for taxation at a different rate. Such a mode of taxation is not taxation on property at its true value. It is that method of taxation which can lawfully be resorted to only in the exercise of the power of indirect taxation, by taxation upon franchises, trades or occupations, and this act has none of the features of such a mode of taxation. It is what its title imports—taxation of property. As such, I think the mode in which it is exercised is not in conformity with the constitutional provision.

Mindful of the great importance of this case, and of the public interest in the question involved, I have given the sub-

State Board of Assessors v. Central R. R. Co.

·ject a careful and thoughtful consideration.   If my investigation had left my mind in doubt, I would defer to the opinions ·of my associates.   But investigation has produced in my mind .a conviction that the law is in violation of constitutional restrictions so strong that I cannot yield my judgment to the opinions of others.   The taxation imposed is said to be an equitable and fair method of taxing these companies.   It probably is, and the law has been executed by the board of assessors with a commendable regard to fairness.   But it is not the equity or fairness of the system, but the legislative power to tax by this method, that is brought before the court for decision.

A faulty construction of a statute does a wrong, but the injury is temporary.   The statute may be altered or repealed. The construction of constitutional law is not for a day or an occasion, and the introduction of an erroneous principle of construction is an abiding wrong that will work incalculable mischief.   Every citizen holds his rights and his property ·under the protection of the constitution, and is interested that at all times and upon every occasion sound rules of constitutional construction shall be laid down and adhered to.   In the construction of this constitutional provision every citizen having property has a direct interest.   It is a part of the organic law, adapted to be a barrier against injustice by unequal taxation.   The construction proposed to be put upon it, in effect, eradicates it from the constitution and puts the power ·of taxation where it was before the amendment was adopted, and even enlarges the power of selection and classification beyond the limits imposed by settled principles of taxation. The right to classify and to subject property to taxation in classes, at such rates and for such purposes as the legislature may will, affects property of every description and ownership in the state.   By this act it is applied to the property of the prosecutors, but who can foretell to what purposes or to what property this doctrine of classification may be extended in the future?

For these reasons I shall vote to affirm the decision below.

On the question, Shall the judgment of the Supreme Court be reversed as to the tax for state purposes?—

*For affirmance*—DEPUE.    1.

*For reversal*—THE CHANCELLOR, DIXON, PARKER, REED, SCUDDER, BROWN, CLEMENT, COLE, MCGREGOR, PATERSON, WHITAKER.    11.

On the question, Shall the judgment of the Supreme Court be reversed as to the tax for county and municipal purposes?—

*For affirmance*—DEPUE, DIXON, REED.    3.

*For reversal*—THE CHANCELLOR, PARKER, SCUDDER, BROWN, CLEMENT, COLE, MCGREGOR, PATERSON, WHITAKER.    9.